# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

-------------------------------------------------------   X

**IN RE SYNGENTA MASS TORT ACTIONS**

-------------------------------------------------------   **Judge David R. Herndon**

**This Document Relates to:**

*Tweet, et. al. v. Syngenta AG et al.* No. 3:16-cv-00255-DRH

## CONSOLIDATED AMENDED COMPLAINT

NOW COME Plaintiffs, Larry Miller, Bradley A. Ferree, and Leroy Tweet, by and through their undersigned attorneys, and for their Consolidated Amended Complaint against Defendants, Syngenta AG, Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC, Syngenta Biotechnology, Inc. and Syngenta Seeds, Inc., (collectively "Defendants" or "Syngenta") state and allege as follows:

### SHORT AND PLAIN STATEMENT OF RELIEF

The Plaintiffs are entitled to the relief they seek from the Defendants because (a) the Defendants prematurely commercialized the genetically modified corn trait at issue, and in so doing, acted negligently, recklessly, and deceptively, causing harm to the Plaintiffs, and (b) the Defendants, at the time they acted as alleged, knew of and foresaw the risk to the Plaintiffs from the acts taken, and that by acting as alleged, the Defendants breached duties that they owed the Plaintiffs to prevent precisely the harm that occurred.

## JURISDICTION AND VENUE

1.       Jurisdiction arises under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) because each of the original actions constituted a Mass Action under CAFA.  As such, the Defendants removed the original actions under 28 U.S.C. § 1453 from an Illinois state court in this judicial district.

2.       The Plaintiffs make no claim under federal law.  No federal question arises on their allegations.  Plaintiffs expressly disclaim any federal cause of action that might otherwise be available to them.

3.       Plaintiffs do not assert, and expressly disclaim, any claim based on a misrepresentation, omission, or failure to warn regarding the labeling or packaging of Defendants' products.  Plaintiffs do not seek to impose or continue in effect any requirements for labeling or packaging of the Defendants' products as described in the complaint.

4.       There is no complete diversity of citizenship in this case.  Multiple Plaintiffs, including Leroy Tweet, reside in the State of Minnesota and are citizens of that state.  Defendant Syngenta Seeds has its principal place of business in the State of Minnesota and is a citizen of that state, accordingly.  Further, multiple Plaintiffs in this mass action reside in the State of North Carolina and are citizens of that state.  Defendants Syngenta Biotech and Syngenta Crop Protection, LLC have their principal places of business in the State of North Carolina and are citizens of that state, accordingly.

5.       Multiple Plaintiffs in this mass action reside in and are citizens of the State of Illinois.  Multiple other Plaintiffs in this mass action reside in and are citizens of states

which are not contiguous to Illinois.   These non- contiguous states of citizenship of multiple Plaintiffs are North Carolina, Minnesota, Alabama, Arkansas, California, Colorado, Florida, Georgia, Idaho, Kansas, Louisiana, Maryland, Michigan, Mississippi, Nebraska, Nevada, New Mexico, New York, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, and Virginia.

6.     Jurisdiction in the originally filed state court actions was proper in Illinois pursuant to section 2-209 of the Illinois Code of Civil Procedure, 735 ILCS §§ 5/2-209(1) and (2), because each Defendant, separately and by acts concerted with the other Defendants, conducts and conducted business within this State and committed tortious acts within this State.   The business and acts the Defendants engage or engaged in in Illinois include, but are not limited to, (a) the promotion and sale of seeds in the state, including by their sales agents, (b) the use of "Syngenta Seed Advisors" to promote their products in the state, (c) the registration of agents for service of process in Illinois, (d) the maintenance of physical facilities in Illinois to make, promote, and sell products inside the state and outside it, and (e) field testing the genetically-modified corn trait at issue.   Each instance of such business and acts in Illinois constitutes purposeful availment by the Defendants of the general commerce of the state and of the farming market specifically, and each such instance was directed by the Defendants to farmers in Illinois.   Each such instance was undertaken by each Defendant for itself and as an agent for the other Defendants.

7.     Upon information and belief, Syngenta Biotech, acting in concert with the other Defendants, and as commanded by Defendant Syngenta AG, was significantly involved in the development and commercialization of the genetically modified corn trait

MIR162.  In 2005 and 2006, while it was registered as a foreign corporation with the Illinois Secretary of State, it performed multiple specific acts in Illinois which the Defendants, acting in concert, decided were necessary to commercialize the corn trait.  The commercialization occurred across the U.S. and was undertaken by the Defendants acting in concert as commanded by Defendant Syngenta AG.

8.      Specifically, in 2005 and 2006, Syngenta Biotech field tested in Illinois genetically modified corn trait MIR162 which is used in both Agrisure VIPTERA® ("VIPTERA") corn and Agrisure DURACADE™ ("DURACADE") corn.  Syngenta Biotech performed far more of these field tests in Illinois than in any other state -- three times as many than in other state.  It did so under permits issued by or notifications to, and made application for deregulation by, the United States Department of Agriculture ("USDA").  The field tests, as decided by the Defendants in concert, and as commanded by Defendant Syngenta AG, were necessary to commercialize the corn trait across the U.S., including in the states where the Plaintiffs were harmed.  Accordingly, the field tests performed by the Defendants in Illinois and other states specifically relate to all the claims made in this case.

9.      The tortious acts alleged in this Complaint occurred in pertinent part in Illinois, in counties of the state including Madison County, and also in the states of citizenship of the multiple Plaintiffs in this mass action who reside in and are citizens of Alabama, Arkansas, California, Colorado, Florida, Georgia, Idaho, Iowa, Indiana, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania,

South Carolina, South Dakota, Tennessee, Texas, Virginia and Wisconsin, which are the states of citizenship of multiple Plaintiffs.

10.     Venue for these consolidated cases was proper in the Circuit Court of Madison County, Illinois, from which these cases were removed, pursuant to section 2-101 of the Illinois Code of Civil Procedure, 735 ILCS § 5/2-101, because, inter alia, Madison County is the county of Illinois in which the Defendants' tortious acts occurred in pertinent part.   These were properly removed to this Court by the Defendants, making venue proper here.

## PLAINTIFFS

11.     Plaintiff Leroy Tweet is a resident of Rock County, Minnesota. Plaintiff maintains a farm and farms corn in Rock and Nobles Counties, Minnesota.

12.     Plaintiff Bradley A. Ferree is a resident of Greene County, Indiana. Plaintiff maintains a farm and farms corn in Clay, Sullivan, and Green Counties, Indiana.

13.     Plaintiff Larry Miller is a resident of Buena Vista County, Iowa.  Plaintiff maintains a farm, and farms corn in Carroll County, Illinois.

14.     Each Plaintiff claims actual damages exceeding $75,000, exclusive of interest and costs.

## DEFENDANTS

15.     Defendant Syngenta AG is a corporation organized and existing under the laws of Switzerland with its principal place of business at Schwarzwaldallee 215, 4058 Basel-Stadt, Switzerland.  Syngenta AG is a publicly traded company on the Swiss stock exchange.  American Depositary Receipts for Syngenta AG are traded on the New York

Stock Exchange.  Syngenta AG was formed in 2000 as a result of the merger of Novartis Agribusiness and Zeneca Agrochemicals and is the only publicly traded company among the various Syngenta entities named as defendants in this case.  Service of Syngenta AG with process under Fed. R. Civ. P. 4(h)(2) and 4(f)(1), and in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, has been initiated.

16.     Defendant Syngenta Crop Protection AG is a corporation organized and existing under the laws of Switzerland with its principle place of business at Schwarzwaldallee 215, 4058 Basel-Stadt, Switzerland.  Upon information and belief, Crop Protection AG is a subsidiary of Syngenta AG.  Service of Syngenta Crop Syngenta Protection AG with process under Fed. R. Civ. P. 4(h)(2) and 4(f)(1), and in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, has been initiated.

17.     Defendant Syngenta Corporation ("Syngenta Corp.") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3411 Silverside Road # 100, Wilmington, Delaware 19810-4812. Syngenta Corp is a subsidiary of Syngenta AG.  Syngenta Corp has been served in the consolidated actions, and is represented by counsel who have made appearances on its behalf.  Accordingly, Syngenta Corp may be served with this Consolidated and Amended Complaint through its attorneys of record. Defendant Syngenta Biotechnology, Inc. ("Syngenta Biotech") is a Delaware corporation with a principal place of business at 3054 Cornwallis Road, Durham, North Carolina 27709.  Prior to January 9, 2015, and at

times material, Syngenta Biotech was registered as a foreign corporation with the Illinois Secretary of State.  It has been served in this case and has appeared in the case in response to the summons.  If necessary, it may be served through either through its registered agent, CT Corporation System, 150 Fayetteville St., Box 1011, Raleigh, North Carolina 37601, or through the Illinois Secretary of State pursuant to 805 ILS § 5/13.45(a)(3).

