## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

------------------------------------------------------------  X

**IN RE SYNGENTA MASS TORT ACTIONS**

------------------------------------------------------------  **Judge David R. Herndon**

**This Document Relates to:**

*Tweet, et. al. v. Syngenta AG et al.* No. 3:16-cv-
00255-DRH

### CONSOLIDATED SECOND AMENDED COMPLAINT

NOW COME Plaintiffs, Larry Miller, Bradley A. Ferree, and Leroy Tweet (collectively "Plaintiffs"), and for their Consolidated Second Amended Complaint at Law against Defendants Syngenta Seeds, Inc., Syngenta AG, Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC, Syngenta Biotechnology, Inc., Gavilon Grain, LLC, Archer Daniels Midland Company, Bunge North America, Inc., Cargill, Incorporated, Cargill International SA, Louis Dreyfus Commodities, LLC, and Louis Dreyfus Commodities B.V. state and allege as follows:

### NATURE OF THE CASE

1.     Plaintiffs bring this action against Defendants Syngenta Seeds, Inc., Syngenta AG, Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC, Syngenta Biotechnology, Inc., Gavilon Grain, LLC, Archer Daniels Midland Company, Bunge North America, Inc., Cargill, Incorporated, Cargill International SA, Louis Dreyfus Commodities, LLC, and Louis Dreyfus Commodities B.V. Throughout this Complaint, Defendants Syngenta Seeds, Inc., Syngenta AG, Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC, Syngenta Biotechnology, Inc., and Gavilon Grain, LLC will be referred to collectively as "Syngenta." Throughout this Complaint, Defendants

Archer Daniels Midland Company, Bunge North America, Inc., Cargill, Incorporated, Cargill International SA, Louis Dreyfus Commodities, LLC, and Louis Dreyfus Commodities B.V. will be referred to collectively as the "ABCD Companies," a name by which these entities are well-known in the agricultural industry.

2.     As a result of Syngenta's refusal to wait for its new biotech traits implanted in genetically modified corn seed to be approved for human and/or animal consumption by major U.S. export partners, and the subsequent and foreseeable discovery of this unapproved trait in exports to China, Syngenta has caused damages to U.S. corn farmers, including Plaintiffs. Syngenta's conduct in marketing, distributing, and selling corn seed that was unapproved for import in major foreign markets violated the legal standards of the marketplace because the primary market risk falls on U.S. farmers, not on Syngenta.

3.     U.S. corn farmers have long been at the mercy of corporate biotechnology giants in their battle to sell genetically modified seed. Syngenta marketed, distributed, and sold its genetically modified corn with unapproved biotech traits in total disregard of the rights of farmers and the impact its actions would have on the U.S. corn market. As foreseen, Syngenta's genetically modified corn contaminated the U.S. corn supply. China, the fastest growing export market for U.S. corn, discovered the contamination and, in February 2014, banned the import of contaminated U.S. corn. As a result, exports of U.S. corn were down 85% in 2014 compared to 2013. This dramatic reduction in exports of U.S. corn to China continues to date. Given the laws of supply and demand, prices have fallen as well. Plaintiffs have been harmed by Syngenta's decision to negligently market, distribute, and sell genetically modified corn seed that was not approved in major U.S. export markets.

4.      Beginning with the 2011 growing season, Syngenta began marketing, distributing, and selling a new type of hybrid corn seed sold under the trade name Agrisure® Viptera™ ("Viptera"), which contains a new genetically modified trait known as "MIR 162." Syngenta claims that its Viptera corn seeds increase yields (as compared to other types of corn seed) due to improved resistance to insects. Despite knowing the rest of the world was not as eager as the United States to adopt bio-engineered food or feed, Syngenta began selling Viptera in the United States before other countries decided whether to approve it.

5.      At all times relevant hereto, Syngenta was well aware of the "highly regulated" nature of new genetically modified traits in foreign markets and understood that "[a]pprovals of genetically modified (GM) seed products occur at different times due to differences in country regulatory processes."[1] As Syngenta knew or should have known would happen, the European Union, China, and most other countries needed time to determine whether to approve Viptera for human and/or animal consumption. Between 2011 and 2013, certain countries approved Viptera for food and feed use; however, other countries, including China, did not. China has adopted a "zero tolerance" policy with respect to unapproved genetic traits.

6.      In November of 2013, China discovered the Viptera trait in shipments of what was supposed to be non-Viptera corn from the United States. After testing conducted over the next several weeks and months revealed that numerous shipments of U.S. corn from U.S. exporters (including corn from each of the ABCD Companies and Gavilon) were contaminated with Viptera, China banned the import of contaminated U.S. corn. To date, China has canceled or rejected orders for hundreds of millions of bushels of U.S. corn.

---

[1]     "Responsible  Agriculture,"  Syngenta.  2016.  Web.  13  Apr.  2016,  *available  at* http://www.syngenta.com/global/corporate/en/investor-relations/questions-about-syngenta/Pages/responsible-agriculture.aspx.

7.    In 2014, despite knowing from its experience with Viptera that China and other countries not only had not approved its genetically modified corn but were not likely to do so in the near future, Syngenta began marketing yet another genetically modified corn seed under the tradename Agrisure® Duracade™ ("Duracade") which, in addition to MIR 162, contains a new genetically modified trait known as "Event 5307." China, all 28 states of the European Union, Brazil, Switzerland (Syngenta's home country), Colombia, Egypt, India, the Philippines, the Russian Federation, Indonesia, Thailand, Singapore, Kazakhstan, Belarus, and Turkey have refused to approve Duracade for human or animal consumption. By improperly and prematurely commercializing its Duracade corn, Syngenta knowingly and intentionally exacerbated and prolonged the disruption to, and loss of, the Chinese market to U.S. corn.

8.    The loss of a large purchaser of U.S. corn like China as a result of Syngenta's Viptera and Duracade contamination has had a sudden and calamitous impact on the U.S. corn market.

9.    In this lawsuit, Plaintiffs allege that in addition to Syngenta, the ABCD Companies, individually and collectively, also contributed to cause the loss of the Chinese market to U.S. corn and Plaintiffs' resulting damages. Due to the closely interconnected nature of the U.S. agricultural industry, the ABCD Companies know that their actions and omissions have a direct and substantial impact on the livelihoods of U.S. farmers, including Plaintiffs. The ABCD Companies dominate global agricultural flows; in fact, it is estimated that the ABCD Companies account for 75 to 90 percent of grain trade globally.[2]  The ABCD Companies buy and sell U.S. corn into various domestic and foreign markets, including China. Despite knowing

---

[2] Lawrence, Felicity. "The Global Food Crisis: ABCD of Food – How the Multinationals Dominate Trade," *Guardian*. Guardian News and Media, 02 June 2011. Web. 13 Apr. 2016, *available at* http://www.theguardian.com/global-development/poverty-matters/2011/jun/02/abcd-food-giants-dominate-trade.

of Syngenta's premature commercialization of its Viptera and Duracade corn in the U.S. and China's "zero tolerance" policy with respect to unapproved genetic traits, through their negligent business practices, the ABCD Companies excacerbated a set of circumstances created by Syngenta and by their own conduct further contributed to cause the loss of the Chinese market. As set forth more fully herein, the ABCD Companies were negligent in their marketing, sourcing, selling, and shipping of Viptera corn.

10.     This lawsuit seeks to recover the damages that Defendants' conduct directly and proximately caused Plaintiffs.

## PARTIES

11.     Plaintiff, LEROY TWEET, is a resident and citizen of Rock County, Minnesota. Plaintiff maintains a farm and farms corn in Rock and Nobles Counties, Minnesota.  Plaintiff has raised corn in the State of Minnesota over a number of years, including in each growing season since 2013.  Plaintiff has never purchased Viptera or Duracade corn seed, neither has Plaintiff ever knowingly planted or grown Viptera or Duracade corn.

12.     Plaintiff, BRADLEY A. FERREE, is a resident and citizen of Greene County, Indiana.  Plaintiff maintains a farm and farms corn in Clay, Sullivan, and Greene Counties, Indiana.  Plaintiff has raised corn in the State of Indiana over a number of years, including in each growing season since 2013.  Plaintiff has never purchased Viptera or Duracade corn seed, neither has Plaintiff ever knowingly planted or grown Viptera or Duracade corn.

13.     Plaintiff, LARRY MILLER, is a resident and citizen of Buena Vista County, Iowa.  Plaintiff maintains a farm and farms corn in Carroll County, Illinois.  Plaintiff has raised corn in the State of Illinois over a number of years, including in each growing season since 2013. Plaintiff has never purchased Viptera or Duracade corn seed, neither has Plaintiff ever knowingly

planted or grown Viptera or Duracade corn.

14.     Each Plaintiff claims actual damages exceeding $75,000, exclusive of interest and costs.

15.     Syngenta Seeds, Inc. is a Delaware corporation with its principal place of business in Minnetonka, Minnesota. Syngenta Seeds, Inc. is a citizen of the states of Delaware and Minnesota.  Upon information and belief, Syngenta Seeds, Inc. formerly did business as Novartis Seeds, Inc., until the company changed its name in or about 2000. Syngenta Seeds, Inc. develops and produces agricultural seeds, including, but not limited to, corn and soybean seeds, and in particular Viptera and Duracade. Syngenta Seeds, Inc. conducts business throughout the United States, including in the Southern District of Illinois. Syngenta Seeds, Inc. sells its agricultural seeds, including its genetically modified Viptera and Duracade seeds, to growers either directly or through a network of seed dealers and distributors.  At all times relevant hereto, Syngenta Seeds, Inc. operated as a subsidiary of Syngenta Corporation.

16.     Syngenta AG is a Swiss corporation headquartered in Basel, Switzerland. Syngenta AG operates a crop chemicals business. Upon information and belief, Syngenta AG's global sales in 2014 were around $15.13 billion. As a biotech company, Syngenta AG develops and produces genetically modified corn seeds. Syngenta AG developed and produced the Viptera and Duracade corn at issue here. Syngenta AG is the assignee of the patent for the genetically modified corn traits MIR 162 (U.S. Patent Nos. 8,455,720 and 8,618,272) and Event 5307 (U.S. Patent No. 9,133,474) at issue herein. Syngenta AG conducts business throughout the United States, including in the Southern District of Illinois.

17.     Syngenta Crop Protection AG is a Swiss corporation headquartered in Basel, Switzerland.  Syngenta Crop Protection AG produces, manufactures, and markets crop protection

chemicals.  Syngenta Crop Protection AG conducts business throughout the United States, including in the Southern District of Illinois.  At all times relevant hereto, Syngenta Crop Protection AG operated as a subsidiary of Syngenta AG.

18.     Syngenta Corporation is a Delaware corporation with its principal place of business in Wilmington, Delaware.  Thus, Syngenta Corporation is a citizen of the State of Delaware.  At present, Syngenta Corporation's corporate status is listed as "suspended" by the Secretary of State of North Carolina. Through its subsidiaries, Syngenta Corporation provides crop protection products and seeds for agricultural producers throughout the United States, including in the Southern District of Illinois.  In addition, Syngenta Corporation provides biotech traits research services for corn and other crops. At all times relevant hereto, Syngenta Corporation operated as a subsidiary of Syngenta AG.

19.     Syngenta Crop Protection, LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 410 Swing Road, Greensboro, North Carolina 27409-2012.  The sole member of Syngenta Crop Protection, LLC is Syngenta Seeds, Inc.  Syngenta Crop Protection, LLC is a citizen of the states of Delaware, Minnesota, and North Carolina.  Syngenta Crop Protection, LLC is an agribusiness involved in the research, development, manufacture and sale of crop protection products including herbicides, fungicides, insecticides and seed treatments for many crops, including corn. Syngenta Crop Protection, LLC conducts business throughout the United States, including in the Southern District of Illinois. At all times relevant hereto, Syngenta Crop Protection, LLC operated as a subsidiary of Syngenta AG.

