IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

-----------------------------------------------------------

IN RE SYNGENTA MASS TORT ACTIONS

-----------------------------------------------------------

Judge David R. Herndon

This Document Relates to:

*Tweet et al. v. Syngenta AG et al.* No. 3:16-cv-00255-DRH

# MEMORANDUM and ORDER

**HERNDON, District Judge:**

This matter comes before the Court on two motions to dismiss plaintiff's third amended complaint filed by Archer Daniels Midland Company, Bunge North America Inc., Cargill, Incorporated, Louis Dreyfus Commodities LLC[1] (hereinafter referred to collectively as "ABCD defendants") (Doc. 138) and Gavilon Grain, LLC (hereinafter referred to as "Gavilon")(Doc. 140). Plaintiffs filed responses

---

[1] Louis Dreyfus Commodities, LLC, the domestic entity originally named in this suit, recently changed its name to Louis Dreyfus Company, LLC. Additionally, given that Cargill International SA and Louis Dreyfus Commodities BV have not been served, neither participates in the motion to dismiss pending before this Court.

opposing both motions (Doc. 170 &171) and Syngenta[2] also filed a response to the ABCD defendants' motion (Doc. 169). For the reasons stated below, the ABCD defendants' motion to dismiss is **GRANTED** (Doc. 138) and Gavilon's motion to dismiss is **GRANTED** (Doc. 140).

### I. Background[3]

This mass action arises from Syngenta's commercialization of its Viptera brand corn seed containing a genetically modified ("GM") trait known as MIR 162 At the time of its production and distribution prior to the 2011 growing season, MIR 162 was not approved in China. Syngenta claimed the Viptera seeds would increase yields due to improved resistance to insects. Syngenta also developed Duracade, a second-generation of Viptera that includes both MIR 162 and a new GM trait known as Event 5307, which was released, distributed, and sold in 2014.

In recent years, China has been a major export market for American corn. Thus, when the Viptera corn was shipped to China and rejected, it resulted in a swift decrease in the demand for U.S. corn, and in turn, a drop in U.S. corn prices. Plaintiffs also allege that Distiller's Dried Grains with Solubles (DDGS)

---

[2] "Syngenta" collectively refers to defendants Syngenta AG, Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC, Syngenta Biotechnology, Inc., and Syngenta Seeds, Inc.

[3] Because this matter is before the Court on a motion to dismiss, these facts are taken from the complaint and are presumed true for purposes of this motion. The Court further draws all reasonable inferences in favor of the Plaintiff. *See Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 995 (7th Cir. 2014).

were marketed and shipped to China alongside U.S. corn. DDGS are produced when corn is processed into ethanol and is used in animal feed.

The plaintiffs in this case are corn farmers from multiple states who never purchased or knowingly planted Viptera or Duracade brand seeds. Plaintiffs seek to hold Syngenta liable for their losses resulting from the reduced price for their corn caused by Syngenta's release of Viptera into the marketplace. Specifically, plaintiffs allege that Syngenta owed a tort duty – not a contract duty – to act reasonably in the timing, manner, and scope of its commercialization of Viptera timing, manner, and scope of its commercialization of Viptera.

In addition to the claims brought against Syngenta, plaintiffs also allege that the ABCD defendants and Gavilon are at fault based on a "breach of their duties by failing to exercise reasonable care to prevent a foreseeable risk of harm that would naturally result from their improper conduct in the marketing, sourcing, selling, and shipping U.S. corn and DDGS.

The motions to dismiss at issue were previously brought before the United States District Court for the District of Kansas in the related Syngenta multidistrict litigation ("MDL"). In the MDL, which includes eight putative class actions, the plaintiffs asserted claims against the ABCD defendants and Gavilon similar to those brought in this action. However, those claims were recently dismissed by Judge Lungstrum. See *Syngenta AG MIR 162 Corn Lit9ig.*, 14-md-2591, (Doc. 2426).

## II. Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *Gen. Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege sufficient factual matter to state a claim to relief that is plausible on its face." *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015) (quotation omitted). The Supreme Court explained *in Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that a complaint "does not need detailed factual allegations" but must contain "enough facts to state a claim for relief that is plausible on its face." in order to withstand Rule 12(b)(6) dismissal. *Twombly*, 550 U.S. at 570.