18.    Upon information and belief, Syngenta Biotech, acting in concert with the other Defendants, and as commanded by Defendant Syngenta AG, was significantly involved in the development and commercialization of the genetically modified corn trait MIR162.  In 2005 and 2006, while it was registered as a foreign corporation with the Illinois Secretary of State, it performed multiple specific acts in Illinois which the Defendants, acting in concert, decided were necessary to commercialize the corn trait. The commercialization occurred across the U.S. and was undertaken by the Defendants acting in concert as commanded by Defendant Syngenta AG.

19.    Specifically, in 2005 and 2006, Syngenta Biotech field tested in Illinois genetically modified corn trait MIR162 which is used in both Agrisure VIPTERA® ("VIPTERA") corn and Agrisure DURACADE™ ("DURACADE") corn.  Syngenta Biotech performed far more of these field tests in Illinois than in any other state -- three times as many than in other state.  It did so under permits issued by or notifications to, and made application for deregulation by, the United States Department of Agriculture ("USDA").  The field tests, as decided by the Defendants in concert, and as commanded by Defendant Syngenta AG, were necessary to commercialize the corn trait across the U.S.,

including in the states where the Plaintiffs were harmed.  Accordingly, the field tests specifically relate to all the claims made in this case.

20.      Syngenta Biotechnology, Inc. has merged with Syngenta Crop Protection, LLC, and the named surviving entity from that merger is Syngenta Crop Protection, LLC.

21.     Defendant Syngenta Crop Protection, LLC is a limited liability company organized and operating under the laws of the State of Delaware with its principle place of business at 410 South Swing Road, Greensboro, North Carolina 27409-2012.  Syngenta Crop Protection, LLC has been served in the consolidated actions, and is represented by counsel who have made appearances on its behalf.  Accordingly, Syngenta Crop Protection LLC may be served with this Consolidated and Amended Complaint through its attorneys of record.  Upon information and belief, Syngenta Crop Protection, LLC was involved with the development and testing of the genetically modified corn trait MIR162 which is used in both VIPTERA corn and DURACADE corn.

22.      Defendant Syngenta Seeds, Inc. ("Syngenta Seeds") is a Delaware corporation with its principal place of business in Minnetonka, Minnesota. Syngenta develops and produces agricultural seeds, including, but not limited to, corn and soybean seeds, and in particular Viptera and Duracade. Syngenta Seeds conducts business throughout the United States, including Minnesota and Illinois. Specifically, Syngenta Seeds sells its agricultural seeds to growers either directly or through a network of dealers and distributors.  Syngenta Seeds has been served in the consolidated actions, and is represented by counsel who have made appearances on its behalf. Accordingly,

Syngenta Seeds may be served with this Consolidated and Amended Complaint through its attorneys of record.

23.     Syngenta Crop Protection, LLC and Syngenta Seeds, LLC have approximately 197 employees in Illinois.   Syngenta Crop Protection, LLC and Syngenta Seeds, Inc. are each registered to do business in Illinois. Syngenta Crop Protection, LLC and Syngenta Seeds, LLC maintain 4 offices in Illinois.

24.     Syngenta AG wholly owns, directly or indirectly, each of Crop Protection AG, Syngenta Corp., Crop Protection LLC, Syngenta Biotech and Syngenta Seeds.

25.     Syngenta AG represents itself as a global company.  According to Syngenta's own website, Syngenta AG's Board of Directors "has full and effective control of the company and holds ultimate responsibility for the company strategy."   https://www.syngenta.com/global/corporate/en/investor-relations/questions-about-syngenta/Pages/governance.aspx#1 (last visited Mar. 3, 2016).

26.     One or more members of Syngenta AG's Board of Directors or the Executive Committee established by the Board of Directors also serve as member(s) of the Board of Directors of Crop Protection AG, Syngenta Corp., Crop Protection LLC, Syngenta Biotech and/or Syngenta Seeds.

27.     Furthermore, Syngenta AG's Executive Committee formulates and coordinates the global strategy for Syngenta businesses, and maintains central corporate

policies requiring Syngenta subsidiaries, including those named as Defendants herein, under the general guidance of the Syngenta group control.

28.    Syngenta AG exercised at all times material an unusually high degree of control over each Syngenta subsidiary named as a defendant here, particularly with respect to the commercialization of VIPTERA and DURACADE corn.

29.    Employees of the Syngenta group as a whole maintain reporting relationships that are not defined by legal, corporate relationships, but in fact cross those corporate lines. For example, Crop Protection AG maintains two separate product lines – Seeds and Crop Protection– that cross the Defendants' separate legal, corporate existences.

30.    The Defendant subsidiaries are subject to additional oversight that requires them to seek approval for certain decisions from higher levels within the functional reporting structure– including in some instances Syngenta AG. Appointments of senior management personnel for the Defendant subsidiaries also may require, in certain instances, approval from individuals or governing bodies that are higher than each subsidiary's respective board of directors.

31.    Moreover, Syngenta AG and Syngenta Crop Protection AG management were intimately involved in, and in some instances directed, decisions concerning the commercialization of Viptera® without Chinese approval.

32.    Also, Syngenta AG maintains a central global finance function that governs all Defendants. Thus, the Defendant subsidiaries do not function independently but under the Syngenta AG umbrella.

33.     In addition, Defendants regularly refer to themselves as "Syngenta," with no further description.

34.     Thus, the respective jurisdictional contacts of Crop Protection AG, Syngenta Corp., Crop Protection LLC, Syngenta Biotech and Syngenta Seeds in the forum state(s) are attributable to Syngenta AG because of the unusually high degree of control Syngenta AG exercises over these subsidiaries. See, e.g., City of Greenville v. Syngenta Crop Protection, Inc. et al., 830 F. Supp. 2d550 (S.D. Ill. 2011).

35.     Upon information and belief, Defendants' acts were conducted in concert pursuant to an agreement amongst themselves to act in a collective manner.  Therefore, and for the other reasons alleged, all Defendants are jointly and severally liable for the acts complained herein.

## JOINDER OF PLAINTIFFS

36.     Plaintiffs incorporate by reference all preceding Paragraphs as though fully set Forth herein.

37.     Joinder of the Plaintiffs in this matter is proper because the claims of all Plaintiffs arise out of closely related transactions, and there are significant questions of law or fact that are common to all the parties.   All claims involve common questions regarding, inter alia, (a) Syngenta's decision to commercialize the MIR162 genetically modified corn trait in the absence of Chinese approval to import corn with that trait, (b) the Defendants' misrepresentations concerning Chinese approval, and (c) damages suffered by the Plaintiffs.

38.     These significant questions of law and fact are common to all Plaintiffs, and on that ground, all the Plaintiffs propose to try their claims together and jointly.

39.     Plaintiffs' damages derive from the same alleged overall drop in the market price of U.S. corn due to Syngenta's premature commercialization of both Viptera and Duracade.  Plaintiffs' damage model is based, in large part, on the prices for corn set by the Chicago Board of Trade, which is the world's oldest futures and options exchange.  Corn grown by farmers, including Plaintiffs, is traded on and prices are set by the Chicago Board of Trade on a daily basis.  Indeed, the Chicago Board of Trade provides a commodities exchange for corn futures for farmers, distributions, and buyers of corn.  Put simply, a specific factual nexus exists between Illinois and Defendants' tortious conduct.

## NATURE OF THE CASE

40.     Syngenta's conduct and fault is more fully described in exacting detail below, and as a consequence of the Defendants' actions Plaintiffs have suffered substantial damages, and their ability to profitably grow, cultivate, harvest and market corn is at great risk.   By way of background, beginning in 2009, Syngenta released, prematurely, a genetically modified corn trait, MIR162, under the trade name Agrisure VIPTERA™ into the U.S. market.  Syngenta's actions thereafter and as more specifically described herein caused the contamination of the entire U.S. corn supply with a genetic trait called MIR162.  During all times relevant to this complaint, MIR162 was prohibited from sale in countries such as China where it was not approved for either purchase or consumption.