20.     Syngenta Biotechnology, Inc. is a Delaware corporation with its principal place of business in Durham, North Carolina.  Syngenta Biotechnology, Inc. is a citizen of the states of

Delaware and North Carolina.  Information obtained from the North Carolina Secretary of State indicates that Syngenta Biotechnology, Inc. was formerly known as Syngenta Agribusiness Biotechnology Research, Inc. and Novartis Agribusiness Biotechnology Research, Inc.  Syngenta Biotechnology, Inc. employs some 25,000 individuals in over 90 countries.  Syngenta Biotechnology, Inc. conducts business throughout the United States, including in the Southern District of Illinois.   In 2008, Syngenta Biotechnology, Inc. invested some $969 million in research and development.   In addition to its Research Triangle Park campus, Syngenta Biotechnology, Inc. operates a sister-site in Beijing, China, which opened in 2008.  Syngenta Biotechnology, Inc. designed and developed the Viptera and Duracade corn seeds, at issue here. Since 1999, Syngenta Biotechnology, Inc. has conducted field trial/testing of corn transformation event MIR162 under USDA release permits or notifications in Illinois, Hawaii, Arkansas, Florida, Idaho, Minnesota, Puerto Rico, Mississippi, Arizona, California, Iowa, Kansas, Missouri, North Carolina, Nebraska, Texas, Wisconsin, Kentucky, Louisiana, Maryland, New York, Ohio, Pennsylvania, Virginia, Colorado, South Dakota, Georgia, Florida, and Tennessee. Syngenta Biotechnology, Inc. petitioned the Animal Plant Health Inspection Service of the USDA to deregulate MIR 162 (Viptera) in August of 2007.   Since 2005, Syngenta Biotechnology, Inc. has conducted field trial/testing of corn transformation Event 5307 under USDA release permits or notifications in Illinois, Hawaii, Arkansas, Florida, Minnesota, Puerto Rico, California, Iowa, Kansas, Missouri, North Carolina, Nebraska, Wisconsin, Kentucky, Louisiana, Ohio, Colorado, South Dakota, Florida, Oklahoma, Washington, and South Carolina. Syngenta Biotechnology, Inc. petitioned the Animal Plant Health Inspection Service of the USDA to deregulate Event 5307 (Duracade) in April of 2011.  The company's website states that Syngenta Biotechnology, Inc. understands the "risks of [its] products" and "is committed to

implementing high standards of stewardship for the safe, effective and environmentally responsible production and use of its products."[3]

21.     Gavilon Grain, LLC ("Gavilon") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Omaha, Nebraska.  The sole member of Gavilon is a citizen of the states of Delaware and Nebraska.  Therefore, Gavilon is a citizen of the states of Delaware and Nebraska.  Gavilon conducts business throughout the United States, including in the Southern District of Illinois.  Gavilon is a commodity management firm, connecting producers and consumers of food through its global supply chain network.  Gavilon provides origination, segregation, storage and handling, transportation and logistics, marketing and distribution, and risk management services. It also markets and sells U.S. corn and Distiller's Dried Grains with Solubles ("DDGS")[4] internationally via bulk vessel or barge, including previously to China.  Gavilon has nearly 300 facilities and offices worldwide, including in Arkansas, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Wisconsin, Washington, and China.  At all times relevant hereto, Gavilon partnered with the Syngenta entities in the commercialization of Viptera and Duracade corn. Syngenta has publicly referred to Gavilon as its business "partner" in several news releases and marketing materials.[5] Also, in a joint letter to the North American Export Grain Association

---

[3] "Syngenta Agricultural Biotechnology Products," Syngenta Biotechnology, Inc. 2016. Web. 09 Feb. 2016, *available at* http://www3.syngenta.com/country/cn/cn/products_solution/biotech/sbcen/syn_biotechnology/Pages/Key_products.asp.

[4] DDGS are produced when corn is processed into ethanol, and is used as animal feed.

[5] "Syngenta and Gavilon Grain, LLC: Right to Grow Program—Q&A," Syngenta, 2014. Web. 12 Apr. 2016, *available at* http://www.syngenta-us.com/viptera_exports/images/right_to_grow_qa.pdf. (Regarding the "Right to Grow" program: "The program includes a working *partnership* with Gavilon to provide marketing and handling assistance for Agrisure Duracade corn for 2014 … Syngenta will continue with a limited-acre introductory launch of Agrisure Duracade for the 2014 season. The plan involves *partnering* with Gavilon, a major grain handling and

("NAEGA") and the National Grain and Feed Association ("NGFA"), Syngenta represented that the commercialization of Duracade and the "Right to Grow" program was launched "in collaboration with" Gavilon.[6]  The letter is personally signed and endorsed by Greg Konsor, Vice President and General Manager of Gavilon Grain, LLC. Under this partnership, Gavilon became responsible with the Syngenta entities for the launch, handling, stewardship, and channeling of Viptera and Duracade corn.  Pursuant to the partnership, in addition to other responsibilities, Gavilon accepted Viptera and Duracade grains and provided "stewardship and distribution services" related thereto.[7] Although the Syngenta entities and Gavilon first announced their partnership formally on February 20, 2014 in relation to the "Right to Grow Program," it is the information and belief of Plaintiffs that this partnership business between the Syngenta entities and Gavilon concerning the launch, handling, stewardship, and channeling of Viptera and Duracade corn existed for years prior to the formal announcement, including as early as 2011 when Viptera was first commercialized in the U.S. Further, at all times relevant hereto, Gavilon and the Syngenta entities have shared profits from this partnership business which they own, including revenues generated by the commercialization, marketing, and sale of Viptera and Duracade corn. In September of 2014, Syngenta announced that it "renewed and enhanced its program with Gavilon" and began to offer farmers a "per unit stewardship premium for each bag of Agrisure Duracade corn planted in 2015" and "consultative services through Gavilon to help

---

marketing firm …. [A] **grain partner representative from Gavilon** will  contact farmers to discuss their marketing options.").

[6] "Joint Letter to the NAEGA and NGFA re: Right to Grow Program," Syngenta Seeds, Inc. and Gavilon Grain, LLC, Mar. 11, 2014. Web. 04 Apr. 2016, *available at* https://www.ngfa.org/wp-content/uploads/Syngenta-Gavilon-Response-to-NGFA-NAEGA-Letter-and-Questions.pdf.

[7] News Release, "Syngenta and Gavilon bring advanced seed technology and grain marketing confidence to corn farmers for 2014," Syngenta. 2014. Web. 11 Apr. 2016, *available at* http://www.syngenta-us.com\newsroom\newsrelease_detail.aspx?id=179900.

them appropriately steward and market their corn[.]"[8] Gavilon continues to directly encourage farmers to plant Duracade seed and promote the commercialization of Duracade despite lack of import approval from China, stating that it "plan[s] to grow [its] network of accepting locations."[9]

22.   At all relevant times, Syngenta Seeds, Inc., Syngenta AG, Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC, and Syngenta Biotechnology, Inc. have been unified in ownership and interest. These entities are alter-egos of each other and they have collectively been run as a single business enterprise.  At all times relevant hereto, Gavilon has partnered with the Syngenta entities in the commercialization of Viptera and Duracade corn, including throughout all counties in the State of Illinois. Consequently, throughout this Complaint, Defendants Syngenta Seeds, Inc., Syngenta AG, Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC, Syngenta Biotechnology, Inc. and Gavilon Grain, LLC are referred to collectively as "Syngenta."

23.   As a result of Syngenta's refusal to wait for its new biotech trait implanted in genetically modified corn seed to be approved for human and/or animal consumption by major U.S. export partners, and the subsequent and foreseeable discovery of this unapproved trait in exports to China, Syngenta has damaged Plaintiffs.

24.   Archer Daniels Midland Company ("ADM") is a Delaware corporation with corporate headquarters in Chicago, Illinois and its principal place of business in Decatur, Illinois.

---

[8] News Release, "Syngenta and Gavilon Enhance Grain Marketing Support for Agrisure Duracade in 2015," Syngenta, Sep. 12, 2014. Web. 11 Apr. 2016, *available at* http://www.syngenta-us.com/viptera_exports/images/right_to_grow_news_release.pdf.

[9] *Id.*, Statement of Jim Anderson, Chief Operating Officer at Gavilon.

ADM is a citizen of the states of Delaware and Illinois. ADM is among the largest processors of agricultural commodities in the world. ADM markets and sells agricultural commodities, including U.S. corn and DDGS, both domestically and abroad. ADM conducts business throughout the United States, including in the Southern District of Illinois. ADM purchases corn throughout the supply chain, including directly from farmers. ADM also provides crop consulting and grain marketing services to farmers. ADM emphasizes publically its "partnership" with the farming community and holds itself out as a "vital link" between corn producers and consumers.[10] ADM has an extensive network of grain elevators, grain handling and processing facilities, and transportation assets throughout the midwestern and southern United States, including throughout all counties in the State of Illinois, which are used to buy, segregate, store, clean, process, transport, and sell agricultural commodities including corn. ADM is one of the largest producers of DDGS in the United States. ADM owns and operates more than a dozen ethanol plants in the midwestern United States, including in Illinois, where ADM receives corn from farmers and other non-producer third parties and processes it into DDGS for sale domestically and abroad. ADM transports a substantial amount of corn and DDGS from Illinois down the Mississippi River to Louisiana, after which it is sold on the international export market, including (previously) to China. ADM is intimately familiar with Chinese legal and regulatory requirements for the import of genetically modified grain. ADM employs more than 150 people in China.[11] ADM has operated in China since at least 1994 and has branch offices located throughout that nation. According to ADM's website:

---

[10]    "Our Company," ADM. Web. 09 Feb. 2016, *available at* http://www.adm.comien-US/company/Pagesidefault.aspx.

[11]    "ADM in China," ADM. Web. 09 Feb. 2016, *available at* http://www.adm.com/en-US/worldwide/cha/Pages/default.aspx.

> In July of 2010, ADM made a $100 million cornerstone investment in the Agricultural Bank of China (ABC). In January of 2011, ADM opened an office in Beijing. Both are key steps to advance ADM's strategy for profitable growth in China and throughout Asia. The investment and collaboration with ABC strengthens our relationships within China and expands our network of potential strategic partners. It also provides an important vantage point from which to identify and act on emerging opportunities.[12]

In its corporate Code of Conduct, ADM represents that it will take all steps necessary to "ensure that our products meet or exceed legal and regulatory requirements."[13]

25.     Bunge North America, Inc. ("Bunge") is a New York corporation with its principal place of business in St. Louis, Missouri. Thus, Bunge is a citizen of the states of New York and Missouri. Bunge operates an extensive grain origination and export business. Bunge conducts business throughout the United States, including in the Southern District of Illinois. Bunge buys, handles, segregates, and stores agricultural commodities produced by U.S. farmers. Bunge has grain elevators and other grain-receiving, storage, and shipping facilities throughout the United States, including but not limited to: Alabama, Arkansas, California, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Tennessee, and Washington. Bunge markets and sells U.S. corn and DDGS domestically. It also markets and sells U.S. corn and DDGS internationally via bulk vessel or barge, including (previously) to China. Bunge represents to the public that it has been working with U.S. farmers for almost 100 years to originate quality grain to transport for domestic use and international export.[14] On its website, Bunge states that its expertise in effective risk management is a

---

[12] *Id.*

[13] "Code of Conduct," ADM. 2015. Web. 09 Feb. 2016, *available at* http://www.adm.com/en-US/company/ADM_way/Documents/Code-Of-Conduct-ENG.pdf.

[14] "Ag Commodities," Bunge North America. 2016. Web. 25 Feb. 2016, *available at* https://www.bungenorthamerica.com/products/categories/5-ag-commodities.

fundamental strength of its business and that Bunge's substantial management experience enables it to anticipate market developments and to optimize the timing and execution of purchases and sales of grain.[15] At all times relevant hereto, Bunge has been intimately familiar with Chinese legal and regulatory requirements for the import of biotech grain. According to Bunge's website:

> The history of Bunge in China dates back to the 1920s[.] In 1998, Bunge established itself in China as a trading operation of agricultural products for Chinese customers. . . Since the entry into the Chinese market, Bunge has been combining Bunge's global expertise with China's local business models to contribute to the sustainable development, social development and benefits of the local people[;] [s]hare the global experience in the agriculture and food sectors with Chinese government, clients and stakeholders while serving community, society and Chinese consumers[;] [a]ssist and promote agriculture development and a secure food supply market in China[;] . . . [and] [e]nhance agricultural products' efficiency and added value in the production, processing, and distribution[.][16]

Bunge represents publically that it supplies grains to China via "dedicated supply chains" acknowledging that "[w]ith growing economies and expanding per capita income, Asia is a driver of global growth for agricultural commodities and food products."[17]

26.     Cargill, Incorporated is a Delaware corporation with its principal place of business in Minnetonka, Minnesota. Thus, Cargill, Incorporated is a citizen of the states of Delaware and Minnesota. Cargill, Incorporated is a domestic and international seller of agricultural products. Cargill, Incorporated conducts business throughout the United States, including in the Southern District of Illinois.  Being among the largest exporters of U.S. corn and DDGS, Cargill, Incorporated has hundreds of millions of dollars in infrastructure dedicated to

---

[15]   "Ag   Commodities,"   Bunge   North   America.   2016.   Web.   10   Feb.   2016,   *available   at* https://www.bungenorthamerica.com/products/categories/5-ag-commodities.