Despite *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) retooling federal pleading standards, notice pleading remains all that is required in a complaint. "A plaintiff still must provide only 'enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.'" *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008) (citation omitted). In making this assessment, the district court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *See Rujawitz v. Martin*, 561 F.3d 685, 688 (7th Cir. 2009); *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 625 (7th Cir.

2007). With this in mind, the Court turns to plaintiff's claims against the ABCD defendants and Gavilon.

### III. <u>Analysis</u>

The ABCD defendants and Gavilon, referred to as the "ABCDG defendants", seek dismissal of the claims alleged against them under Rule 12(b)(6). The ABCDG defendants argue that plaintiff' claims against them mirror those asserted by the Phipps' plaintiffs in the MDL and therefore, this Court should apply the same rationale finding that plaintiffs' claims are preempted under the United States Grain Standards Act (GSA). The ABCD defendants also assume for the sake of argument that even if the "fringe theories", put forth by the plaintiffs in their third amended complaint, are not preempted, those claims still fail under Rule 12(b)(6) for failure to allege a duty.[4] The Court will address the arguments in turn.

   a. **Preemption**

The ABCDG defendants argue that plaintiffs' negligence claims against them are preempted by the United States Grain Standards Act (GSA), 7 U.S.C. §§ 71-87k. Plaintiffs, however, argue that their common law negligence claims against the ABCDG defendants fall outside the scope of the GSA's express preemption provision.

---

[4] The ABCD Defendants, not including Gavilon, assume *arguendo* that certain claims are not preempted by the GSA. The Court will address the viability of those three remaining claims in a later section, thus adopting a similar approach to that of the MDL Court.

Congress can preempt state law either expressly, "by enacting a statute containing an express preemption provision," or impliedly. *Arizona v. United States*, 132 S. Ct. 2492, 2500-01 (2012). Here, the ABCDG defendants assert that § 87g(a) of the GSA expressly preempts plaintiffs' negligence claims seeking to impose a duty to inspect, test, describe, and establish separate facilities for corn in order to segregate Viptera corn from non-Viptera. Section 87g(a) of the GSA contains the Act's express preemption provision which states:

> No State or subdivision thereof may require the inspection or description in accordance with any standards of kind, class, quality, condition, or other characteristics of grain as a condition of shipment, or sale, of such grain in interstate or foreign commerce, or require any license for, or impose any other restrictions upon the performance of any official inspection or weighing function under this chapter by official inspection personnel. Otherwise nothing in this chapter shall invalidate any law or other provision of any State or subdivision thereof in the absence of a conflict with this chapter.

See 7 U.S.C. § 87g(a). When determining the scope of a preemption provision, "[t]he question, at bottom, is one of statutory intent," and a court must "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (internal quotation omitted).

Looking to the GSA's preemption provision, it states that "[n]o State ... may require the inspection or description in accordance with any standards of ... quality, condition, or other characteristics of grain as a condition of shipment, or sale, of such grain in interstate or foreign commerce." See 7 U.S.C. § 87g(a).

Under the ordinary meaning of the statute text, the presence of a genetic trait, like MIR 162, qualifies as a characteristic of corn. The GSA preempts plaintiff's negligence claims as they relate to inspection and description requirements, sourcing and segregating requirements, and shipping requirements of the Viptera and dried grains with solubles ("DDGS"). The Court therefore concludes that allowing liability for the alleged breach of these duties by the ABCDG's defendants would, in fact, impose a duty on the part of the defendants that falls squarely within the scope of Section 87g(a).

The GSA includes multiple provisions that support the Court's conclusion. First, Section 74(a) begins with Congress's assertion that "[g]rain is an essential source of the world's total supply of human food and animal feed and is merchandised in interstate and foreign commerce," and that the GSA's regulation of grain and grain transactions "is necessary to prevent or eliminate burdens on such [interstate or foreign] commerce and to regulate effectively such commerce." See 7 U.S.C. § 74(a). Additionally, various other GSA provisions implement the stated purpose of facilitating foreign commerce in trade.[5] As the MDL Court noted