41.    A substantial amount of the total U.S. corn crop, specifically including Illinois' corn production, is exported.  The U.S. exports of corn amount to billions of dollars annually. Further, the U.S. corn marketing system is commodity-based, meaning the corn grown by farmers such as the Plaintiffs in Illinois and throughout the U.S. is harvested, gathered, commingled, consolidated, and otherwise shipped from thousands of farms from which it is cultivated, harvested and passed through local, regional, and terminal distribution centers.   In order to maintain the stability of the corn marketing system and its integrity, it is essential that the U.S. corn supply and U.S. corn exports maintain the highest standards of purity and integrity.  Prior to the incidents giving rise to this lawsuit, the U.S. corn market maintained a reputation for such purity and integrity. Due to Syngenta's premature release of VIPTERA corn, sale of U.S. corn previously exported to China ceased.  During times relevant to this complaint, China refused to import U.S. corn grown, harvested and marketed by farmers and landowners such as the Plaintiffs.

42.    Plaintiffs have incurred losses arising from the rejection of U.S. grown corn by export markets.  They have sustained damage to their farmland and entire farming operations.  And because the substantial portion of the U.S. corn crop is exported annually, the United States ability and limitations of corn exports deeply impacts corn price levels, including domestic prices in the corn market.   Due solely to Syngenta's release of VIPTERA, Plaintiffs have incurred, and will continue to incur, substantial losses arising from the loss of export markets in amounts that have yet to be fully determined, but are far in excess of this Court's jurisdictional amounts for diversity jurisdiction.

43.     Syngenta is, among other things, in the business of developing and selling in this district, in Illinois and throughout the U.S., corn seed with certain genetically modified traits. After development, Syngenta then licenses corn seed with multiple genetically enhanced features, called "trait stacks," to seed manufacturers, including Syngenta subsidiaries.

44.     The primary focus of this case is Syngenta's corn containing the MIR162 trait, utilized in the VIPTERA and Agrisure DURACADE™ trait stacks. DURACADE is Syngenta's second generation of MIR162 corn and was released, sold and distributed for planting in 2014. Over seventy (70) varieties of corn utilize the MIR162 trait to produce a protein that results in insect resistance. These corn varieties are commonly referred to as VIPTERA corn and DURACADE corn, representing the particular traits the corn will express.

45.     Defendants, at the time they acted as alleged, knew of and foresaw the risk to the Plaintiffs from the acts taken, and that by acting as alleged, the Defendants breached the duty in tort that they owed the Plaintiffs to prevent precisely the harm that occurred.

46.     Plaintiffs' harm and consequent damages arise from Syngenta's intentional and reckless release of VIPTERA and DURACADE into the U.S. market prior to Syngenta obtaining approval for MIR162 import into China and other countries.

47.   VIPTERA corn has been grown, licensed, marketed, sold, and/or

otherwise disseminated in the United States since early 2009.  During times relevant to this complaint, crops or products containing MIR162 lacked approval for import into China (among other countries), and China refused to accept corn containing MIR162.

48.     Although Syngenta, during times relevant to this complaint, lacked approval to import corn or other products containing MIR162 into China, it nevertheless misinformed farmers such as the Plaintiffs about that fact, as it similarly misinformed grain elevators, grain exporters, landowners, Syngenta's own investors, the farming community, and the general public -- leading all to believe, including these Plaintiffs, that approval from China was imminent.  For example, during Syngenta's first quarter 2012 earnings conference call, Syngenta CEO Michael Mack stated "[t]here isn't outstanding approval for China, which we expect to have quite frankly within the matter of a couple days . . . we know of no issue with that whatsoever . . . ."

49.     Contrary to Syngenta's affirmative misstatements, MIR162 was not approved for import by China in 2012 and remained unapproved until December 2014.

50.     Despite knowing MIR162 had not yet been approved for import into China, Syngenta created and distributed forms and documents that imply MIR162 is accepted in China. Syngenta's "Request Form for Biosafety Certificate Issued by the Chinese Ministry of Agriculture" states, "Biosafety Certificates for the following transgenic event(s) were issued to Syngenta Seeds AG . . . by the Ministry of Agriculture (MOA) of the People's Republic of China (PRC)." Syngenta's request form includes MIR162 among approved genetically modified traits, even though MIR162 was not at that time approved for import into China.

51.    Syngenta's "Request Form for Biosafety Certificate Issued by the Chinese Ministry of Agriculture", further states: "The requested Biosafety Certificates will be provided to Recipient to assist Recipient in obtaining required authorization for shipments containing the above marked Corn Product(s) into China."   Syngenta's statement was flagrantly deceptive, and it deceived the Plaintiffs, because MIR162 had not yet been approved during the relevant time for import into China.

52.    Plaintiffs, when the above statement was made, relied upon the statement and did not know it was untrue.  This statement was not part of the product's packaging or labeling.  It did not involve a warning concerning the product, but rather involved Syngenta's claims concerning the markets available to consumers choosing to plant Syngenta's product.  Accordingly, Syngenta deceived the Plaintiffs by misleading them to believe that MIR162 had been approved for import into China, which was set to be one of the largest, if not the largest, importers of corn in the world.

53.    In November 2013, shipments of corn containing MIR162 arrived in China.  These shipments were rejected because MIR162 was present and not approved for import.   Since this initial rejection and through, at least, December of 2014, China continued to reject shipments of corn due to the MIR162 contamination caused by Syngenta.   In fact, the widespread nature of MIR162 contamination shut down, for all intents and purposes, the 2014 U.S. corn export market to China, causing billions of dollars of damages to U.S. exporters, including farmers, farm landowners and farming entities.

54.     Upon information and belief, Syngenta knew the potential for catastrophic damage when unapproved traits are released prematurely.  The NGFA and NAEGA advised:

> U.S. farmers, as well as the commercial grain handling and export industry, depend heavily upon biotechnology providers voluntarily exercising corporate responsibility in the timing of product launch as part of their product stewardship obligation.  Technology providers must provide for two critical elements: First maintaining access to key export markets like China, or for that matter any market like China that has a functional, predictable biotech-approval process in place; for restricted marketability of their products based upon approval status in major markets.  The negative consequences of overly aggressive commercialization of biotech-enhanced events by technology providers are numerous, and include exposing exporting companies to financial losses because of cargo rejection, reducing access to some export markets, and diminishing the United States' reputation as a reliable, often-preferred supplier of grains, oilseeds and grain products.  Premature commercialization can reduce significantly U.S. agriculture's contribution to global food security and economic growth.  Putting the Chinese and other markets at risk with such aggressive commercialization of biotech-enhanced events is not in the best interest of U.S. agriculture or the U.S. economy.

55.     According to the National Grain and Feed Association, Syngenta's premature release of VIPTERA corn cost the U.S. corn market a minimum of $1 Billion - and up to $3 Billion - due to the rejection and resulting seizures of U.S. containers and cargo ships transporting U.S. corn to China.

56.     Syngenta's motivation in prematurely releasing VIPTERA corn is purely profit driven, placing Syngenta's profits first and foremost ahead of the U.S. Corn interests, including but not necessarily limited to the Plaintiffs.  Upon information and belief, VIPTERA corn is presently approximately 25% of Syngenta's corn portfolio.  In 2013, Syngenta's corn sales were over $3.5 billion.

57.     Syngenta nevertheless continued its irreparable damage to U.S. exports of corn to China, even though it either knew or should have known, or actually knew, that VIPTERA corn would and had crippled exports of corn to China.  Syngenta likewise knew or should have known of the devastating effect of its release of MIR162 because, as Syngenta stated in its Bio Product Launch Policy, "We will conduct market and trade assessments to identify key import markets for all of our biotech products prior to product commercialization." See, www.syngentabiotech.com/biopolicy.aspx (as of Sept.  11, 2014).  Nevertheless, with such knowledge, Syngenta released its MIR162 in reckless disregard of the consequences from which malice may be inferred, and punitive damages should be assessed to punish Syngenta and deter others from such outrageous, selfish conduct in utter disregard of the damage to those such as the Plaintiffs.

58.     Despite the above, Syngenta continued its conduct by releasing a second version of MIR162 corn, DURACADE, once again without import approval from China.

59.     Concerned about another premature release and given the damage Syngenta singlehandedly caused to the corn export market with its premature release of VIPTERA corn, the National Grain and Feed Association ("NGFA") and North American Export Grain Association ("NAEGA") released a joint statement to Syngenta requesting that Syngenta stop the release of DURACADE corn, so that it would stop the cycle of rejection and damage.

60.     In that statement, the two organizations stated:

> NAEGA and NGFA are gravely concerned about the serious economic harm to exporters, grain handlers and, ultimately, agricultural producers - as well as the United States' reputation to meet its customers' needs - that

has resulted from Syngenta's current approach to stewardship of VIPTERA. Further, the same concerns now transcend to Syngenta's intended product launch plans for DURACADE, which risk repeating and extending the damage. Immediate action is required by Syngenta to halt such damage.