[16] "Bunge in China," Bunge. Web. 09 Feb. 2016, *available at* http://www.bunge.com.cn/en/bgchina.php.

[17] "Bunge: Asia Pacific," Bunge. Web. 09 Feb. 2016, *available at* http://www.bunge.com/Asia-Pacific.

handle, segregate, store, and transport corn to customers domestically and internationally. Cargill, Incorporated owns and operates a network of grain elevators as well as storage and processing facilities in the U.S., including in Illinois, and has a significant grain presence along the Mississippi, Illinois, and Ohio Rivers. These facilities purchase, segregate, and store corn from U.S. farmers as well as third-party grain handlers. As one of the largest producers of DDGS in the United States, Cargill owns and operates several ethanol plants in the midwestern United States, including in Iowa, Nebraska, and Missouri, where Cargill receives corn from farmers and other non-producer third parties, and processes it into DDGS for sale domestically and abroad. Cargill, Incorporated loads corn and DDGS onto massive "Panamax" vessels for transport to Asian markets, including previously China.

27.     Cargill International SA ("CISA") is a Swiss corporation with its principal place of business in Geneva, Switzerland. CISA provides access to world markets for Cargill entities originating grains, oilseeds, and other agricultural products, including corn and DDGS.   In addition, much of Cargill, Incorporated's ocean-freight business is managed by CISA. For instance, in 2013, CISA sold some 31 Panamax vessels of U.S. corn into China.  CISA conducts business throughout the United States, including in the Southern District of Illinois.

28.     At all relevant times, Cargill, Incorporated and CISA (collectively "Cargill") have been unified in ownership and interest. These entities are alter-egos of each other, and they have collectively been run as a single business enterprise.  At all times relevant hereto, Cargill has been intimately familiar with Chinese legal and regulatory requirements for the import of genetically modified grain. For more than 40 years, Cargill has operated a wide range of business

in China, including within the agricultural supply chain.[18] Cargill has a presence in all parts of mainland China with more than 50 locations and in excess of 8,000 employees nationwide.[19] On its website, Cargill states:

> Cargill is committed to utilizing its global expertise to support rural development and increase farmer incomes in China. Cargill's contributions are aligned with China's commitment to promote sustainable agriculture and a safe and secure food supply. We help China achieve these commitments by improving efficiency and adding value in the production, processing, distribution, and trade of food and agriculture products.[20]

Cargill has also stated, "[t]he breadth of our operations means that Cargill touches almost every aspect of society. With our global reach comes the responsibility to understand and manage our impact."[21] Cargill further states: "[a]s a global organization privileged to do business all over the world, we have the responsibility to comply with all of the laws that apply to our businesses."[22] Cargill claims it acts responsibly across all of its supply chains.  Cargill claims it uses its global expertise to enrich communities and increase farmer incomes.[23] Cargill has represented that it "provide[s] farmers with the training, tools and inputs they need to grow more food and help them access markets for their crops."[24]  In its Code of Corporate Responsibility, Cargill states:

---

[18] "Over Forty Years' Growth in China," Cargill, Incorporated. 2016. Web. 25 Feb. 2016, *available at* http://www.cargill.com.cn/en/about/40-years-growth/index.jsp.

[19] "2013/14   China   Corporate   Responsibility   Report," Cargill, Incorporated. 2013, *available at* http://www.cargill.com.cn/wcm/groups/public/@csf/@china/documents/document/na3082391.pdf.

[20] *Id.*

[21] *Id.* at 3.

[22] *Id.*

[23] *Id.*

[24] "2015 Corporate Responsibility Report," Cargill, Incorporated. 2015. Web. 09 Feb. 2016, *available at* http://www.cargill.com/wcm/groups/public/@ccom/documents/document/na31881260.pdf.

> When Cargill began in 1865, our business was founded on the belief that "our word is our bond." Today, as a diversified global company still grounded in a culture of trust and respect, this remains the standard by which we do business. We operate with integrity and accountability. . . .
>
> Our world faces complex challenges. The breadth and scope of our business gives us an unparalleled view — and with the broad perspective comes responsibility. . .
>
> Cargill's interest extends beyond our own operations to the suppliers, partners, and other stakeholders in our supply chains.   A responsible supply chain respects people and human rights; produces safe and wholesome food; treats animals humanely; promotes the best, most responsible agricultural practices; and reduces environmental impact, including protecting the land and conserving resources. Achieving this will require collaboration with all stakeholders across developed and emerging markets. We strive to demonstrate measurable progress against the supply chain issues that we can control and those we can influence.[25]

In related litigation, Cargill has admitted its duty and obligation to operate responsibly across the agriculture markets it serves.

29.    Louis Dreyfus Commodities, LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 40 Danbury Road, Wilton, Connecticut. The sole member of Louis Dreyfus Commodities, LLC is a citizen of the states of Delaware and Connecticut. Therefore, Louis Dreyfus Commodities, LLC is a citizen of the states of Delaware and Connecticut. Louis Dreyfus Commodities, LLC operates an extensive grain origination, processing and export business. Louis Dreyfus Commodities, LLC buys, handles, segregates, and stores agricultural commodities produced by U.S. farmers. Louis Dreyfus Commodities, LLC conducts business throughout the United States, including in the Southern District of Illinois.  Louis Dreyfus Commodities, LLC has corn ethanol plants in Norfolk, Nebraska and Grand Junction, Iowa where it receives grain directly from farmers and other non-producer third parties and uses it to produce DDGS for sale domestically and abroad.  Louis Dreyfus Commodities, LLC has other processing facilities in Indiana, Florida,

---

[25] *Id.* at 16.

Louisiana, Kentucky and Georgia. Louis Dreyfus Commodities, LLC has grain elevators and other grain-receiving, storage, and shipping facilities throughout the United States.  It has offices and logistics assets in Chicago, Illinois. It also has either offices or logistics assets throughout the United States, including but not limited to:  Arkansas, California, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Mississippi, Missouri, Nebraska, North Carolina, Oregon, Tennessee, Texas and Washington. Louis Dreyfus Commodities, LLC markets and sells U.S. corn and DDGS internationally via bulk vessel or barge, including (previously) to China.

30.     Louis Dreyfus Commodities B.V. is a private limited liability company incorporated in the Netherlands. Louis Dreyfus Commodities B.V.'s principal place of business is Westblaak 92, 3012 KM Rotterdam, Netherlands. Louis Dreyfus Commodities B.V. owns subsidiaries and affiliates in various countries worldwide, including but not limited to Louis Dreyfus Commodities, LLC in the United States. In its annual report, Louis Dreyfus Commodities B.V. is referred to as the "governance" and "head office" and its subsidiary, Louis Dreyfus Commodities, LLC is referred to as the "regional head office" for North America.[26] Louis Dreyfus Commodities B.V. conducts business throughout the United States, including in the Southern District of Illinois.

31.     At all relevant times, Louis Dreyfus Commodities, LLC and Louis Dreyfus Commodities B.V. (collectively "Dreyfus") have been unified in ownership and interest. These entities are alter-egos of each other, and they have collectively been run as a single business enterprise.  At all times relevant hereto, Dreyfus has been intimately familiar with Chinese legal and regulatory requirements for the import of biotech grain.  On its website, Dreyfus states that it is a "pioneer of China's agricultural trade" with "long lasting relationships" with many of

---

[26] "2014 Annual Report," Louis Dreyfus Commodities B.V. 2015. Web. 25 Feb. 2016, *available at* https://www.ldcom.com/files/8614/2735/5606/LDC-AR-2014.pdf.

China's "major state-owned enterprises responsible for the procurement and commercialization of agricultural commodities."[27] Dreyfus represents to the public that it complies with all the international quality standards required by its customers.[28] Dreyfus also states that it uses a risk management process, which allows it to manage the risks inherent in complex supply chains that operate from field to end consumer.[29]

32.     Upon information and belief, ABCD Companies have many non-federally licensed facilities, including warehouses, grain elevators and ethanol plants, which they own and operate in various locations throughout the State of Illinois and the United States.   Upon information and belief, the ABCD Companies maintain many of its facilities throughout the State of Illinois and the United States where no application for federal licensure was ever conducted.

## JURISDICTION AND VENUE

33.     Jurisdiction arises under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) because each of the original actions constituted a Mass Action under CAFA.  As such, Syngenta Corporation, Syngenta Crop Protection, LLC, Syngenta Biotechnology, Inc., and Syngenta Seeds, Inc.  removed the original actions under 28 U.S.C. § 1453 from an Illinois state court in this judicial district.

34.     The Plaintiffs make no claim under federal law. No federal question arises on their allegations.   Plaintiffs expressly disclaim any federal cause of action that might otherwise be available to them.

---

[27] "About Louis Dreyfus Commodities in China," Louis Dreyfus Commodities B.V. 2016. Web. 24 Feb 2016, *available at* https://www.ldcom.com/cn/en/about-us/ldc-china.

[28] *Id.*

[29] *Id.*

35.     There is no complete diversity of citizenship in this case.  Multiple plaintiffs in this mass action, including Leroy Tweet, reside in the State of Minnesota and are citizens of that state.  Defendant Syngenta Seeds, Inc. has its principal place of business in the State of Minnesota and is a citizen of that state, accordingly.  Further, multiple plaintiffs in this mass action reside in the State of North Carolina and are citizens of that state.  Defendants Syngenta Biotechnology, Inc. and Syngenta Crop Protection, LLC have their principal places of business in the State of North Carolina and are citizens of that state, accordingly.

36.     Multiple plaintiffs in this mass action reside in and are citizens of the State of Illinois. Multiple other plaintiffs in this mass action reside in and are citizens of states which are not contiguous to Illinois.  These non-contiguous states of citizenship of multiple plaintiffs are North Carolina, Minnesota, Alabama, Arkansas, California, Colorado, Florida, Georgia, Idaho, Kansas, Louisiana, Maryland, Michigan, Mississippi, Nebraska, Nevada, New Mexico, New York, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, and Virginia.

37.     Jurisdiction in the originally filed state court actions was proper in Illinois pursuant to section 2-209 of the Illinois Code of Civil Procedure, 735 ILCS §§ 5/2-209(1) and (2), because each defendant, separately and by acts concerted with the other defendants, conducts and conducted business within Illinois and committed tortious acts within Illinois. The business and acts Syngenta engaged in in Illinois include, but are not limited to, (a) the promotion and sale of seeds in the state, including by their sales agents, (b) the use of "Syngenta Seed Advisors" to promote their products in the state, (c) the registration of agents for service of process in Illinois, (d) the maintenance of physical facilities in Illinois to make, promote, and sell products inside the state and outside it, and (e) field testing the genetically-

modified corn trait at issue.  The business and acts the ABCD Companies engage or engaged in in Illinois include, but are not limited to, (a) the marketing, grain sourcing, handling, shipping and promotion of products and services in the state, including by their sales agents, (b) the maintenance of physical facilities in Illinois to make, promote, market, sell, and offer products and services inside the state and outside it, (c) the registration of agents for service of process in Illinois, and (d) the commingling of Viptera and non-Viptera corn inside the state. Each instance of such business and acts in Illinois constitutes purposeful availment by both Syngenta and the ABCD Companies of the general commerce of the state and of the farming market specifically, and each such instance was directed by both Syngenta and the ABCD Companies to farmers in Illinois.   Each such instance was undertaken by each defendant for itself and/or as an agent for its subsidiaries.

38.     The tortious acts alleged in this Complaint occurred in pertinent part in Illinois, in counties of the state including Madison County, and also in the states of citizenship of the multiple plaintiffs in this mass action who reside in and are citizens of Alabama, Arkansas, California, Colorado, Florida, Georgia, Idaho, Iowa, Indiana, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Virginia and Wisconsin, which are the states of citizenship of multiple plaintiffs.