---

[5] See 7 U.S.C.§ 76(d) ("If the Government of any country requests that moisture content remain a criterion in the official grade designations of grain, such criterion shall be included in determining the official grade designation of grain shipped to such country."); § 77(a)(1) (requires the weighing, inspection, and official certificate for shipment of any grain to any place outside the United States); § 77(c) (requires that "all corn exported from the United States be tested to ascertain whether it exceeds acceptable levels of aflatoxin contamination, unless the contract for export between the buyer and seller stipulates that aflatoxin testing shall not be conducted"); § 78(a) (in any sale involving shipment in interstate or foreign commerce, prohibiting use in advertising of description of grade with respect to standards regulated under the Act); § 78(b) ("No person shall, in any sale, offer for sale, or consignment for sale, of any grain which involves the shipment of such grain from the United States to any place outside thereof, knowingly describe

when addressing plaintiff's nearly identical claims, these provisions demonstrate "Congress's intent to regulate foreign commerce in grain" and facilitate and promote grain trade. *In re: Syngenta Ag Mir 162 Corn Litig.*, No. 14-MD-2591-JWL, 2016 WL 1312519, at *3 (D. Kan. April. 4, 2016). Therefore, under the plain language of Section 87g(a), plaintiffs' claims against the ABCDG defendants are preempted as they fall within the scope of the GSA's express preemption provision.[6] The Court adopts the MDL Court's rationale argued by the ABCDG defendants, and rejects plaintiff's interpretation of Section 87g(a).

### b. Plaintiffs' Non-Preempted Claims

The ABCD defendants further argue that any non-preempted negligence claims asserted against the ABCDG defendants fail to establish a state-law duty owed to the plaintiffs. In the third amended complaint, plaintiffs allege that the ABCD companies were negligent in three ways: (1) in encouraging farmers to plant Viptera (or failing to discourage farmers from doing so); (2) in providing poor

---

such grain by any official grade designation, or other description, which is false or misleading"; § 87b(d) ("to ensure the quality of grain marketed in or exported from the United States," prohibiting (A) recombining certain materials once removed from grain with any grain, and prohibiting (B) addition foreign material of any origin to the grain, or recombining of certain material with grain); § 87e(c) (authorizes the Secretary of Agriculture "to monitor in foreign nations which are substantial importers of grain from the United States, grain imported from the United States upon its entry into the foreign nation, to determine whether such grain is of a comparable kind, class, quality, and condition after considering the handling methods and conveyance utilized…"); § 87e(k) (authorizes the Secretary of Agriculture to "extend appropriate courtesies to official representatives of foreign countries in order to establish and maintain relationships to carry out the policy stated in section 74"); §87f-1 (requiring registration with the Secretary of persons in the business of buying, handling, weighing, or transporting grain for sale in foreign commerce).

[6] Based on the Court's conclusions under the express preemption provision of the GSA, the Court need not address the ABCDG defendants' arguments in favor of dismissal based on implied preemption or the Warehouse Act.

customer service to Chinese customers; and (3) in making errors or misrepresentations in paperwork provided to Chinese officials.

The defendants cite to the MDL Court's ruling that disposes of the aforementioned allegations as a matter of generally applicable state tort law. The Court adopts a similar analysis. First, to the extent that plaintiffs are alleging a duty to act with respect to harvested corn, such a claim is preempted by Section 87g(a) of the GSA as discussed in the previous section.

Plaintiffs also assert that the ABCD defendants were negligent in "[d]irecting their crop consultants and corporate representatives or agents to recommend and/or not discourage farmer cultivation of Viptera and/or Duracade," and by "indicating that they would accept Viptera at times when farmers were making planting decisions," (Doc. 65). Plaintiffs argue that the ABCDG defendants breached a general duty of reasonable care and caused harm that was foreseeable given their knowledge about Viptera and Duracade. The ABCDG defendants argue that they owe no such duty to plaintiffs, who did not plant either Viptera or Duracade seeds.

Plaintiffs failed to cite any authority to support an argument that these defendants owe a duty to prevent the harmful conduct by others in the absence of a special relationship with the injured party. Furthermore, plaintiffs have not alleged that the ABCDG defendants had a special relationship with all corn growers sufficient to impose a duty to discourage or to refrain from encouraging

farmers regarding their seed choices. Additionally, plaintiffs do not allege that farmers who themselves planted Viptera and Duracade acted tortuously. Looking to the Restatement (Second) of Torts, Section 876(b) states that a defendant is subject to liability if he:

> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself

This provision in no way addresses conduct by a third party that is not wrongful, nor does plaintiff provide binding authority to support such a finding. Accordingly, the Court dismisses these claims of negligence against the ABCDG defendants.