61. Yet, despite the joint petitions and pleas from the NGFA and NAEGA, Syngenta released DURACADE. This second premature release further jeopardized the Chinese import market, as DURACADE contains not only MIR162 which was still unapproved at that time, but also other traits unapproved at that time. Contamination of corn with these additional genetically modified ("GM") traits, as set forth more fully below, continued the Defendants' harm to U.S. corn shipments to China.

62. Plaintiffs are corn farmers in the business of owning and cultivation of farmland, planting, growing, and harvesting corn with the expectation of ultimately selling the corn they grow. Plaintiffs have been damaged, at least, by: 1) Syngenta's premature release of VIPTERA corn into the U.S. corn and corn seed supply which has destroyed the export of U.S. corn to China; 2) Syngenta's premature release of DURACADE corn into the U.S. corn and corn seed supply which, again, has effectively foreclosed U.S. exports of corn to China; 3) Syngenta's materially misleading statements relating to the approval status of MIR162 in China upon which Plaintiff relied or upon which Syngenta failed to disclose material facts that MIR162 was not approved in China; 4) and upon information and belief, Syngenta's widespread contamination of the U.S. corn and corn seed supply with MIR162 which will continue to result in the destruction of the U.S. corn export market to China for years to come.

63.     Defendants, at the time they acted as alleged, knew of and foresaw the risk to the Plaintiffs from the acts taken, and that by acting as alleged, the Defendants breached the duty in tort that they owed the Plaintiffs to prevent precisely the harm that occurred.

64.     Plaintiffs seek relief for compensatory, consequential, and punitive damages, and injunctive relief arising from, inter alia:

a.      Syngenta's harm to Plaintiffs caused by contamination of the general U.S. corn and corn seed supply in the form of, inter alia, (i) inability to export corn to China, (ii) diminished corn and corn product prices resulting from the loss of the entire Chinese corn import market.

b.      Syngenta's premature release of VIPTERA corn into the U.S. corn supply, knowing that once VIPTERA corn was released, it would be commingled with and would contaminate the U.S. corn supply resulting in the inability to export to markets that had not approved products containing MIR162 (such as China);

c.      Syngenta's encouragement of farmers to plant VIPTERA corn in such a manner that it would contaminate the U.S. corn supply, so that U.S. corn could not be sold to markets that had not approved products containing MIR162;

d.      Syngenta's testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn in light of knowledge that it was essentially impossible to prevent contamination of other non-VIPTERA corn via cross-pollination;

e.      Syngenta's testing, growing, storing, transporting, selling, disposing, or otherwise disseminating DURACADE corn in light of knowledge that it was essentially impossible to prevent contamination of other non-DURACADE corn via crosspollination;

f.      Syngenta's selling or otherwise disseminating VIPTERA corn in light of knowledge that it was essentially impossible to prevent contamination of other non- VIPTERA corn via cultivation, harvesting, handling, storage, and transportation, resulting in damages from loss of sales and to equipment;

g.      Syngenta's selling or otherwise disseminating DURACADE corn in light of knowledge that it was essentially impossible to prevent contamination of

other non- DURACADE corn via cultivation, harvesting, handling, storage, and transportation; and

h.    Syngenta's materially false statements and representations made regarding the regulatory-approval status of MIR162 and VIPTERA corn or, in the alternative, Syngenta used deception, fraud or false pretense, or through failure disclose material facts, through concealment or suppression of material facts, omission, deception, fraud or false pretense of material facts in connection with the regulatory-approval status of MIR162 and VIPTERA corn with the intent that the Plaintiffs rely upon their concealment, suppression or omission of material facts, all of which was a proximate cause of the Plaintiffs damages.

65.    Syngenta made the conscious decision in reckless disregard of the consequences from which malice may be inferred that it was more profitable to speed VIPTERA to the market, maximize and extract a huge profit, and recoup its research costs, even though it knew the premature release of VIPTERA corn would prevent U.S. corn from being sold to markets such as China. By doing this, Syngenta crippled the 2013 and 2014 corn export markets to China. Further, on top of devastating the entire corn market and inflicting at least $1 billion in economic damage, Syngenta prematurely released another MIR162 corn hybrid, further devastating and inflicting widespread harm to the U.S. corn market, and all causing lost sales and income to the Plaintiffs.

## FACTUAL ALLEGATIONS

### *The United States Corn Export Market*

66.    Corn is the most widely-cultivated grain crop in the U.S. The United States is a major player in the world corn trade market, and is the world's largest producer and exporter of corn.  Approximately 80 million acres of farmland is devoted to growing corn.  Nearly 20% of U.S. corn is exported to other countries.

67.    The premature release of VIPTERA corn has hurt the U.S. corn market in many ways.

68.    The NGFA determined that the premature release of VIPTERA corn caused corn prices to decline.

69.    The U.S. corn marketing system, generally, is commodity-based and gathers, commingles, and ships corn from hundreds of thousands of farmers, including Plaintiffs, through local, regional, and terminal grain elevators.   Grain elevators and other corn storage and transportation facilities are generally not equipped to test and segregate corn varieties, and to undertake testing and segregation at these facilities causes disruption and expense.

70.    After rejections of U.S. corn by China started in late 2013, Plaintiffs corn prices plunged and continued downward.

71.    VIPTERA corn was developed by Syngenta by using modern biotechnology techniques.  Syngenta modified the corn by inserting genetic material from a bacterium, Bacillus thuringiensis ("Bt").  Within the corn-biotechnology industry, corn manipulated in this fashion is commonly referred to as "Bt corn."

72.    The specific genetic material inserted into the genome of VIPTERA corn allows the genetically altered corn to produce certain proteins including Cry1Ab, mCry3A, and Vip3A.

73.    These proteins have insecticidal properties which, according to Syngenta, "controls more insects than any other trait stack on the market" including Black

Cut Worm, Corn Earworm, European Corn Borer, Fall Armyworm, Western Bean Cutworm, and Stalk Borer.

74.     VIPTERA's insecticidal protection comes from the Vip3A protein, a "vegetative insecticidal protein," which binds to the insect's midgut epithelium and forms pores, killing the insect before further crop damage may be done.

75.     Syngenta invested approximately $200 million and five to seven years developing VIPTERA corn.

76.     Notably, VIPTERA corn is protected by Syngenta patent(s) giving Syngenta the right to exclude others from selling products with the VIPTERA corn traits.  This is part of its motivation in pushing this product prior to approval from China (i.e., Syngenta is attempting to maximize its period of exclusivity when no others can sell VIPTERA corn).

77.     As a bio-engineered product, VIPTERA corn was subject to U.S. and foreign regulatory approval prior to cultivation or import.

78.     Syngenta had registered VIPTERA corn as a pesticide with the Environmental Protection Agency.

79.     VIPTERA was deregulated by the U.S. Department of Agriculture in April 2010.

80.     In the spring of 2010, Syngenta made the decision to release VIPTERA corn commercially for the 2010/11 growing season.  This release came at a time when VIPTERA corn lacked approval by import markets such as China, Japan, and the European Union.

81.     At the time of release, Syngenta believed and reassured the public that approval in Japan and the European Union was imminent.  Syngenta, however, was silent regarding China.

82.     Japan and the European Union have since approved the importation of VIPTERA corn.

83.     On December 22, 2014, Syngenta announced that it had "received the safety certificate for its Agrisure Viptera® trait (event MIR162) from China's regulatory authorities, formally granting import approval." See, http://www.syngenta.com/global/corporate/SiteCollectionDocuments/pdf/media-releases/en/20141222-en-Viptera-China-approval.pdf  (last visited Mar. 3, 2016). Despite knowing that it lacked approval to import its VIPTERA corn to China prior to December 2014, Syngenta at all relevant times prior to December 2014 encouraged farmers to grow VIPTERA corn.

*Contamination of the United States Corn Supply*

84.     Commingling different varieties of corn is always a risk during planting, harvesting, drying, storage, and transportation of corn.   Thus, once released, a corn variety will, without adequate protections, contaminate the broader corn supply.

85.     Despite contamination risks, Syngenta offered farmers a "side-by-side program" which encouraged farmers to plant VIPTERA corn side-by-side with other corn seed.

86.     Syngenta knew or should have known that encouragement of side-by-side planting of VIPTERA and non-VIPTERA corn would inevitably lead to commingling.