39.     Venue for these consolidated cases was proper in the Circuit Court of Madison County, Illinois, from which these cases were removed, pursuant to section 2-101 of the Illinois Code of Civil Procedure, 735 ILCS § 5/2-101, because, *inter alia*, Madison County is the county of Illinois in which the tortious acts occurred in pertinent part.  These consolidated

cases were properly removed to this Court by Defendants Syngenta Corporation, Syngenta Crop Protection, LLC, Syngenta Biotechnology, Inc. and Syngenta Seeds, Inc., making venue proper here.

### JOINDER OF MEYERS & FLOWERS CONSOLIDATED PLAINTIFFS[30]

40.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

41.     Joinder of the Meyers & Flowers Consolidated Plaintiffs in this matter is proper because the claims of all Meyers & Flowers Consolidated Plaintiffs arise out of closely related transactions, and there are significant questions of law or fact that are common to all parties. All claims involve common questions regarding, *inter alia*, (a) Syngenta's decision to commercialize the MIR162 genetically modified corn trait in the absence of Chinese approval to import corn with the trait, (b) Syngenta's misrepresentations concerning Chinese approval and other affirmative misconduct resulting in contamination of the U.S. corn supply with its Viptera and Duracade corn, (c) the ABCD Companies' negligent actions and omissions which contributed to cause the loss of the Chinese market, and (d) damages suffered by the Plaintiffs as a result thereof.

42.     These significant questions of law and fact are common to all Meyers & Flowers Consolidated Plaintiffs, and on that ground, the Meyers & Flowers Consolidated Plaintiffs propose to try their claims together and jointly.

43.     Plaintiffs' damages derive from the same alleged overall drop in the price of U.S. corn due to Syngenta's premature commercialization of both Viptera and Duracade and

---

[30] The Court's order of March 10, 2016, ECF No. 60, severed the claims of the Meyers & Flowers Consolidated Plaintiffs from the Garrison Consolidated Plaintiffs. As noted by the Court, this post-removal severance does not divest the Court of CAFA jurisdiction as to the Meyers & Flowers Consolidated Plaintiffs.

the ABCD Companies' negligent actions and omissions which also contributed to cause the loss of the Chinese market. Plaintiffs' damage model is based, in large part, on the prices of corn set by the Chicago Board of Trade, which is the world's oldest futures and options exchange. Corn grown by farmers, including Plaintiffs, is traded on prices set by the Chicago Board of Trade on a daily basis. Indeed, the Chicago Board of Trade provides a commodities exchange for corn futures for farmers, distributors, and buyers of corn. Put simply, a specific factual nexus exists between Illinois and Defendants' tortious conduct.

### FACTUAL ALLEGATIONS

***The Market for United States Corn***

44.     The United States is the world's largest producer and exporter of corn. There are more acres of farmland growing corn each year than any other crop in the United States. Over 13 billion bushels of corn–over 35% of the world's corn production–are grown annually in the United States on roughly 95 million acres of farmland. Corn is a commonly traded commodity with a market that can be quantified, calculated, and measured.

45.     International markets have been a key destination for U.S. agricultural products for decades.  Roughly 20% of the over 13 billion bushels of corn grown each year is sold for export to foreign countries. During the 2011-2012 growing season, the export of U.S. corn generated close to $18 billion in revenues—making corn the largest and most important cash crop grown in the United States.

46.     At all times relevant hereto, China has been a major export market for U.S. corn. Since at least 2010, China had been rapidly increasing its purchases of U.S. corn. In the 2011-2012 marketing year, 203 million bushels out of 1.543 billion total exported U.S. corn bushels were exported to China. China has also been the number one U.S. export partner for DDGS

since the 2011-2012 marketing year.[31]   Given the size of the Chinese market, the laws of supply and demand drove the price of U.S. corn higher.

47.   Importantly, China has long been resistant to new genetically modified crops, and in fact requires new genetically modified seeds to be planted in China and generate crops for testing before a new genetically modified seed type is even eligible for import approval into China.

48.   Like the U.S., the European Union, and many other nations, China has adopted a "zero tolerance" policy with respect to the importation of unapproved genetic traits, a fact well-known to Syngenta and each of the ABCD Companies at all times relevant hereto.

49.   Due to the interdependence and connectedness of the modern U.S. agricultural industry, there is a shared responsibility among industry participants to exercise reasonable care in the commercialization, handling, marketing, selling, and shipping of new biotechnology products to protect other known industry stakeholders, including farmers, from an unreasonable risk of harm.  Syngenta and each of the ABCD Companies recognizes the inter-connectedness of the industry and market by referring to corn producers as "stakeholders"[32] in its commercial activities and by its representations that it would take certain steps to protect corn producers from the very harm that occurred.[33]   Moreover, Syngenta has represented publically that corporate

---

[31] "Market Data: Top U.S. Export Partners," U.S. Grains Council, 2016. Web. 14 Apr. 2016, *available a*t http://www.grains.org/market-data/top-us-export-partners.

[32] "Stakeholder Engagement," Syngenta, 2016. Web. 12 Apr. 2016, *available at* http://www.syngenta.com/ global/corporate/en/about-syngenta/corporate-responsibility/Pages/stakeholderengagement.aspx ("Our **stakeholders** are the people who can affect our business or who are affected by it. They include the following groups: Growers, Industry, Non-governmental organizations and international agencies, Investors, Employees, Government, Multi-stakeholder engagement."); "Bunge Citizenship Report," Bunge, 2014. Web. 12 Apr. 2016, *available at* http://www.bunge.com/citizenship/BG_CR14_Citizenship_Report_v16_FullReport .pdf ("We communicate openly about our activities and maintain a constructive dialogue with stakeholders.")

[33] "Safety in Research & Development," Syngenta, 2016. Web. 12 Apr. 2016, *available at* http://www.syngenta.com/global/corporate/en/about-syngenta/corporateresponsibility/operations/stewardship/Pages/ safety-in-research-and-development.aspx ("Biotechnology is subject to strict regulation internationally. **We**

responsibility is part of everything it does, from developing its products to controlling the impact of its operations, and that it has a corporate responsibility to industry stakeholders to properly steward its biotechnology products.[34]

**Corn Farming in Illinois**

50.     According to the Illinois Corn Growers Association, agriculture is Illinois' largest industry, contributing billions of dollars to the state's economy each year with corn as the largest contributor. Last year, corn accounted for nearly 40 percent of the $9 billion in agricultural commodities generated.

51.     In 2013, Illinois farmers planted 12.1 million acres of corn, which accounted for approximately 17 percent of the nation's corn crop. Illinois produces enough corn each year to

---

**implement stringent safety measures** that ensure the safety of our employees, our customers and the environment."); "Statement on Genetic Modification and Other Technologies," ADM, 2016. Web. 12 Apr. 2016, *available at* http://www.adm.com/en-US/responsibility/2014CRReport/PoliciesandCommitments/Pages/GMOs.aspx ("Because of our vertical integration, we have developed—for certain product lines—systems that track and **preserve crop identity** from seed to factory to finished product to make such options available for our customers."); "Code of Conduct," Bunge, 2015. Web. 12 Apr. 2016, *available at* http://www.bunge.com/citizenship/files/code_conduct/code-of-conduct-eng.pdf ("We are a part of the **global food supply chain**, and many people and governments around the world depend on us. We serve a very important purpose: creating global supply chains and building local operations which help make affordable and high quality food products available to millions of people."); "2015 Corporate Responsibility Report," Cargill, Aug. 19, 2015. Web. 12 Apr. 2016, *available at* http://www.cargill.com/wcm/groups/public/@ccom/documents/document/na31881260.pdf ("We also advocate for policies that increase food security by encouraging responsible adoption of technology advances and market access for genetically modified (GM) crops to **reduce trade disruptions**."); "From Farm to Fork," Louis Dreyfus Company, 2016. Web. 12 Apr. 2016, available at http://www.ldcom.com/global/en/our-business/farm-fork/ ("We strive to strictly manage the journey from farm to fork to ensure that quality is maintained every step of the way. The greater control we have, the greater the **security and value we provide to our customers**."); Polansek, Tom. "Gavilon Calls on U.S. Farm Sector to Deal with Unapproved GMO Crops." *Reuters*. Thomson Reuters, 24 Mar. 2014. Web. 14 Apr. 2016, *available at* http://www.reuters.com/article/syngenta-corn-gavilon-idUSL2N0MI20420140324 (Statement from Gavilon Chief Executive Greg Heckman regarding acceptance of Duracade "[Gavilon] is equipped to direct [Duracade] to **appropriate markets**.").

[34]   "Corporate Responsibility," Syngenta. 2016. Web. 26 Feb. 2016, *available at* http://www.syngenta.com/global/corporate/en/about-syngenta/corporate-responsibility/Pages/corporate-responsibility.aspx; *See also* "Stewardship," Syngenta. 2016. Web. 26 Feb. 2016, *available at* http://www.syngenta.com/global/corporate/en/about-syngenta/corporate-responsibility/operations/stewardship/Pages/stewardship.aspx ("Taking responsibility for our products – from the production of seeds to the safe use, storage and disposal of crop protection products by growers – is a priority at Syngenta . . . .")

fill a train of box cars stretching more than 7,600 miles from the U.S. to Hong Kong.[35]

52.     According to the Illinois Department of Agriculture, each year, 274 million bushels of Illinois corn are used to produce more ethanol than any other state—about 678 million gallons.[36]

***Syngenta's Genetically Modified Corn***

53.     Syngenta's Viptera and Duracade brands of corn seed each have a genetically modified protein that purportedly makes the corn plant more resistant to insects and other pests. As bio-engineered products, Syngenta's genetically modified corn was subject to regulatory approval prior to commercialization.

54.     Other countries take varying periods of time to review and approve or disapprove new genetically modified grains before they can be imported into that country. China's regulatory process begins *after* regulatory approval of the seed in the exporting country, and typically takes at least two years for a regulatory decision to be made.

55.     At all times relevant hereto, Syngenta was familiar with China's regulatory process for obtaining import approval for new biotechnology products. In or about March of 2010, Syngenta applied to have Viptera deregulated in China such that it would be eligible for import from the U.S.  Syngenta knew that after submission of its application, the review process would last some two or three years, and could take longer depending on the circumstances, including if insufficient information was provided in the application. Syngenta

---

[35] "Fact Sheet – Illinois Corn," Illinois   Corn Growers Ass'n. Web. 26 Feb. 2016, *available at* www.ilcorn.org/file/103.

[36] "Facts about Illinois Agriculture," Illinois Dep't of Agric., 2014. Web. 26 Feb. 2016, *available at* https://www.agr.state.il.us/facts-about-illinois-agriculture/.

also knew or should have known that its request to deregulate Viptera for cultivation in China would lengthen the overall review and deregulation process.

56.     Viptera is a brand of yellow corn that has been genetically altered to contain the "Vip3A" insecticidal protein that is supposed to help corn crops resist various corn pests.

57.     On or about August 31, 2007, Syngenta petitioned the USDA to deregulate Viptera (MIR 162). In or about April of 2010, Viptera was deregulated by the USDA.  Also in 2010, the United States Environmental Protection Agency ("EPA") granted registration approval for genetic trait stacks including Syngenta's Agrisure Viptera gene.

58.     Numerous other countries, however, refused to approve Viptera corn as fit for human consumption.  These countries included China, Venezuela, South Korea, Saudi Arabia, Cuba, and Jamaica.  These nations collectively comprised over 25% of the U.S. corn export market.

59.     Nevertheless, promptly after receiving approval for Viptera in the U.S., Syngenta began marketing, distributing, and selling its Viptera corn seeds—even though it had not received approval from other countries that purchase U.S. corn and on whose purchases the market price for corn depends.  Knowing under the circumstances that contamination of the U.S. corn supply with Viptera would result Syngenta risked U.S. farmers' livelihood on the approval of Viptera by the major corn importing countries.  But Syngenta was not concerned about the livelihood of U.S. farmers or other industry stakeholders. Syngenta was solely interested in making a quick and substantial profit on its genetically modified Viptera corn after having invested hundreds of millions of dollars in research and project development.

60.     In fact, Syngenta projected that sales of Viptera would ultimately exceed 20% of the corn seed market.

61.     Syngenta's Duracade brand corn seed also express a new Bt Cry protein, eCry3.1Ab, that was genetically designed to help control problems with corn rootworm. This new protein had never been used commercially before Syngenta's introduction of Duracade. On or about April 22, 2011, Syngenta petitioned the USDA to deregulate Duracade (Event 5307). The EPA granted registration approval of Syngenta's Duracade trait in October 2012.  In or about February of 2013, Duracade was deregulated by the USDA. Once again, without having obtained approval for Duracade in major U.S. export markets, including China and European Union, Syngenta began marketing, distributing, and selling Duracade in the United States in 2014, thereby further damaging the market.