Plaintiffs next allege that the ABCDG defendants were negligent in "[f]ailing to timely and adequately respond to customer complaints and/or mitigate losses incurred by Chinese purchasers following the rejection of their corn and DDGS shipments in China (for instance by not re-directing contaminated shipments or providing replacement goods promptly), thereby causing Chinese purchasers to source corn and DDGS from locations other than the U.S.". The MDL Court dismissed identical claims on this theory. The MDL Court held that an "alleged duty to keep the Chinese buyers happy, even if not preempted, would not support a cognizable claim" because "plaintiffs have not provided any authority to support a claim based on such a duty to all American corn growers with respect to acts so far down the supply chain." *In re: Syngenta Ag Mir 162 Corn Litig.*, No. 14-MD-2591-JWL, 2016 WL 4382772, at \*6 (D. Kan. Aug. 17, 2016). The same is true in

the underlying action. Accordingly, the Court dismisses these claims of negligence against the ABCDG defendants.

Finally, plaintiffs allege that the ABCDG defendants made misrepresentations in paperwork provided to Chinese officials regarding the presence of MIR-162. As previously determined, any requirement to describe the shipments as Viptera-free would be preempted based on the express preemption provision of the GSA. The Restatement (Second) of Torts § 552 states that in order to allege negligent misrepresentation, plaintiffs must show, that each of the ABCDG companies was in the business of supplying information, that the ABCDG companies negligently "supplie[d] false information for the guidance of others in their business transactions", and that plaintiffs suffered by acting in reliance on that false information. Restatement (Second) of Torts § 552. Plaintiffs fail to satisfy this criterion, as they allege that the ABCD defendants made misrepresentations to their Chinese customers, not the plaintiffs to this action. Also, plaintiffs do not allege that they took certain actions in reliance on the ABCD defendants' alleged statements to Chinese customers regarding shipment contents. Finally, plaintiffs allege that Chinese rejected shipments of corn and DDGS because their tests indicated the presence of MIR 162, not because of a paperwork-related misrepresentation.

As the MDL Court recognized in dismissing claims based on the same allegations set forth in this litigation, "plaintiffs have not stated a plausible claim of causation, as they do not allege plausibly that the buyers would have accepted

the shipments (thus avoiding the alleged impact on the market) if the exporters would have correctly stated that the corn was contaminated with Viptera." *In re: Syngenta Ag Mir 162 Corn Litig.*, No. 14-MD-2591-JWL, 2016 WL 4382772, at *6 (D. Kan. Aug. 17, 2016). The same is true of plaintiffs' claims in this case. Accordingly, any potentially non-preempted negligence claim asserted by the plaintiffs against the ABCDG defendants is legally insufficient. Thus, the Court dismisses all plaintiffs' remaining claims against the ABCDG defendants.[7]

### c. Plaintiffs' Partnership Claim against Gavilon

In addition to plaintiff's claims discussed above, plaintiffs allege that Gavilon is liable for the economic harm resulting from Syngenta's commercialization of the Viptera and Duracade corn based on an alleged legal partnership with Syngenta. Gavilon seeks dismissal of plaintiffs' claims alleging a partnership between itself and Syngenta for failure to state a claim. Specifically, Gavilon argues that plaintiffs fail to allege any facts that plausibly suggest a legal partnership between itself and Syngenta. The Court agrees.

In the third amended complaint plaintiffs allege:

> "At all times relevant hereto, Gavilon partnered with the Syngenta entities in the commercialization of Viptera and Duracade corn. Syngenta has publicly referred to Gavilon as its business "partner" in several news releases and marketing materials. Also, in a joint letter to the North American Export Grain Association ("NAEGA") and the National Grain and Feed Association ("NGFA"), Syngenta represented that the commercialization of Duracade and the "Right to Grow"

---

[7] Based on the Court's ruling above, the Court will not address defendant's arguments regarding personal jurisdiction or the economic loss doctrine.