87.     Syngenta knew or should have known that this commingling would result in rejected shipments of U.S. corn by Chinese regulatory officials.

88.     In short, Syngenta knew or should have known of the high risk and consequences of commingling VIPTERA corn with the broader corn supply.  Syngenta encouraged farmers to disregard practices designed to prevent commingling and encouraged side-by-side planting of VIPTERA and non-VIPTERA corn, essentially ensuring the contamination by commingling.

89.     Corn replicates by cross-pollination from one plant to another.  Pollen from corn has been shown to "drift" over considerable distances and cross-breed with corn from other plants.

90.     The corn resulting from cross-pollination can express traits from the pollen- donating plant.

91.     Those knowledgeable in the field suggest that, at a minimum, pollen can travel 200 feet.  Some studies have found that cross-pollination cannot be eliminated, even at a distance of one third of a mile.  See Peter Thomison, Managing "Pollen Drift" to Minimize Contamination of Non-GMO   Corn,   The   Ohio   State   University Extension   Fact   Sheet,   available   at: http://ohioline.osu.edu/agf-fact/0153.html (last visited Sept.  16, 2015).

92.     Without adequate precautions, neighboring com fields will exchange pollen.

93.     The Thomison article states "[e]ach corn plant is capable of producing 4 to 5 million pollen grains." Id.

94.    Further, the Thomison article states "even if only a small percentage of the total pollen shed by a field of corn drifts into a neighboring field, there is considerable potential for contamination through cross pollination." Id.

95.    Syngenta, as a leader in the field of corn biotechnology, understood or should have understood the effects of contamination by cross-pollination at the time of the release of VIPTERA corn.

96.    Syngenta recognized in its "Agrisure™ Traits Stewardship Guide" that "[a] normal occurrence in corn production is cross-pollination ...  " and "[i]t is not possible to achieve 100% purity of seed or grain in any corn production system and a certain amount of adventitious pollen movement will occur."

97.    Other seed producers agree.   DuPont Pioneer published a fact sheet stating "Remember that achieving 100% purity is virtually impossible in seed or grain production." See DuPont Pioneer Maximizing Genetic Purity of Corn in the Field, available     at     https://www.pioneer.com/home/site/us/agronomy/corn-specialty-markets/#genetics (last  visited Mar.  3, 2016).

98.    Upon information and belief, Syngenta encouraged cross-pollinating of VIPTERA corn with non-VIPTERA corn and its "side-by-side program" because it knew that cross- pollination was certain to occur.   Unfortunately, this led to additional contamination of the U.S. corn supply with the MIR162 trait.

99.    To summarize, Syngenta knew that pollen drift was certain to occur  and encouraged farmers to plant VIPTERA corn in a way that promoted cross-pollination and thus contamination of the U.S. corn supply.

*VIPTERA – A Continuing  Controversy*

100.     After the 2011 planting season, but before the 2011 harvest season, Bunge North America, Inc.  ("Bunge"), a grain elevator and handler based in St.  Louis, Missouri, posted signs and distributed materials stating that VIPTERA corn would not be accepted during the harvest season.

101.   Bunge cited the lack of Chinese import approval as its reason for not Accepting VIPTERA corn.

102.     In response, Syngenta sued Bunge in the Northern District of Iowa, seeking, inter alia, preliminary and permanent injunctions requiring Bunge to stop posting materials regarding its refusal to accept VIPTERA corn, and, more importantly, requiring Bunge to accept VIPTERA corn at its facilities.  Complaint, Syngenta Seeds, Inc., v.  Bunge North America, Inc., No.  5: 11- cv-04074-MWB, (N.D.  Iowa Aug.  22, 2011) ECF No.  1.

103.      Bunge responded to the lawsuit stating" ...  we are surprised and disappointed that Syngenta has taken an action which could put at risk a major export market for U.S. corn producers [-] China."  Further, in the same statement, Bunge made clear:

> Bunge's decision not to accept Agrisure VIPTERA is consistent with the North American Export Grain Association's (NAEGA) policy to advocate that technology providers receive all major international approvals for a trait prior to seed sales.  The grain export industry, which includes Bunge, notified Syngenta more than a year ago that China is considered a major export market.

See Statement of Soren Schroder, President and CEO of Bunge North America,

https://www.bungenorthamerica.com/news/28-bunge-responds-to-syngenta-suit (last

visited Mar.3, 2016).

104.   Syngenta's request for a preliminary injunction was denied.

Memorandum Opinion and Order: Denying Motion for Preliminary Injunction, Syngenta

Seeds, Inc., v. Bunge North America, Inc., No.  5:11-cv-04074-MWB, (N.D.  Iowa Sept.

26, 2011) ECF No.  42.

105.   Syngenta knew or should have known of the high risk and consequences of

commingling VIPTERA corn with the broader corn supply.  Syngenta encouraged farmers to

disregard practices designed to prevent commingling and encouraged side-by-side planting

of VIPTERA and non-VIPTERA corn, essentially ensuring the contamination by commingling.

### The Chinese Imports Market

106.   In the past, Japan and Canada were considered the major corn import

markets Accordingly,  many biotech-trait commercialization decisions were made

based  on  approval obtained from these two countries.

107.   However, in recent years, China has become a major importer of corn and

corn products.  A recent study by the USDA shows that during the 2012/13 import year China

imported five times more corn than Canada.

http://www.usda.gov/oce/commodity/wasde/latest.pdf (last visited Mar. 3, 2016).

**Table  1**
**Corn Imports by Country by Trade Year**
**(Thousand  Metric Tons)**

|  | 2009/10 | 2010/11 | 2011/12 | 2012/13 | 2013/14 (estimated) |
|---|---|---|---|---|---|
| Japan | 15,971 |  | 14,892 | 14,412 | 15,500 |
| China | 1,296 | 979 | 5,231 | 2,702 | 3,500 |
| Canada | 2,100 | 950 | 870 | 480 | 400 |

Data compiled from USDA World Agricultural Supply and Demand Estimates available at http://www.usda.gov/oce/commodity/wasde/

108.    China, having not approved the importation of VIPTERA corn during the relevant time period, maintained a strict zero tolerance policy regarding contamination of corn imports with corn containing MIR162.

109.    This means that any detection of MIR162 in a shipment to China could result in rejection of that shipment.

110.    Syngenta had knowledge of China's zero-tolerance policy prior to the commercialization of VIPTERA corn.

111.    Further, Syngenta had knowledge that there was no means of detecting a "zero" level of MIR162 in a given sample.  At least, Charles Lee - Syngenta's North American Head of Corn - stated, when asked about potential detection methods, "Yeah, nothing can detect to zero."In other words, there is always a risk that if a corn shipment is tested in the U.S. and is negative for MIR162, a second test at port could result in a positive for MIR162.

112.    Even further, when questioned about the decision-making process to commercialize VIPTERA corn, Mr. Lee stated that commercialization was premised on U.S. deregulation and Japanese and Canadian approval.

113.   Mr. Lee stated in his deposition "we operate on the principle that we need U.S., Japan and Canada.  And so once we have those approvals, we do commercialization of the product . . . ."

114.   Therefore, Syngenta recognized that it is improper to rush a product to market without first receiving approvals from certain other countries to which U.S. corn is exported. Despite this knowledge, it did not wait for Chinese approval.

115.   There was no requirement that Syngenta commercialize VIPTERA corn at this time.   However, as stated by Mr. Lee, Syngenta was "trying to recoup [its] costs as an organization." Further, Syngenta "[l]ike anybody, [wanted] to derive some income from [its] products." Id.  At 70:22-71:13.

116.   Syngenta also commercialized VIPTERA corn before major market approval for another reason: "[y]ou have to operate in the nongeneric period [of Syngenta's patent covering VIPTERA corn].  You like to optimize that period." Id. at 72:3-6.

117.   On or about November 2013, cargo shipments of U.S. corn were rejected by Chinese regulatory officials after testing positive for VIPTERA corn.

118.   On December 24, 2013, the General Administration of Quality Supervision, Inspection and Quarantine of China issued a warning notification strengthening the inspection and supervision for the import of GMO feed materials.  This notification stated the impetus was that the Shanghai Chinese Inspection and Quarantine Service ("CIQ") had detected MIR162.   The December 24 notification indicated that all

batches of corn would now be tested at the Chinese ports for MIR162, and that any cargo which tested positive for MIR162 would be returned or destroyed.

119.    After this notification, corn transactions were at increased risk.

120.    Also, since China initially only required certification from the seller/exporter that the shipped corn did not contain MIR162, a negative test result from the seller/exporter was sufficient.  This allowed predictability in that customers in China would know from the beginning of a contract that the corn products would clear Chinese customs.