62.     Notably, Syngenta Canada Inc. announced that it would not sell Duracade brand corn seed in Canada for planting and that any seed containing Duracade shipped to Canada "cannot be sold" and that "arrangements for immediate returns will be made." Syngenta Canada's announcement noted the lack of regulatory import approvals in other countries, particularly China and the European Union. "Accordingly, we want to ensure the acceptance of any trait technology grown in Canada meets end market destination requirements."[37]

### Syngenta's Genetically Modified Corn Contaminates the U.S. Corn Supply

63.     In marketing and selling Viptera in the United States, Syngenta knew that it was not possible to completely isolate Viptera corn from other types of corn absent the implementation by it of strict stewardship, containment, and channeling measures.  Corn replicates by cross-pollination from one plant to another. Pollen from corn stalks "drift" over considerable distances and cross-breeds with other corn plants.  At all times relevant hereto, Syngenta knew that Viptera corn would cross-pollinate with other nearby corn plants.

---

[37] Polansek, Tom. "UPDATE 1-Syngenta Halts Sales of New GMO Corn Seed in Canada." *Reuters.* Thomson Reuters, 10 Mar. 2014. Web. 08 Feb. 2016, *available at* http://www.reuters.com/article/syngenta-corn-canada-idUSL2NOM71UX20140310.

64.     Additionally, Syngenta knew that the U.S. corn marketing system is commodity-based.  This means that corn is harvested, gathered, and shipped from hundreds of thousands of farms through local, regional, and terminal grain elevators.

65.     Therefore, given the permissive and market-driven nature of the U.S. grain handling system, Syngenta knew that unless strict stewardship and identity preservation measures were implemented at all levels – from the farm level through the marketing chain – Viptera would contaminate other U.S. corn crops, infiltrate the domestic U.S. corn supply, and cause the closure of foreign markets that imported U.S. corn but had not approved Viptera corn.

66.     In fact, in its deregulation petition, Syngenta represented to the USDA that it would implement a "product stewardship program" which would be "monitored and enforced [by Syngenta] according to a fully documented compliance program" to "divert this product away from export markets (i.e. channeling) where the grain has not yet received regulatory approval for import."[38]  Syngenta also represented that its MIR 162 trait should have "no effects on the U.S. maize export market[.]"  By these and other similar representations to the USDA and industry stakeholders, Syngenta recognized that the implementation, oversight, and execution of a vigorous stewardship program was the industry standard and essential to segregate Viptera from other corn to channel Viptera into accepting markets and avoid contamination.  At all times relevant hereto, Syngenta also knew that the industry standard was to obtain import approval in key foreign markets, including China, prior to its commercialization of Viptera in the U.S.

67.     Despite the foregoing, and despite Syngenta's representations to the USDA and industry stakeholders that it was committed to principles of good stewardship to protect industry

---

[38] See "Petition for Determination of Nonregulated Status for Insect-Resistant MIR162 Maize," Dennis P. Ward, Ph.D. and Scott A. Huber, Syngenta Biotechnology, Inc., August 31, 2007, available at https://www.aphis.usda.gov/brs/aphisdocs/07_25301p.pdf.

stakeholders from the loss of the Chinese and other export markets due to the commercialization of its Viptera corn, Syngenta failed to employ any meaningful or adequate stewardship, segregation, and identity preservation measures to isolate Viptera from other commercial U.S. corn. Moreover, Syngenta failed to adequately inform and educate Viptera farmers and other industry stakeholders on the proper handling, stewardship, segregation, and channeling of Viptera grain to prevent contamination of the domestic corn supply. Syngenta failed to implement or failed to adequately implement a compliance program with Viptera growers to contain and channel Viptera to accepting markets.

68.    Rather, Syngenta engaged in several acts of affirmative wrongdoing which not only increased the risk of contamination of the U.S. commercial corn supply, but made it a virtual inevitability.  For instance, Syngenta misrepresented and deceived industry stakeholders concerning the standing of its petition for deregulation of Viptera/MIR 162 with the Chinese government.  Syngenta indicated that approval of its Viptera corn seeds would happen quickly, when in fact this was not true.[39] Syngenta misrepresented to industry stakeholders China's significance as a purchaser of U.S. corn and corn products. Further, despite knowing that China was increasing yearly the volume of its purchases of U.S. corn, Syngenta also continued to increase its sales of Viptera corn seed in 2012 and 2013 further heightening the threat of contamination.  Additionally, to demonstrate the many attributes of its Viptera corn, Syngenta instructed farmers to raise Viptera directly alongside other commercial corn, resulting in cross-pollination and commingling of Viptera with other commodity corn.   Likewise, Syngenta

---

[39] Transcript of Investor Presentation, "First Quarter 2012 Sales," Syngenta, Apr. 18, 2012. Web. 14 Apr. 2016, *available at* http://www.syngenta.com/global/corporate/SiteCollectionDocuments/pdf/transcripts/q1-2012-transcript-syngenta.pdf ("On the import approval [for Viptera], it has import approval in all of the major markets. There is an outstanding approval for China, which we expect to have quite frankly within the matter of a couple of days.").

encouraged Viptera growers to deliver Viptera grain to any and all nearby grain elevators, handlers, and distributors. Furthermore, at various times, Syngenta represented to U.S. corn farmers and other industry stakeholders that Viptera could be sold to, and imported by, Chinese buyers, when in fact it could not. Syngenta engaged in all of the above-referenced conduct and wrongdoing simply to increase its revenue from the sale of its Viptera product, knowing fully the harm that would result to other industry stakeholders, including Plaintiffs, upon the contamination of the U.S. domestic corn supply and the loss of major export markets, including China.

69.     Syngenta knew that the timing, manner and scope of how it commercialized Viptera would contaminate the U.S. corn supply with the traits found in Viptera.    The contamination that occurred was actually foreseen by Syngenta, and farmers such as Plaintiffs suffered the very harm that Syngenta expected would occur in reckless disregard to the rights of U.S. corn farmers, including Plaintiffs.

70.     At all relevant times, the risk of harm to the U.S. corn industry posed by the negligent and premature commercialization of unapproved transgenic events was well-known to Syngenta. The presence of unapproved genetically modified traits in U.S. commodity exports has a history of generating import bans, which have repeatedly caused trade disruptions and devastating financial losses for U.S agricultural producers. For example, it was well known to Syngenta in September of 2000, that traces of an unapproved transgenic corn variety called "StarLink" were detected in U.S. corn products.[40] Immediately following the discovery, Japan and South Korea, the first and second largest importers of U.S. corn at that time, virtually halted all U.S. corn imports. The price of U.S. corn dropped dramatically. The U.S. commodity market

---

[40] *In re: StarLink Corn Products Liability Litigation,* MDL No. 1403 (N.D. Ill.).

took another hit in 2006, when unapproved genetically modified rice was detected in the U.S. rice supply. That led several U.S. trading partners, including the European Union, to ban or significantly reduce acceptance of U.S. rice exports, causing the U.S. rice industry hundreds of millions of dollars in losses.[41] Syngenta had full knowledge of these and other trade disruptions at all times relevant hereto.

71.     The contamination of U.S. crops by transgenic traits that are not approved for import by major foreign markets have consistently and predictably resulted in lost export markets and depressed crop prices. By commercializing Viptera and Duracade in the manner stated herein without receiving import approval from China, one of the U.S.'s largest trading partner for corn, Syngenta unreasonably disregarded a foreseeable risk of harm to Plaintiffs.

***The Harm Caused by Syngenta to U.S. Corn Farmers***

72.     In November 2013, China began rejecting shipments of U.S. corn after inspection tests revealed the presence of Syngenta's unapproved Viptera corn. In November and December 2013 alone, China rejected more than 665,000 metric tons of U.S. corn shipments due to the presence of Viptera. The Chinese General Administration of Quality Supervision, Inspection, and Quarantine began inspecting "every single shipment" of U.S. corn to detect Viptera. If Viptera was detected, China rejected shipment because of its "zero-tolerance" policy for unapproved imports, which both China and the United States have adopted.

73.     In 2014, despite having full knowledge of the market disruption resulting from its negligent commercialization of Viptera, Syngenta began marketing yet another genetically modified corn seed known as Duracade.  In addition to MIR 162, Duracade also contains another genetically modified trait known as Event 5307.   Neither MIR 162 nor Event 5307 were

---

[41] *In re: Genetically Modified Rice Litigation*, MDL No. 1811 (E.D. Mo.).

approved in China at the time Syngenta commercialized its Duracade seed.  In fact, at the time Syngenta commercialized its Duracade seed, none of the following countries had approved Duracade for human or animal consumption:  China, the 28 states of the European Union, Brazil, Switzerland, Colombia, Egypt, India, the Philippines, the Russian Federation, Indonesia, Thailand, Singapore, Kazakhstan, Belarus, and Turkey.  Even to this day, Duracade remains unapproved in China and other countries.  Yet, Syngenta keeps selling this seed in total disregard of the consequences. By negligently and prematurely commercializing its Duracade corn seed, Syngenta has knowingly and intentionally intensified and extended the disruption to, and loss of, the Chinese market to U.S. corn.

74.     In recent years, China was the fastest growing market for U.S. corn and the number one export market for DDGS. Before the 2013-2014 marketing year for corn, the USDA projected that China would import approximately 7 million metric tons of U.S. corn. Instead, because of the contamination of the U.S. corn supply with Viptera and Duracade corn, China has only imported 1.23 million metric tons. The USDA also projected that China would become the largest importer of U.S. corn by 2020 and would increase its import of corn to 22 million metric tons by 2023, accounting for nearly half of the projected growth in world corn trade.

75.     In December of 2013 however, China not only rejected shipments of U.S. corn, but also rejected approximately 2,000 tons of U.S. DDGS.  On June 9, 2014, China cancelled all import licenses to import U.S. DDGS.

76.     Before China's rejection of U.S. corn and DDGS began, the USDA forecast that China would triple its import of U.S. DDGS to seven million tons.  Indeed, China had rapidly increased its import of U.S. DDGS since 2008, and particularly in the last two years. Overall, roughly 20% of all U.S. DDGS are exported abroad, with China accounting for almost two-thirds

of all U.S. exports of DDGS.

77.     Because of China's rejection of Syngenta's Viptera and Duracade corn, U.S. exports of corn are down roughly 85% since 2013.   Exports of U.S. DDGS also stagnated following the rejection of U.S. DDGS shipments in late December 2013.   The loss of this large export market for U.S. corn and DDGS has resulted in substantially reduced prices for all U.S. corn.

78.     The NGFA is one of the largest industry organizations promoting U.S. grain producers.   This organization seeks to facilitate trade and provide for regulatory compliance while improving the environment for crop production.

79.     On January 22, 2014, the NGFA and the NAEGA sent a joint letter to Syngenta asking it to immediately stop selling Viptera and Duracade until such time as China and other U.S. export markets granted regulatory approval to one or both because of the harm that Syngenta's commercialization of these two brands had caused to U.S. corn farmers.[42] In their joint letter, the NGFA and NAEGA stated that they "are gravely concerned about the serious economic harm to exporters, grain handlers and, ultimately, agricultural producers—as well as the U.S.'s reputation to meet its customers' needs—that has resulted from Syngenta's current approach to stewardship of Viptera."[43] The NGFA and NAEGA informed Syngenta that launching Duracade would risk repeating and extending the damage that Syngenta had already caused by selling Viptera.

80.     As the letter further explained, "[a]s a matter of policy, NGFA and NAEGA have

---

[42] NGFA and NAEGA, *Joint Statement Regarding Letter to Syngenta Requesting Suspension of Commercialization Activities of Syngenta's Agrisure Viptera and Duracade Corn,* Jan. 23, 2014, *available at* www.ngfa.org/wp-content/uploads/NAEGA-NGFA-Joint-Public-Statement-on-Syngenta-Agrisure-Viptera-and-Duracade-Biotech-Traits-Jan-23-2014.pdf.