program was launched "in collaboration with" Gavilon. The letter is personally signed and endorsed by Greg Konsor, Vice President and General Manager of Gavilon Grain, LLC. Under this partnership, Gavilon became responsible with the Syngenta entities for the launch, handling, stewardship, and channeling of Viptera and Duracade corn. Pursuant to the partnership, in addition to other responsibilities, Gavilon accepted Viptera and Duracade grains and provided "stewardship and distribution services" related thereto. Although the Syngenta entities and Gavilon first announced their partnership formally on February 20, 2014 in relation to the "Right to Grow Program," it is the information and belief of Plaintiffs that this partnership business between the Syngenta entities and Gavilon concerning the launch, handling, stewardship, and channeling of Viptera and Duracade corn existed for years prior to the formal announcement, including as early as 2011 when Viptera was first commercialized in the U.S. Further, at all times relevant hereto, Gavilon and the Syngenta entities have shared profits from this partnership business which they own, including revenues generated by the commercialization, marketing, and sale of Viptera and Duracade corn. In September of 2014, Syngenta announced that it "renewed and enhanced its program with Gavilon" and began to offer farmers a "per unit stewardship premium for each bag of Agrisure Duracade corn planted in 2015" and "consultative services through Gavilon to help them appropriately steward and market their corn[.]" Gavilon continues to directly encourage farmers to plant Duracade seed and promote the commercialization of Duracade despite lack of import approval from China, stating that it "plan[s] to grow [its] network of accepting locations."

(Doc. 65, ¶730)(Footnotes omitted). This complaint simply does not allege sufficient facts to state a plausible claim that Syngenta and Gavilon Grain entered into a legal partnership. Although plaintiffs cite that Syngenta and Gavilon Grain referred to each other as "partners" on some occasions, plaintiffs fail to set forth facts supporting such a relationship. Gavilon argues that referencing the word "partner" in business merely indicates that two entities may work together, but this in no way signifies the existence of a legal partnership. The Court agrees that

under the facts alleged, the word "partner" is not sufficient to state a plausible claim that Gavilon Grain and Syngenta were entered into a legal partnership.

A plaintiff must set forth factual allegations or assertions to support the existence of a legal partnership. Although the complaint "does not need detailed factual allegations" it still must contain "enough facts to state a claim for relief that is plausible on its face" in order to withstand Rule 12(b)(6) dismissal. *Twombly*, 550 U.S. at 570.[8] Here, plaintiffs failed to plead adequately the existence of a legal partnership between Syngenta and Gavilon. Plaintiffs cite to Syngenta's 2014 public statements that introduced the "Right to Grow Program", but nothing concrete prior to 2014. Gavilon argues that parties in business often use the word "partner" to indicate "teaming up" or working together, without the relationship signifying the existence of a legal partnership.

The Court rejects the plaintiffs' argument that the pleading requirements require only minimal factual allegations to claim a legal partnership between Gavilon and Syngenta in order to withstand a Rule 12(b)(6) motion to dismiss. Plaintiffs argue that they should be allowed to proceed to discovery to find facts to support their claim of a partnership. However this Court disagrees based on applicable standards set forth in *Twombly*. Plaintiff's third amended complaint includes references to the "Right to Grow Program" to support its partnership allegations. Said program involved commercializing Duracade, which is a seed that came to the market *after* Viptera (in 2014). Therefore, even if the Court

found that the plaintiffs' complaint was sufficient to support a claim that a partnership existed, the facts still do not support a claim relating to Viptera.

Plaintiffs attempt to infer such a partnership existed when Viptera was first commercialized, but offer nothing more than bare assertions as support. Absent facts to support plaintiff's conclusory allegation that a partnership "existed for years prior to the formal announcement, including as early as 2011 when Viptera was first commercialized in the U.S." plaintiffs' allegations are insufficient to support a plausible claim for relief. Plaintiffs argue that Syngenta's announcement of a "renewed and enhanced" program with Gavilon involving the Duracade seed, allows one to reasonably infer that the "Right to Grow Program" existed prior to 2014. However, there are no factual allegations to support a claim that the program went so far back as to include the time when Viptera was commercialized. Furthermore, no factual allegations support the argument that the program's existence translated to legal partnership existed between Gavilon and Syngenta. Thus, plaintiffs' conclusory allegation based on "information and belief" that the partnership also involved the commercialization of Viptera is simply insufficient without facts to support it. Therefore, plaintiff's claim alleging a partnership between Gavilon and Syngenta are dismissed.

### IV. Conclusion

Accordingly, the Court **GRANTS** the ABCD defendants' motion to dismiss (Doc. 138). All claims against Archer Daniels Midland Company, Bunge North

America Inc., Cargill, Incorporated and Louis Dreyfus Commodities LLC are hereby **DISMISSED with prejudice**.

Furthermore, the Court **GRANTS** Gavilon Grain's motion to dismiss (Doc. 140). Therefore, all claims against Gavilon Grain are hereby **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

Signed this 4th day of January, 2017.

Judge Herndon
2017.01.04
09:12:48 -06'00'

**United States District Judge**