121.    Now that testing occurred at Chinese ports, an increased risk was placed on export contracts, because, as Syngenta testified, there was no way to detect a "zero" level of MIR162 (i.e., a negative test of a container in the U.S. could still result in a positive test in China).  This caused an initial amount of Chinese customers to walk away from their contracts, placed great deal of uncertainty on the market, and dramatically hurt corn prices.

122.    An increased frequency of corn shipments were testing positive, and in July 2014, China again strengthened its policy regarding MIR162.

123.    Since November of 2013 (i.e., the positive tests for MIR162 in China), Chinese imports for U.S. corn have fallen by an estimated 85%.

124.    This market shift came at a time when China was expected to import a record high 7 million tons of U.S. corn, according to estimations made by the U.S. Department of Agriculture.

125.    The rejection of U.S. corn imports has and continues to negatively impact

the global corn market.

126.    Syngenta knew or should have known that disruption to the Chinese import market would influence the global corn market.

127.    Syngenta knew or should have known that contracts between grain exporters and Chinese corn buyers would be negatively affected if MIR162 was found in grain exports to China.

### Syngenta's Admissions Regarding MIR162

128.    Syngenta knew or should have known of the damage that the rejection of corn by China would cost.  For example, the unrebutted evidence at the hearing on Syngenta's Motion for Preliminary Injunction indicated that the redirection costs for a rejected shipment of contaminated corn could be anywhere from $4 million to $20 million for a single shipment.   Memorandum Opinion and Order Regarding Plaintiff Motion for Preliminary Injunction, Syngenta Seeds, Inc., v. Bunge North America, Inc., No. 5:11-cv-04074-MWB, (N.D. Iowa Sept. 26, 2011) ECF No. 42, at 12 (emphasis added).

129.    Syngenta also knew or should have known that releasing MIR162 prior to Chinese approval would affect corn prices.

130.    In Syngenta's 2010 Full Year Results, CEO Michael Mack ("Mr. Mack") stated that Chinese "import requirements alone influence global commodity prices."

131.    During Syngenta's 2011 Half Year Earnings Report, Mr. Mack again commented on the importance of the Chinese market, stating that China "continues to have

the greatest impact on world markets, with increasing imports not just of soybeans but also now of corn."

132.   In response to a question during the first quarter 2012 earnings conference call regarding the status of Chinese approval of VIPTERA, Mr. Mack stated "[t]here isn't outstanding approval for China, which we expect to have quite frankly within the matter of a couple days . . . we know of no issue with that whatsoever . . . ."

133.   Yet as set forth in the preceding paragraphs: the CEO of Syngenta publicly stated in 2012 that approval of VIPTERA was days away.

134.   Mr. Mack's statement was made as an advertisement for VIPTERA corn.

135.   Mr. Mack referred specifically to VIPTERA corn.

136.   Mr. Mack had an economic motivation for making this statement—continued sales of VIPTERA corn.

137.   Mr. Mack's statement was disseminated sufficiently to constitute promotion within the grain industry.  His statement, and others like it, dangerously impacted the corn market by, for example, encouraging 1) farmers to plant MIR162, 2) the acceptance and commingling of MIR162 with other grains, and 3) the purchase of products containing MIR162.

138.   Obviously, Syngenta was incorrect with its prediction that Chinese approval would come in just a "matter of a couple days."

139.   In 2014, Syngenta knew or should have known that China would not approve MIR162 in time for 2014 planting.  For example, Mr. Mack stated during Syngenta's

first quarter 2014 conference call "I think it is fair to say at this point in time that we don't

have—that we will not have any approval before the start of the season.  That's for sure."

     140.   During Syngenta's 2014 second quarter earnings conference call Mr.

Mack made the following statements regarding Chinese approval of VIPTERA corn:

> You ask about VIPTERA and our regulatory issues.  Actually, I
> think this is a regulatory matter in China as opposed to any regulatory
> matter with Syngenta. The delays coming out of China are such that people
> just aren't really understanding right now even what the process is.
>
> We don't have it in hand and I wouldn't want to say any more
> about when we might have it in hand, beyond to say that there is no
> question; there is no technical question right now waiting from the Chinese
> about it, and it's been approved already in virtually every other market.  So,
> we'll see what happens over the coming weeks, months, quarters.

     141.   This statement confirms that Syngenta recognized that there was no end in

sight for problems with exports to China due to its MIR162 products.  Despite this,

Syngenta continued to sell MIR162 products, as well as launch new GMO products, none

of which were approved by China during the relevant time period.  In doing so, Syngenta

knew or should have known that its MIR162 products would continue to destroy U.S.

exports of corn to China.

     142.   Further, and despite its 2014 statements as to uncertainty in China, Syngenta

misled exporters into believing products containing MIR162 would be accepted in China.

     143.   Syngenta, currently and during much of the relevant time period, published

on its website a form entitled "Request Form for Biosafety Certificate Issued by the Chinese

Ministry of Agriculture." See, e.g., http://www3.syngenta.com/country/us/en/agriculture/

Stewardship/Documents/Biosafety-Certificate-Request-Form.pdf (last visited Sept. 16, 2015).

144.    This form states, "Biosafety Certificates for the following transgenic event(s) were issued to Syngenta Seeds AG . . . by the Ministry of Agriculture (MOA) of the People's Republic of China (PRC)."  One of the "transgenic event(s)" listed on this Syngenta form is MIR162.

145.    The Syngenta form continues, "The requested Biosafety Certificates will be provided to Recipient to assist Recipient in obtaining required authorization for shipments containing the above marked Corn Product(s) into China," and additionally states, "The Biosafety Certificate(s) provided allows importation of the above marked Corn Product(s) as raw materials for processing for food and feed use only, not for any research purpose or cultivation purpose."

146.    The implication of this form is clear: if completed (by, for example, an exporter), Syngenta will issue Biosafety Certificates, which will ensure the cargo can enter into China.

147.    Syngenta's request form was released as an advertisement for VIPTERA corn, as it indicates that products containing MIR162 may be imported into China.

148.    Syngenta's request form refers specifically to MIR162, the key trait in VIPTERA corn.

149.    Syngenta had an economic motivation to include MIR162 on its request form, even though Syngenta knew MIR162 was not approved for import into China at the time: to maximize the length of time it could exclusively sell corn containing MIR162 under its various patents.

150.   Syngenta's form was disseminated sufficiently to constitute promotion within the seed sales industry.

151.   The statements made by Syngenta officials above show Syngenta knew that while the other Corn Products/transgenic events identified on this form were approved in China, MIR162 was not.

## PLAINTIFFS' CLAIMS FOR RELIEF

### COUNT I
### PUBLIC NUISANCE
### (As to all Plaintiffs)

152.   Plaintiffs incorporate by reference all preceding Paragraphs as though fully set forth herein.

153.   Through the conduct alleged above, Syngenta has created a public nuisance by causing widespread contamination of the U.S. corn supply with the MIR162 trait.

154.   This unreasonable interference is imposed on the community at large and on a considerable diverse number of persons and entities.   It arises from Syngenta's testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn: (a) without adequate precautions to prevent contamination of the U.S. corn and corn seed supplies; (b) with the knowledge that VIPTERA corn would contaminate other corn; (c) with the knowledge that this contamination would likely affect the U.S. corn and corn seed supplies; or (d) with the knowledge that there was a substantial risk of contamination of corn and corn seed supplies earmarked for export.

155.   Syngenta has unreasonably interfered with the public's right to expect compliance with the federal laws governing the testing, growing, storing, transporting, selling, disposing, or otherwise disseminating VIPTERA corn.   Syngenta has further unreasonably interfered with the public's right to expect that the corn sold to the general public is free from contamination with VIPTERA corn as well as the public's right to be notified of whether the corn sold to the public is contaminated with genetically-modified organisms—including corn containing MIR162—so that the public has the freedom to choose to purchase and consume non-contaminated corn.

156.   This interference is unreasonable in that it involves a significant interference with the public health, the public safety, the public peace, the public comfort, or the public convenience. It is also unreasonable in that it is proscribed by law, is of a continuing nature, and has produced a permanent or long-lasting effect.

157.   Plaintiffs  have suffered harm caused by Syngenta's public nuisance distinct from and different than that suffered by the general public in that, as described above, they have suffered business losses in the form of, among other things, the rejection of the crops by certain export markets, namely China.

158.   This constitutes an unreasonable and substantial interference with rights common to the general public, restricted demand for their products and services in certain markets; and reduced prices for their corn in all markets.