[43] *Id.* at 1.

communicated consistently, clearly and in good faith with biotechnology providers and seed companies about the importance of biotechnology providers actually obtaining regulatory approvals/authorizations for import in foreign markets before such traits are commercialized in the United States."[44]

81.    Further, the NGFA and NAEGA stressed to Syngenta that "U.S. farmers … depend heavily upon the exercise of due corporate responsibility by biotechnology providers with respect to the timing of product launch and commercialization."[45]

82.    In April 2014, the NGFA issued two economic analyses that conservatively calculated the combined harm caused by Syngenta to farmers and other industry stakeholders, as ranging between $1 billion and $2.9 billion, depending on how the harm is measured.[46] Further, given Syngenta's launch of Duracade, the NGFA estimated that the total harm to the grains sector for the 2014-15 marketing year could be even higher—as high as $3.4 billion.[47] In these economic analyses, the NGFA stressed its support for agricultural biotechnology developments, but not the commercialization of such crop biotechnology before securing import approvals from major U.S. export markets.

83.    As stated by the NGFA, "[r]egaining and maintaining access to the Chinese import market, as well as preserving access to other U.S. export markets, is critically important to the short and long-term prospects of U.S. agriculture. These export markets are key drivers of

---

[44] *Id.* at 2.

[45] *Id.*

[46] Max Fisher, *Lack of Chinese Approval for Import of U.S. Agricultural Products Containing Agrisure Viptera MIR 162: A Case Study on Economic Impacts in Marketing Year 2013/14,* NGFA, Apr. 16, 2014, *available at* ngfa.org/wp-content/uploads/Agrisure-Viptera-MIR-162-Case-Study-An-Economic-Impact-Analysis.pdf.

[47] Max Fisher, *Potential Forecasted Economic Impact of Commercializing Agrisure Duracade 5307 in U.S. Corn Prior to Chinese Import Approval,* NGFA, Apr. 16, 2014, *available at* ngfa.org/wp-content/uploads/Agrisure-Duracade-5307-Economic-Impact-Analysis.pdf.

producer profitability, current and future economic growth for U.S. agriculture, and achieving global food security."[48]

84.    Yet, Syngenta has rejected all pleas for it to stop selling Viptera and Duracade corn seed.  And instead of taking responsibility for the damage it has caused and is still causing with its premature commercialization of Viptera and Duracade, Syngenta refuses to compensate corn producers, including Plaintiffs, for the losses they have suffered.

85.    Although Syngenta did eventually gain approval for the import of Viptera to China in December of 2014, this approval came far too late to prevent the loss of the Chinese market to U.S. corn.  The loss of the Chinese market to U.S. corn and DDGS has caused diminished prices for corn in the United States, and Plaintiffs' resulting damages. Further, there is no end in sight to the loss of the Chinese market to U.S. corn. As set forth above, Syngenta has now knowingly, intentionally, and recklessly commercialized its Duracade corn in the U.S., despite the fact that this corn remains unapproved in China. Because of China's rejection of Syngenta's Viptera and Duracade corn, exports of U.S. corn continue to be down drastically since 2013.

86.    Farmers like Plaintiffs who have not purchased or harvested Viptera or Duracade corn have sustained significant damages as a direct and proximate result of Syngenta's tortious conduct.  Such damages include, but are not limited to, diminished prices for U.S corn resulting from the loss of export markets as well as cleaning and other remediation costs associated with Syngenta's contamination of farmland, farming equipment, harvesting equipment, and transportation facilities and equipment.

87.    At all times relevant to this suit neither Viptera nor Duracade was a biological

---

[48] Max Fisher, *Lack of Chinese Approval, supra* at 2.

control organism, plant pest, or noxious weed and thus are not governed by the Plant Protection Act ("PPA"), 7 U.S.C. § 7711 et seq. Plaintiffs do not assert, and expressly disclaim, any claim against Syngenta for violation of the PPA.

88.     Plaintiffs do not assert, and expressly disclaim, any claim based on a misrepresentation or omission regarding the labeling of Syngenta's product. Plaintiffs do not seek to impose or continue in effect any requirements for labeling or packaging of Syngenta's products.

***The ABCD Companies and Gavilon Also Contributed to Cause the Loss of the Chinese Market***

89.     In addition to Syngenta, the ABCD Companies and Gavilon also contributed to cause the loss of the Chinese market and Plaintiffs' resulting damages through their tortious conduct described herein.

90.     At the heart of this case is the interdependence and interconnected relationship that exists between those in the U.S. agricultural industry, specifically biotechnology companies, farmers, and exporters of U.S. grain.   The ABCD Companies and Gavilon are large, sophisticated agricultural commodity companies.   Collectively, the ABCD Companies and Gavilon dominate the global flow of agricultural commodities, including corn.   In fact, it is estimated that the ABCD Companies alone account for some 75 to 90 percent of international grain trade.   The ABCD Companies and Gavilon source grain from U.S. corn producers.[49]   The ABCD Companies and Gavilon then sell this corn into various domestic and foreign markets, including China.   Alternatively, the ABCD Companies and Gavilon use the corn to produce ethanol and sell the DDGS (a co-product of ethanol) into various domestic and foreign markets,

---

[49] This grain may be delivered to the ABCD Companies or Gavilon at their respective grain elevators and other facilities.  This grain may also be delivered directly to one or more of the ethanol plants owned and operated by each of the ABCD Companies or Gavilon.

including China.  The ABCD Companies and Gavilon are among the largest U.S. producers of DDGS.  At all relevant times, the ABCD Companies and Gavilon knew that China was a major export market for U.S. corn and DDGS.

91.     The ABCD Companies and Gavilon have long recognized the interdependency and interconnected relationship that exists between participants in the U.S. agricultural industry, including biotechnology companies, farmers, and exporters.  As admitted by Cargill, "[d]ue to the interdependence and interconnectedness of the modern agricultural industry," "there is a shared responsibility, among industry participants to exercise reasonable care when commercializing, releasing, and selling new biotechnology."[50] The ABCD Companies and Gavilon have long recognized U.S. farmers as industry "stakeholders." At all times relevant hereto, the ABCD Companies and Gavilon have known that their actions and omissions directly impact the livelihoods of U.S. farmers, including Plaintiffs.  At all times relevant hereto, the ABCD Companies and Gavilon have also known that U.S. farmers, including Plaintiffs, rely upon them to responsibly source, gather, market, transport, sell, and ship U.S. corn and DDGS domestically and abroad and to maintain the export market for U.S. corn and DDGS.

92.     As early as 2010, the ABCD Companies and Gavilon knew from discussions with Syngenta—and based upon overt actions taken by Syngenta—that Syngenta would commercialize its genetically modified Viptera corn seed in the U.S. without first obtaining the necessary approvals of all major export markets, including China.  The ABCD Companies and Gavilon also knew that Syngenta began marketing, distributing and selling its Viptera corn seed in 2011 and increased its sales of Viptera during subsequent years.

---

[50] Petition for Damages, *Cargill, Incorporated and Cargill International SA v. Syngenta Seeds, Inc.*, Case No. 67061, In the 40th Judicial District Court for the Parish of St. John the Baptist, State of Louisiana (filed Sep. 12, 2014).

93.     As set forth herein, each of the ABCD Companies and Gavilon have operated extensively in China for many years, are intimately familiar with China's legal and regulatory requirements for the import of biotech commodities, and knew at all relevant times of China's zero tolerance policy concerning unapproved genetically modified organisms.

94.     Thus, at all times during Syngenta's commercialization of its Viptera corn in the U.S. as described above, the ABCD Companies and Gavilon knew that Viptera had not been approved for food or feed use in China and knew or should have known Viptera could not be exported to China. Further, each of the ABCD Companies and Gavilon knew and discussed the certain risk of harm to farmers in the event that the Viptera trait was detected in U.S. corn and DDGS shipments to China. In related litigation, certain of the ABCD Companies have produced internal communications admitting their awareness of this risk and the potential for massive economic losses to U.S. farmers as a result of accepting and shipping commodities with transgenic events not approved for major U.S. export markets, specifically China. Through their corporate policies, public statements, communications and conduct, the ABCD Companies and Gavilon represented that they were taking steps to prevent the contamination of U.S. corn and DDGS exports and to ensure that their shipments of U.S. corn and DDGS to China would not contain Viptera.

95.     Nevertheless, the ABCD Companies and Gavilon failed to take reasonable steps to protect industry stakeholders, including Plaintiffs, against the foreseeable harm that would result upon the detection of Viptera in U.S. export shipments to China, specifically the loss of the Chinese market to U.S. corn and DDGS and the resulting drop in domestic corn prices suffered by U.S. farmers.

96.     At all relevant times, the ABCD Companies and Gavilon knew the risks posed by

Syngenta's commercialization of genetically modified traits prior to receiving import approval from major foreign markets. The ABCD Companies and Gavilon were, at all times before and after the commercialization of Viptera and Duracade, aware of the importance of obtaining import approval from major export markets. The ABCD Companies and Gavilon also knew that without adequate channeling and sourcing procedures, Viptera would ultimately contaminate the U.S. corn supply and be detected in export shipments, resulting in disruption of trade.

97.    Despite knowing that Syngenta was launching its genetically-modified Viptera corn seed, that Viptera had not been approved in China, and that upon detection in China this key market would be lost to U.S. corn and DDGS, each of the ABCD Companies and Gavilon engaged in numerous acts of affirmative misconduct and malfeasance which contributed to cause the loss of the Chinese market and Plaintiffs' resulting damages.

***The ABCD Companies and Gavilon Failed to Exercise Reasonable Care in the Marketing, Sourcing, Selling and Shipping of U.S. Corn and DDGS***

98.    Through their negligent business practices, the ABCD Companies and Gavilon excacerbated a set of circumstances created by Syngenta and by their own conduct further contributed to cause the loss of the Chinese market. More specifically, and as described in greater detail herein, Plaintiffs assert that the ABCD Companies and Gavilon were negligent and failed to exercise reasonable care by:

   a.  Issuing and disseminating corporate policies, publications, and other communications to U.S. farmers indicating that they would accept Viptera at times when farmers were making planting decisions, thereby encouraging and inducing farmers to plant Viptera;

   b.  Permitting their crop consultants and corporate representatives or agents to recommend and/or not discourage farmer cultivation of Viptera and/or Duracade

resulting in more expansive cultivation and contamination of the U.S. corn supply by cross-pollination and commingling;

c.   Failing to meaningfully consult and communicate promptly and transparently with industry stakeholders about the foreseeable risk of harm posed by commercialization of Viptera and Duracade prior to receiving import approval from China;

d.   Adopting untimely, inconsistent and inadequate delivery policies regarding the acceptance of Viptera corn at harvest;

e.   Purchasing corn from producers without requiring seed certification paperwork or other written documentation, or taking any other action sufficient to demonstrate the corn they sourced was Viptera-free;

f.    Purchasing corn from producers without requiring seed certification paperwork or other written documentation, or taking any other action sufficient to demonstrate the corn they sourced for the production of DDGS for shipment to China was Viptera-free;

g.   Knowingly accepting and purchasing Viptera corn during the relevant time period without plans or without adequate plans for proper channeling and segregating Viptera from other corn being shipped to China;

h.   Knowingly accepting and purchasing Viptera corn during the relevant time period without plans or without adequate plans for proper channeling and segregating Viptera from other corn used to produce DDGS for shipment to China;

i.    Failing to source uncontaminated corn for shipment to China despite representing to the industry, the public, and their Chinese customers that they could, and

would, do so;

j.   Failing to source uncontaminated corn for the production of DDGS shipped to China despite representing to the industry, the public, and their Chinese customers that they could, and would, do so;

k.   Failing to employ known identity-preservation methods to segregate Viptera from non-Viptera corn;

l.   Contributing to the contamination of the corn supply by commingling and mixing Viptera with other non-Viptera grain in their ethanol plants, state-licensed grain elevators and other facilities;

m.   Knowingly shipping and continuing to ship contaminated U.S. corn and DDGS to China, even after initial rejections by Chinese authorities and despite actual knowledge that their shipments were contaminated with unapproved Viptera corn; and,

n.   Failing to timely and adequately respond to customer complaints following the rejection of their corn and DDGS shipments from China thereby causing Chinese purchasers to source corn and DDGS from locations other than the U.S.