159.   In light of the surrounding circumstances, Syngenta knew or should have known that their conduct would naturally or probably result in injuries and damages to the Plaintiffs. Nevertheless, Syngenta continued such conduct in reckless disregard of or

conscious indifference to those consequences from which malice may be inferred and, consequently, punitive damages should be assessed to punish and deter.

### COUNT II
### PRIVATE NUISANCE
### (As to all Plaintiffs)

160.   Plaintiffs incorporate by reference all preceding Paragraphs as though fully set forth herein.

161.   Syngenta has created a private nuisance through the sale and distribution of Viptera corn. Syngenta licensed, sold, and distributed Viptera corn negligently and/or intentionally, without regard for the cross-pollination that results when Viptera corn pollen drifts to neighboring, non-Viptera fields. As a result, the entire U.S. corn farming and production chain, including, but not limited to, farmland, farming equipment, storage facilities, harvesting equipment, and transportation facilities and equipment of Plaintiffs are contaminated with Viptera.   The interference caused by the pollen drift has been material, substantial and unreasonable such to cause a nuisance to exist.

162.   Syngenta's acts or omissions interfered with the use and enjoyment of Plaintiffs' rights, comfort, and convenience.

163.   The interference with the use and enjoyment of the property caused by Syngenta is substantial, unreasonable, and ongoing and is imposed not just on Plaintiffs but on a considerable number of individuals and entities. Plaintiffs, though, have suffered injuries distinct from the general public in that Plaintiffs have suffered and continue to suffer business losses in the form of reduced or restricted demand for

Plaintiffs' crops, reduced prices for Plaintiffs' crops, and diminution in value of Plaintiffs'

corn harvesting.

164.   Syngenta's acts and omissions are the direct and proximate cause of the

damages suffered by Plaintiffs.

**COUNT III**
**COMMON LAW NEGLIGENCE**
**(As to all Plaintiffs)**

165.   Plaintiffs incorporate by reference all preceding Paragraphs as though fully

set forth herein.

166.   With respect to its testing, growing, storing, transporting, selling,

disposing, or otherwise disseminating VIPTERA corn, Syngenta had a duty to utilize its

professional expertise and exercise that degree of skill and learning ordinarily used under

the same or similar circumstances by a person or entity in Syngenta's business.

167.   Syngenta breached its duty by acts and omissions including but not

limited to:

      a.   Prematurely commercializing VIPTERA and DURACADE on a
         widespread basis without reasonable or adequate safeguards;

      b.   Instituting a careless and ineffective "stewardship" program, which
         ensured contamination of the U.S. corn supply;

      c.   Failing to enforce or effectively monitor its stewardship program;

      d.   Selling VIPTERA and/or DURACADE to thousands of corn
         farmers with knowledge that they lacked the mechanisms,
         experience, ability and/or competence to effectively isolate or
         "channel" those products;

      e.   Distributing misleading information about the importance of the
         Chinese market; and

    f.   Distributing misleading information regarding the timing of China's approval of VIPTERA and/or DURACADE.

168.   Upon information and belief, Syngenta further breached their duty by failing to notify the appropriate regulatory bodies and the public in a timely fashion after it first learned of the contamination of the U.S. corn supply with MIR162.

169.   The damages incurred by Plaintiffs were or should have been foreseen by Syngenta as Syngenta understood the risks of releasing VIPTERA corn, including but not limited to, the near certainty of cross-pollination, risks of intentional or unintentional commingling of VIPTERA corn with non-VIPTERA corn, China's zero-tolerance policy for MIR162, and China's large, and growing, U.S. corn import market.

170.   Syngenta breached its duties, as alleged above and breached the requisite standard of care owed to Plaintiffs, and was therefore negligent.

171.   Syngenta's breaches are a direct and proximate cause of the injuries and damages sustained by the Plaintiffs in amounts not yet fully determined but far in excess of any amounts necessary for diversity jurisdiction.

172.   Syngenta's conduct was willful, wanton and in reckless disregard for the rights of others, including the Plaintiffs.

## COUNT IV
## PRODUCTS LIABILITY
### (As to all Plaintiffs)

173.   Plaintiffs incorporate by reference all preceding Paragraphs as though fully set forth herein.

174.   Syngenta was and continues to be a supplier of VIPTERA and/or

DURACADE corn.

175.   Syngenta has in the past and continues to manufacture, sell, or otherwise distribute VIPTERA and/or DURACADE corn.

176.   VIPTERA and/or DURACDE corn was used in a manner reasonably anticipated.

178.   As a direct and proximate result of the defective and unreasonably dangerous condition of VIPTERA and/or DURACADE corn as it existed when it left Syngenta's control, the Plaintiffs have sustained injuries and damages as alleged above.

179.   In light of the surrounding circumstances, Syngenta knew or should have known that their conduct would naturally or probably result in injuries and damages to the Plaintiffs, yet continued such conduct in reckless disregard for the consequences from which malice may be inferred and, accordingly, punitive damages should be imposed to both punish and deter.

180.   Syngenta's VIPTERA and/or DURACDE corn is the direct and proximate cause of the injuries and damages sustained by the Plaintiffs.

## COUNT V
## TORTIOUS  INTERFERENCE  WITH  BUSINESS ACTION
### (As to all Plaintiffs)

181.   Plaintiffs incorporate by reference all preceding Paragraphs as though fully set forth herein.

182.   Plaintiffs had business relationships whereby Plaintiffs would sell their corn  to grain purchasers.  These business relationships were memorialized by invoices, receipts, and other documents showing a consistent course of sales.

183. Plaintiffs had a reasonable expectation of economic gain resulting from the relationships with their grain purchasers. Plaintiffs reasonably expected to continue to sell corn from their farms to such companies, and that the price at which they would be able to do so would be based on marketplace conditions and would not be adversely affected by the contamination of the U.S. corn supply with corn seed products that were not approved in all major export markets. Plaintiffs rightfully maintained the expectation that such business relationships would continue in the future.

184. Syngenta knew that Plaintiffs and other farmers had business relationships with such grain elevators and supply companies in the normal chain of crop export and sales, and Syngenta was fully aware that Plaintiffs and other farmers expected these business relationships to continue in the future.

185. Despite this knowledge, Syngenta made representations that deceived farmers and other consumers as to whether grain elevators and other supply companies would accept MIR162 corn, and deceived farmers and other consumers regarding the negative impact of MIR162 on U.S. corn prices. These misrepresentations stated that MIR162 corn is or would imminently be approved for import into China.

186. Syngenta interfered with these prospective future business relationships through its conscious decision to bring MIR162 corn to the market. Syngenta knew, or should have known, that releasing MIR162 corn would lead to the contamination of all U.S. corn shipments and prevent U.S. corn from being sold in China, which had not granted import approval.

187.   Syngenta's release of MIRl62 corn destroyed the export of U.S. corn to China and caused depressed prices for all domestic corn producers.  Thus, Plaintiffs have been unable to sell their corn to grain elevators and supply companies at the price they reasonably expected to receive.

188.   Syngenta intentionally interfered with Plaintiffs' prospective business relationships; and Syngenta knew the interference was certain or substantially certain to occur as a result of its conduct in releasing MIR162 corn into the U.S. market.

189.   Plaintiffs have been proximately damaged and continue to be damaged as a result of Syngenta's interference.

190.   Syngenta's tortious conduct serves as a direct and proximate cause of the injuries and damages sustained by Plaintiffs.

**COUNT VI**
**STRICT LIABILITY**
**(As to Plaintiffs  from Illinois, Minnesota, Indiana, and Iowa)**

191.   Plaintiffs incorporate by reference all preceding Paragraphs as though fully set forth herein.

192.   Syngenta developed and distributed Viptera corn seed, a defective and unreasonably dangerous product that, when used as anticipated, produced corn that has not been approved for human consumption by China and the European Union.

193.   The sale and distribution of Viptera corn resulted in the contamination of the U.S. grain production and handling system, causing export markets to restrict, or ban altogether, importation of U.S. corn. Exercise of reasonable care could not have eliminated the risk of such contamination and resulting injuries.

194.   Given the structure and operation of the U.S. grain production and handling system, Syngenta's sale and distribution of Viptera corn was improper.

195.   Any benefit derived from the cultivation of Viptera corn is greatly outweighed by the harm resulting from Viptera contamination of the U.S. corn supply.