99.   By electing to accept delivery of Viptera and Duracade at their elevators and ethanol plants, the ABCD Companies and Gavilon had a duty to do so in a manner that was not negligent. By their assurances, policies and practices, the ABCD Companies and Gavilon facilitated widespread planting and cultivation of Viptera and Duracade, despite the known risk of cross-pollination and mixing, thereby contributing to the contamination of the U.S. corn supply.  Each of the negligent actions and omissions of the ABCD Companies' and Gavilon described herein and throughout this Complaint was a proximate cause of the loss of the Chinese

market to U.S. corn and DDGS and Plaintiffs' resulting damages. Such damages include, but are not limited to, diminished prices for U.S corn resulting from the loss of export markets as well as cleaning and other remediation costs associated with contamination of farmland, farming equipment, harvesting equipment, transportation facilities and equipment, and other property.

100.    On at least an annual basis, if not more frequently, the ABCD Companies and Gavilon issue and disseminate corporate policies, publications, and other materials and information to U.S. farmers.  These communications advise farmers of market conditions and instruct farmers as to which varieties of corn and other crops the ABCD Companies and Gavilon will accept at harvest.  U.S. farmers rely on these communications in making planting decisions. The ABCD Companies and Gavilon know that U.S. corn is typically planted in the spring months and harvested in late summer or fall.   If a farmer knows before buying his seed that the grain elevators will not accept a certain variety, the farmer will not plant it. Accordingly, through their marketing materials, the ABCD Companies and Gavilon knowingly and intentionally influence the extent to which any particular variety of seed is raised in the U.S. in any given year.

101.    While at various times, certain of the ABCD Companies (Bunge and Cargill) adopted corporate policies and issued publications indicating they would not accept Viptera corn, these policies were not in place at all relevant times or were not stringently enforced.  In some instances, they were communicated after farmers had already made planting decisions or had the corn in the field.  For instance, in the spring of 2010, before Syngenta obtained approval for Viptera corn in Japan and Korea and before Syngenta began selling Viptera corn seed commercially, Bunge adopted a policy stating it would not accept delivery of Viptera corn during the 2010 growing season.  Yet, when Syngenta subsequently received import approval for

Viptera from Japan and Korea, Bunge lifted this policy and indicated it would accept Viptera grain into its facilities.  On information and belief, this shift in policy induced certain farmers to raise Viptera during the 2011 growing season as opposed to other varieties of corn.  Thereafter, in the summer of 2011, Bunge again announced that it would refuse to accept delivery of Viptera corn based on Syngenta's failure to obtain regulatory approval from other major export partners, specifically China and the European Union. Several months later, after corn was already being harvested and delivered to grain elevators, Cargill first announced that it would no longer accept Viptera corn, but only at certain locations.  However, Cargill did accept Viptera corn at many of its facilities on the alleged basis that it could segregate the Viptera grain from its other corn stocks.[51]  Notably, both ADM and Dreyfus accepted delivery of Viptera corn at their grain elevators, ethanol plants, and other facilities at all times relevant hereto, and made this fact known to farmers through their marketing materials or communications. Gavilon did likewise.

102.    In addition, each of the ABCD Companies and Gavilon employs crop consultants who visit farmers' fields and advise them throughout the year what, when, where, and how to raise corn most productively, for among other purposes, garnering higher yields at harvest. Under the circumstances, the ABCD Companies and Gavilon failed to exercise reasonable care by permitting their crop consultants or other agents, upon whom the farmers relied to make planting decisions, to recommend and/or not discourage farmer cultivation of Viptera and/or Duracade.

103.    In related litigation, certain of the ABCD Companies have claimed Syngenta was

---

[51] Even if Bunge or Cargill adopted policies or issued some publications indicating that they would not accept Viptera corn at harvest as set forth herein, such policies and publications were untimely, inadequate, and insufficient for the reasons stated herein; moreover, such policies and publications were insufficient to ensure that the corn sourced and exported to China was free of Viptera.

negligent for failing to meaningfully consult and communicate promptly and transparently with industry stakeholders about the commercialization of Viptera and Duracade.  While Plaintiffs share those criticisms of Syngenta, the ABCD Companies and Gavilon were also negligent in this respect for the reasons set forth herein which contributed to the contamination of the U.S. corn supply and Plaintiffs' resulting damages.

104.   The agriculture industry has sourced numerous agricultural products separately over the years, including waxy corn and high oil corn as well as non-GMO and food grade soybeans to name a few. The ABCD Companies and Gavilon customarily manage these issues by coordinating the timing of delivery and transportation of these products, or loading products directly onto barges or vessels. However, the ABCD Companies and Gavilon negligently failed to source non-Viptera corn for shipment to China. The ABCD Companies and Gavilon also negligently failed to source non-Viptera corn for the production of DDGS shipped to China or otherwise failed to source from third parties non-Viptera DDGS for shipment to China.

105.   Despite knowing of this risk and the consequences certain to result upon the detection of an unapproved transgenic event in a shipment of corn or DDGS to China, the ABCD Companies and Gavilon marketed their services to, and sourced grain from, growers of Viptera; purchased grain without requiring seed certification paperwork or other written documentation, or taking any other action sufficient to demonstrate the corn they sourced was Viptera-free; sourcing corn and/or DDGS from non-producer third-parties without sufficiently inquiring about or knowing the third-parties' policies, practices, and procedures regarding the acceptance of Viptera at their facilities; and, in fact, knowingly and voluntarily purchased[52] Viptera grain

---

[52] Each of the ABCD Companies and Gavilon demands that farmers delivering corn to them identify the type or brand of corn delivered in each lot and will not accept the delivery of corn without the farmer providing this information.  The ABCD Companies and Gavilon voluntarily obtain this information from the grain producers to satisfy customer demands for certain types of corn needed to make their products.

during the relevant time period without plans or without adequate plans for proper channeling and segregating that corn from other corn intended for shipment to China.

106.    In fact, each of the ABCD Companies and Gavilon actively contributed to the contamination of the corn supply by commingling and mixing Viptera with other non-Viptera grain in their state-licensed grain elevators, ethanol plants, and other facilities.

107.    Additionally, upon information and belief, it was the standard practice of the ABCD Companies and Gavilon before, during, and/or after exporting U.S. corn and DDGS to Chinese buyers, to warrant and certify to their Chinese buyers that the corn or DDGS shipped were free from unapproved genetically modified corn events, including Viptera;[53] specifically, the ABCD Companies and Gavilon represented and promised their Chinese buyers that their shipments of U.S. corn and DDGS to China were not contaminated with unapproved genetically modified Viptera corn.

108.    But the ABCD Companies and Gavilon falsely made these representations of material fact to their Chinese buyers knowing that their marketing and grain sourcing practices were insufficient to source uncontaminated corn and DDGS for shipment to China.[54]  By failing to properly and adequately source the corn and DDGS destined for China, the ABCD Companies and Gavilon lacked any good faith basis to guarantee Viptera-free shipments or to certify their respective shipments as Viptera-free. Yet, the ABCD Companies and Gavilon made these false and misleading certifications anyway, despite knowing both that China had adopted a "zero tolerance" policy with respect to unapproved genetic traits and that, upon the detection of

---

[53] The Chinese customers required these certifications and guarantees of the ABCD Companies and Gavilon.

[54] Moreover and alternatively, though validated testing methodologies were available and well-known in the marketplace, including but not limited to, lateral flow strips and/or polymerase chain reaction ("PCR") tests, the ABCD Companies and Gavilon failed to test, or failed to adequately test prior to delivery at their facilities, the corn or DDGS for shipment to China.

Viptera in China, they could not furnish the biosafety certificates required by Chinese law.

109.   The ABCD Companies and Gavilon failed to take adequate steps to ensure that their U.S. corn and DDGS shipments were exported to appropriate foreign markets. In so doing, the ABCD Companies and Gavilon completely disregarded the foreseeable risk of harm to the U.S. corn industry that would result from China's rejection of U.S. corn and DDGS. Regardless of any testing or inspection performed or not performed, the ABCD Companies and Gavilon were negligent in their marketing of U.S. corn and DDGS because they knew that there existed a high likelihood of Viptera contamination in their shipments based upon their improper conduct described herein and yet elected to channel this U.S. corn and DDGS to China, a market where Viptera had not received import approval.

110.   In 2013 and 2014, and in the years leading up thereto, each of the ABCD Companies and Gavilon exported U.S. corn via vessel or barge to China. In November of 2013, China discovered Viptera corn in shipments of what was supposed to be non-Viptera corn from the United States. Consequently, these shipments were quarantined and rejected due to unapproved GMO contamination. Despite this fact, the ABCD Companies and Gavilon continued shipping barge after barge and vessel after vessel of contaminated corn to China. Upon information and belief, each of the ABCD Companies and Gavilon sent several shipments of U.S. corn to China which were rejected due to GMO contamination, even after the initial rejections by the Chinese authorities. When testing of these shipments by Chinese authorities over the next several weeks and months revealed that numerous shipments of U.S. corn from the ABCD Companies and Gavilon had tested positive for Viptera, China banned the import of such corn.

111.   In 2013 and 2014, and in the years leading up thereto, each of the ABCD

Companies and Gavilon exported U.S. DDGS via vessel or barge to China. For instance, Gavilon has reported that it is one of the top two exporters of U.S. DDGS to China.[55]  The ABCD Companies have also been large exporters of U.S. DDGS at all times relevant hereto.  In late December of 2013, China discovered Viptera in shipments of U.S. DDGS.  Consequently, these shipments were quarantined and rejected due to unapproved GMO contamination. In December alone, China rejected approximately 2,000 tons of U.S. DDGS.  Despite this fact, the ABCD Companies and Gavilon continued shipping barge after barge and vessel after vessel of contaminated U.S. DDGS to China. Upon information and belief, each of the ABCD Companies and Gavilon sent several shipments of U.S. DDGS to China which were rejected due to GMO contamination, even after the initial rejections by the Chinese authorities. When testing of these shipments by Chinese authorities over the next several weeks and months revealed that numerous shipments of U.S. DDGS from the ABCD Companies and Gavilon had tested positive for Viptera, on June 9, 2014, China cancelled all import licenses for U.S. DDGS.

112.    Before China's rejection of U.S. corn and DDGS began, the USDA forecast that China would triple its import of U.S. DDGS to seven million tons.  Indeed, China had rapidly increased its import of U.S. DDGS since 2008, and particularly in the last two years. Overall, roughly 20% of all U.S. DDGS are exported abroad, with China accounting for almost two-thirds of all U.S. exports of DDGS.

113.    Because of China's rejection of Viptera corn found in shipments of U.S. corn to China by the ABCD Companies and Gavilon, U.S. exports of corn are down roughly 85% since 2013. Exports of U.S. DDGS to China also plummeted following the initial rejection of U.S.

---

[55] "Distillers Grains Technology Council Symposium: Issues Affecting Economics of DDGS Production and Marketing 2014-15," Gavilon, May 13, 2015. Web. 14 Apr. 2016, *available at* http://www.distillersgrains.org/files/symposium/2015Presentations/3-ives-DGTC_2015.pdf.

DDGS shipments in late December 2013.  The loss of the Chinese export markets for U.S. corn and DDGS has resulted in reduced prices for all U.S. corn.

114.    Having failed to deliver non-Viptera corn and DDGS as certified, the ABCD Companies and Gavilon regularly defaulted on their contracts with the Chinese buyers, further stifling the export of U.S. corn and DDGS to China.

115.    By electing and undertaking to ship U.S. corn and DDGS to China, the ABCD Companies and Gavilon had a duty to do so in a manner that was not negligent. Had the ABCD Companies and Gavilon exercised reasonable care under the circumstances, they would have sourced and shipped non-Viptera U.S. corn and DDGS for export to the Chinese market. But they did not.

116.    Through their tortious conduct described herein the ABCD Companies and Gavilon contributed to cause disruption to, and the loss of, the Chinese market for U.S. corn and DDGS and Plaintiffs' resulting damages.

117.    The actions by the ABCD Companies and Gavilon detailed herein, including their continued shipments of corn and DDGS to China that they knew or should have known contained unapproved genetically modified material, contributed to cause the loss of the Chinese market to U.S. corn and DDGS and constitute negligence.

### COUNT 1: NEGLIGENCE – SYNGENTA

118.    Plaintiffs reallege the above paragraphs as though fully set forth herein.

119.    Syngenta's acts and/or omissions, as described herein, constitute negligence, negligence per se, or both.

120.    As a product developer and manufacturer, Syngenta had a duty to refrain from selling and distributing Viptera and Duracade in a manner that would foreseeably cause harm to

the Plaintiffs, to use reasonable care in its commercialization of Viptera and Duracade, and to protect Plaintiffs from an unreasonable risk of harm. Syngenta owed farmers, such as Plaintiffs, a duty of reasonable care concerning the timing, manner, and scope of Syngenta's commercialization of Viptera and Duracade. Syngenta also owed farmers, such as Plaintiffs, a duty to provide assistance through either channeling or stewardship programs.