196.   Plaintiff seeks compensatory damages and all costs and fees as allowed by law.

**COUNT VII**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND**
**DECEPTIVE BUSINESS PRACTICES ACT**
**(As to Illinois Plaintiffs)**

197.   Plaintiffs incorporate by reference all preceding Paragraphs as though fully set forth herein.

198.   Corn seed such as VIPTERA and DURACADE is an object, good, and/or commodity constituting merchandise pursuant to 815 Ill. Comp. Stat. 505/1.

199.   Syngenta engaged in numerous unfair acts or practices in the timing, scope and terms under which it commercialized VIPTERA and DURACADE, including, but not limited to:

a.   Prematurely commercializing VIPTERA AND DURACADE on a widespread basis without reasonable or adequate safeguards;

b.   Instituting a careless and ineffective "stewardship" program;

c.   Failing to enforce or effectively monitor its "stewardship" program;

d.   Selling VIPTERA and/or DURACADE to thousands of corn farmers with knowledge that they lacked the mechanisms, experience, ability and/or competence to effectively isolate or "channel" those products.

e.   Distributing misleading information about the importance of the Chinese market; and

     f.   Distributing misleading information regarding the timing of China's approval of VIPTERA and/or DURACADE.

200.  Syngenta's practices, as set forth above, were unfair in that:

    i.   The practices offend public policy in that they were done negligently, were done in a manner that brought VIPTERA and/or DURACADE in contact with the Illinois Plaintiffs' corn, thereby resulting in a trespass to chattels, and/or violated industry recognized stewardship obligations;

    ii.   The practices were immoral, oppressive and unscrupulous in that they imposed no meaningful choice on corn farmers, imposed an unreasonable burden on the corn farming industry and was so oppressive as to leave corn farmers with little alternative but to submit to the practices. Corn farmers had no control over the closure of the Chinese market due to the commercialization of VIPTERA and/or DURACADE; had no reasonable ability to prevent VIPTERA and/or DURACADE from entering onto their land, into their corn or into the corn market, and had no reasonable ability to separately channel their corn and VIPTERA and/or DURACADE; and

    iii.   The practices caused substantial injury to corn farmers in that it caused the loss of the Chinese export market and reduced corn prices. Corn farmers cannot reasonable avoid the injury caused by Syngenta's actions because the actions have caused a drop in the price for all U.S. corn.

201. Syngenta's unfair practices and conduct was directed toward consumers of VIPTERA and DURACADE as well as other corn producers. Syngenta intended consumers of VIPTERA and DURACADE as well as other corn producers to rely on its acts and practices in commercializing and selling VIPTERA and DURACADE as being done in a manner that would avoid negatively impacting corn export markets.

202.   Syngenta's unfair practices occurred during the course of conduct involving trade or commerce, specifically the commercialization and sale of VIPTERA and DURACADE.

203.   Illinois corn producers incurred damages due to the loss of the Chinese import market and resulting drop in the price of corn due to Syngenta's unfair acts and practices.

204.   The loss of the Chinese import market and resulting drop in corn prices was directly and proximately caused by Syngenta's unfair acts and practices.

205.   Syngenta's conduct was addressed to the market generally and otherwise implicates consumer protection concerns and, therefore, a consumer nexus exists in that:

   a.  Syngenta's acts and practices in commercializing and selling VIPTERA and DURACADE corn were directed to all corn farmers generally; and

   b.  Syngenta's acts and practices otherwise implicate consumer protection concerns including, but not limited to, not unreasonably risking the availability and welfare of corn export markets or minimizing the potential for unwanted comingling of crops.

206.   Illinois Plaintiffs are authorized to bring a private action under the Illinois Consumer Fraud and Deceptive Businesses Practices Act pursuant to 815 Ill. Comp. Stat 505/10(a).

207.   Syngenta's conduct was willful and intentional and done with evil motive or reckless indifference to the rights of others.  Punitive damages are thus warranted.

208.   Reasonable attorneys' fees and costs should be awarded pursuant to 815 Ill. Comp. Stat. 505/10a.

## COUNT VIII
## VIOLATION OF MINNESOTA DECEPTIVE TRADE PRACTICES ACT
### (As to Minnesota Plaintiffs)

209.   Plaintiffs incorporate by reference all preceding Paragraphs as though fully set forth herein.

210.   The Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, et. seq., provides in relevant part:

**Subdivision 1. Acts constituting**

A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

(1) passes off goods or services as those of another;

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;
***
(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

Minn. Stat. § 325D.44.

211.   The Minnesota Plaintiffs are authorized to bring this claim under Minn. Stat. § 8.31, subd. 3a.

212.   Syngenta has used in commerce false or misleading descriptions of fact and/or false or misleading representations of fact, which were likely and/or did cause confusion or mistake. These misleading descriptions and/or representations related to VIPTERA's approval or imminent approval for import to China. These deceptions originated in pertinent part in Minnesota, at the principal place of business of Defendant

Syngenta Seeds.   These deceptions and/or misrepresentations did not involve the product's labeling and packaging.

213.   Syngenta's false or misleading descriptions of fact and/or false or misleading representations of fact, caused, and/or were likely to cause costumer confusion about the approval of the products from foreign regulatory authorities, including the Chinese government.

214.   Plaintiffs have and continue to be damaged by Syngenta's conduct.

215.   Plaintiffs' damages were proximately caused by Syngenta's conduct.

216.   As a direct result and proximate result of the foregoing, Plaintiffs have been injured and suffered financial loss in excess of $75,000 for which damages and other relief as may be available at law or equity is warranted.

217.   Because Syngenta's actions have been committed willfully, maliciously, and intentionally, Plaintiffs are entitled to recover costs and reasonable attorneys' fees under Minn. Stat. § 325D.45.


<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray they have of and recover from the Defendants, jointly and severally, compensatory and punitive damages, together with appropriate equitable relief, as follows:

A.   Entry of judgment ordering Syngenta to take affirmative steps to remediate the contamination that it has already caused;

B.   Entry of judgment finding:

1.  Syngenta's release of VIPTERA and DURACADE corn constituted a public nuisance;

2.  Syngenta's release of VIPTERA and DURACADE corn constituted a private nuisance;

3.  Syngenta's release of VIPTERA and DURACADE corn was negligent;

4.  Syngenta is liable for damages done by the release of VIPTERA and DURACADE corn

5.  Syngenta is strictly liable for damages done by the release of VIPTERA and DURACADE corn and the resulting injuries to the Plaintiffs throughout the United States, including Illinois, Minnesota, Indiana, and Iowa;

6.  Syngenta's release of VIPTERA and DURACADE corn constitutes tortious interference;

7.  Syngenta's activities surrounding its release of VIPTERA and DURACADE corn violated the Illinois Consumer Fraud and Deceptive Business Practices Act;

8.  Syngenta's activities surrounding its release of VIPTERA and DURACADE corn violated the Minnesota Deceptive Trade Practices Act; and

C.      Monetary damages including compensatory relief to which Plaintiffs are entitled and will be entitled at the time of trial;

D.      Prejudgment interest;

E.      The costs of this action;

F.      Attorneys' fees; and

G.      Such other and legal and proper relief.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues.

Dated: March 11, 2016

                                             Respectfully submitted,

/s/Peter J. Flowers
Peter J. Flowers
Illinois State Bar No. 06210847
Brian J. Perkins
Illinois State Bar No. 06283734
MEYERS & FLOWERS, LLC
3 North Second Street, Suite 300
St. Charles, Illinois 60174
Telephone:  (630) 232-6333
Facsimile:  (630) 845-8982

/s/Martin J. Phipps
Martin J. Phipps
Texas State Bar No. 00791444
*Pro Hac Vice Pending*
Barry Deacon
Texas State Bar No. 24096725
*Pro Hac Vice Pending*
PHIPPS ANDERSON DEACON LLP
THE PHIPPS
102 9TH STREET
San Antonio, Texas 78215
Telephone: (210) 340-9877
Facsimile: (210) 340-9899

/s/Clayton A. Clark
Clayton A. Clark
Texas State Bar No. 04275750
*Pro Hac Vice Pending*
Scott A. Love
*Pro Hac Vice Pending*
CLARK, LOVE & HUTSON, GP
440 Louisiana St., Ste. 1600
Houston, Texas 77002-1638
Telephone: (832) 699-1528
Facsimile: (713) 759-1217

CERTIFICATE OF SERVICE

       I, Peter J. Flowers, Esq., as one of the attorneys for the Plaintiffs, hereby certify that on this 11th day of March, 2016, the foregoing Consolidated Amended Complaint was filed via the Court's ECF system, which will send notice of such filings to all counsel of record.

                                      /s/Peter J. Flowers