121.    Syngenta breached these duties by failing to exercise reasonable care to prevent the foreseeable contamination of the U.S. corn supply that would naturally result from the premature sale and distribution of Viptera and Duracade.

122.    Syngenta's breaches of duty are a direct and a proximate cause of the damages suffered by Plaintiffs.

123.    The rejection by China of U.S. corn could not have occurred without Syngenta's negligence in prematurely releasing its genetically modified corn seed without prior approval of major export partners because the commercialization of these genetically modified corn seeds was solely under its management and control. Syngenta made the decision to commercialize Viptera and Duracade knowing that it would likely contaminate the U.S. corn supply. Viptera and Duracade in fact contaminated the U.S. corn supply, which could not have occurred without Syngenta's negligence. Syngenta had exclusive control over the commercialization of Viptera and Duracade and these unapproved genetically modified traits could not have contaminated the U.S. corn supply without a lack of proper care.

124.    Syngenta's negligence was a direct and proximate cause of Plaintiffs' injuries and damages.   Plaintiffs' injuries and damages would not have occurred absent Syngenta's negligence.   Plaintiffs suffered injury and property damage by the sale and distribution of Viptera and Duracade by Syngenta as outlined herein, and seek compensatory damages.

Plaintiffs further seek punitive damages as a result of Syngenta's gross negligence, reckless, and willful conduct indicating its reckless and wanton disregard of the rights of farmers, including Plaintiffs, and all costs and fees allowed by law.

## COUNT 2: RES IPSA LOQUITUR – SYNGENTA

125.    Plaintiffs reallege the above paragraphs as though fully set forth herein.

126.    The rejection by China of U.S. corn could not have occurred without Syngenta's negligence in prematurely releasing its genetically modified corn seed without prior approval of major export partners because the commercialization of these genetically modified corn seeds was solely under its management and control. Syngenta made the decision to commercialize Viptera and Duracade knowing that it would likely contaminate the U.S. corn supply. Viptera and Duracade in fact contaminated the U.S. corn supply, which could not have occurred without Syngenta's negligence. Syngenta had exclusive control over the commercialization of Viptera and Duracade and these unapproved genetically modified traits could not have contaminated the U.S. corn supply without a lack of proper care.

127.    Plaintiffs suffered injury and property damage by the sale and distribution of Viptera and Duracade by Syngenta as outlined herein and seeks compensatory damages. Plaintiffs further seek punitive damages as a result of Syngenta's gross negligence, reckless, and willful conduct indicating its reckless and wanton disregard of the rights of farmers including Plaintiffs, and all costs and fees allowed by law.

## COUNT 3: NEGLIGENCE – ABCD COMPANIES AND GAVILON

128.    Plaintiffs reallege the above paragraphs as though fully set forth herein.

129.    The ABCD Companies' acts and/or omissions, as described herein, constitute negligence, negligence per se, or both. Likewise, Gavilon's acts and/or omissions, as described

herein, constitute negligence, negligence per se, or both.

130.    The ABCD Companies and Gavilon have long recognized that due to the interdependence and connectedness of the modern agricultural industry, there is a shared responsibility among industry participants, including both biotech companies and exporters, to exercise reasonable care in the commercialization, marketing, sourcing, selling, and shipping of new biotechnology products.

131.    Therefore, knowing that Syngenta would commercialize its genetically modified Viptera corn without first obtaining the necessary approvals of all major export markets, including China, knowing that China had adopted a "zero tolerance" policy with respect to unapproved genetic traits, and further knowing the consequences certain to result upon the detection of an unapproved transgenic event in a shipment of corn to China, the ABCD Companies and Gavilon owed Plaintiffs a duty to exercise reasonable care in the marketing, sourcing, selling, and shipping of U.S. corn and DDGS to China. The ABCD Companies and Gavilon had a duty to refrain from selling and shipping Viptera in a manner that would foreseeably cause harm to Plaintiffs, to use reasonable care in their export and shipping of U.S. corn and DDGS to China, and to protect Plaintiffs from an unreasonable risk of harm.

132.    By electing to accept delivery of Viptera and Duracade at their elevators, ethanol plants, and other facilities, the ABCD Companies and Gavilon had a duty to do so in a manner that was not negligent. By their assurances, policies and practices, the ABCD Companies and Gavilon facilitated widespread planting and cultivation of Viptera and Duracade, thereby contributing to the contamination of the U.S. corn supply.

133.    Each of the ABCD Companies and Gavilon breached their duties by failing to exercise reasonable care to prevent a foreseeable risk of harm that would naturally result from

their improper conduct in the marketing, sourcing, selling, and shipping of U.S. corn and DDGS to China. Specifically, despite knowing that Syngenta was launching its genetically-modified Viptera corn seed, that this variety had not been approved in China, and that upon detection in China, that market would close to U.S. corn and DDGS, each of the ABCD Companies and Gavilon breached its duty of reasonable care by:

> a. Issuing and disseminating corporate policies, publications, and other communications to U.S. farmers indicating that they would accept Viptera at times when farmers were making planting decisions, thereby encouraging and inducing farmers to plant Viptera;
>
> b. Permitting their crop consultants and corporate representatives or agents to recommend and/or not discourage farmer cultivation of Viptera and/or Duracade resulting in more expansive cultivation and contamination of the U.S. corn supply by cross-pollination and commingling;
>
> c. Failing to meaningfully consult and communicate promptly and transparently with industry stakeholders about the foreseeable risk of harm posed by commercialization of Viptera and Duracade prior to receiving import approval from China;
>
> d. Adopting untimely, inconsistent and inadequate delivery policies regarding the acceptance of Viptera corn at harvest;
>
> e. Purchasing corn from producers without requiring seed certification paperwork or other written documentation, or taking any other action sufficient to demonstrate the corn they sourced was Viptera-free;
>
> f.  Purchasing corn from producers without requiring seed certification paperwork

or other written documentation, or taking any other action sufficient to demonstrate the corn they sourced for the production of DDGS for shipment to China was Viptera-free;

g.  Knowingly accepting and purchasing Viptera corn during the relevant time period without plans or without adequate plans for proper channeling and segregating Viptera from other corn being shipped to China;

h.  Knowingly accepting and purchasing Viptera corn during the relevant time period without plans or without adequate plans for proper channeling and segregating Viptera from other corn used to produce DDGS for shipment to China;

i.  Failing to source uncontaminated corn for shipment to China despite representing to the industry, the public, and their Chinese customers that they could, and would, do so;

j.  Failing to source uncontaminated corn for the production of DDGS shipped to China despite representing to the industry, the public, and their Chinese customers that they could, and would, do so;

k.  Failing to employ known identity-preservation methods to segregate Viptera from non-Viptera corn;

l.  Contributing to the contamination of the corn supply by commingling and mixing Viptera with other non-Viptera grain in their ethanol plants, state-licensed grain elevators and other facilities;

m.  Knowingly shipping and continuing to ship contaminated U.S. corn and DDGS to China, even after initial rejections by Chinese authorities and despite actual knowledge that their shipments were contaminated with unapproved Viptera corn;

and,

n.   Failing to timely and adequately respond to customer complaints following the rejection of their corn and DDGS shipments from China thereby causing Chinese purchasers to source corn and DDGS from locations other than the U.S.

134.   By electing to accept delivery of Viptera and Duracade at their elevators and ethanol plants, the ABCD Companies and Gavilon had a duty to do so in a manner that was not negligent. By their assurances, policies and practices, the ABCD Companies and Gavilon facilitated widespread planting and cultivation of Viptera and Duracade, thereby contributing to the contamination of the U.S. corn supply. Moreover and alternatively, each of the ABCD Companies and Gavilon breached its duties because prior to selling U.S. corn and DDGS to China, the ABCD Companies and Gavilon failed to adequately test its corn and DDGS bound for China to determine whether or not that shipment contained genetically modified material not approved for import, sale and/or use in China. Likewise, each of the ABCD Companies and Gavilon exported shipment after shipment of corn and DDGS to China without taking reasonable and adequate precautions to ensure the corn it sold was not contaminated with Viptera.

135.   Each of the ABCD Companies' and Gavilon's breaches of duty is a direct and a proximate cause of the loss of the Chinese market and the damages suffered by Plaintiffs.

136.   Each of the ABCD Companies' and Gavilon's breaches of duty contributed to cause the loss of the Chinese market to U.S. corn and Plaintiffs' resulting damages. The ABCD Companies' and Gavilon's actions described herein contributed to exacerbate the contamination of the U.S. corn supply.  The ABCD Companies' and Gavilon's actions described herein, including their continued shipment to China of corn and DDGS that they knew or should have known contained Viptera, also contributed to the negative reaction from the Chinese market, the

loss of the Chinese market to U.S. corn and DDGS, and Plaintiffs' resulting damages.

137.   Plaintiffs would not have sustained damages to the same degree they would otherwise had the ABCD Companies and Gavilon exercised ordinary and reasonable care in the marketing, sourcing, selling, and shipping of corn and DDGS to China.

138.   Plaintiffs suffered injury and damages due to the tortious conduct of each of the ABCD Companies and Gavilon as outlined herein, and seek compensatory damages.  Plaintiffs further seek punitive damages as a result of ABCD Companies' and Gavilon's gross negligence, reckless and willful conduct indicating their reckless and wanton disregard of the rights of farmers such as Plaintiffs, and all costs and fees allowed by law.

## JURY DEMAND

139.   Plaintiffs demand a trial by jury on all issues.

## REQUEST FOR RELIEF

WHEREFORE, each of the Plaintiffs named herein has sustained damages in excess of $75,000.00, exclusive of interest and costs, as a direct and proximate result of Defendants' tortious conduct in the commercialization, marketing, sourcing, selling and shipping of Viptera and Duracade corn. Accordingly, Plaintiffs respectfully request that this Court enter judgment jointly and severally against Defendants for compensatory damages in a sum to be determined by the trier of fact, exclusive of interest and costs, and for such other and further relief as this court deems equitable and just in the premises.

Dated: April 15, 2016.

Respectfully Submitted:

s/Peter J. Flowers_____

Peter J. Flowers
Illinois State Bar No. 06210847
Brian J. Perkins
Illinois State Bar No. 06283734
MEYERS & FLOWERS, LLC
3 North Second Street, Suite 300
St. Charles, Illinois 60174
P:  (630) 232-6333 | F: (630) 845-8982
Email: pjf@meyers-flowers.com
          bjp@meyers-flowers.com

Martin J. Phipps
*Admitted*, Southern District of Illinois
Illinois ARDC No. 6321872
Texas Bar No. 00791444
Barry Deacon *(Pending pro hac vice)*
Illinois ARDC No. 6321873
Arkansas State Bar No. 75030
PHIPPS ANDERSON DEACON, LLP
102 9th Street
San Antonio, Texas 78215
P: (210) 340-9877 | F: (210) 340-9899
Email: mphipps@phippsandersondeacon.com
          bdeacon@phippsandersondeacon.com

Clayton A. Clark
*Admitted*, Southern District of Illinois
Illinois ARDC No. 6322111
Scott A. Love
*Admitted*, Southern District of Illinois
Illinois ARDC No.  6322113
William W. Lundquist
*Admitted*, Southern District of Illinois
Texas Bar No. 24041369
CLARK LOVE HUTSON GP
440 Louisiana Street, Suite 1600
Houston, Texas 77002
P: (713) 757-1400 | F: (713) 759-1217
Email: CClark@TrialLawFirm.com
          SLove@TrialLawFirm.com
          WLundquist@TrialLawFirm.com

57

Michael K. Johnson (*Pending pro hac vice*)
Minnesota State Bar No. 0258696
JOHNSON BECKER, PLLC
33 South Sixth Street, Suite 4530
Minneapolis, Minnesota 55402
P: (612) 436-1800 | F:  (612) 436-1801
Email: mjohnson@JohnsonBecker.com

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I, Peter J. Flowers, Esq., as one of the attorneys for the Plaintiffs, hereby certify that on this 15th day of April, 2016, the foregoing Second Amended Consolidated Complaint was filed via the Court's ECF system, which will send notice of such filings to all counsel of record.

s/Peter J. Flowers_____