## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

-------------------------------------------------------------

**IN RE SYNGENTA MASS TORT ACTIONS**

-------------------------------------------------------------

**Judge David R. Herndon**

**This Document Relates to:**

*Tweet et al. v. Syngenta AG et al.* No. 3:16-cv-00255-DRH

## MEMORANDUM and ORDER

**HERNDON, District Judge:**

This matter comes before the Court on the Motion to Dismiss Consolidated Third Amended Complaint and Motion for Oral Argument, [doc. 137], filed by Syngenta AG, Syngenta Biotechnology, Inc., Syngenta Corporation, Syngenta Crop Protection AG, Syngenta Crop Protection, LLC, and Syngenta Seeds, Inc.[1] Plaintiffs filed their response opposing the motion on October 20, 2016 [doc. 172]. For the following reasons stated below, Syngenta's motion to dismiss is **GRANTED** in part and **DENIED** in part.

---

[1] Defendants Syngenta AG, Syngenta Biotechnology, Inc., Syngenta Corporation, Syngenta Crop Protection AG, Syngenta Crop Protection, LLC, and Syngenta Seeds, Inc. will be collectively known as "Syngenta" or "defendants" for purposes of brevity.

# I.  <u>BACKGROUND</u>[2]

This mass action arises from Syngenta's commercialization of its genetically modified ("GMO") corn trait MIR162, which was sold under the trade name Agrisure VIPTERA™.  Agrisure VIPTERA™, and its second-generation variant containing both MIR 162 and Event 5307, DURACADE™, ("genetically-modified products"), contained multiple genetically enhanced modified traits and were sold for their insect-resistant capabilities.  Syngenta claimed the GMO seeds would increase yields due to the improved resistance to insects.  However, at the time of production and distribution prior to the 2011 growing season, MIR162 was barred for sale in several countries, including China—where it was not yet approved for purchase or consumption.

In 2013, shipments of MIR 162-infused corn arrived in China and were not approved for import and were subsequently rejected.  In recent years, China has been a major export market for American corn.  Thus, when the Viptera corn was shipped to China and rejected, it resulted in a swift decrease in the demand for U.S. corn, and in turn, a drop in U.S. corn prices. Plaintiffs also allege that Distiller's Dried Grains with Solubles (DDGS) were marketed and shipped to China alongside U.S. corn. DDGS are produced when corn is processed into ethanol and is used in animal feed.

---

[2] Because this matter is before the Court on a motion to dismiss, these facts are taken from the complaint and are presumed true for purposes of this motion. The Court further draws all reasonable inferences in favor of the plaintiffs. *See Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 995 (7th Cir. 2014).

The plaintiffs in this case are corn farmers from multiple states who never purchased or knowingly planted VIPTERA™ or DURACADE™ brand seeds. Plaintiffs seek to hold Syngenta liable for their losses resulting from the reduced price for their corn caused by Syngenta's release of the GMO products into the marketplace. Specifically, plaintiffs allege that Syngenta owed a tort duty – not a contract duty – to act reasonably in the timing, manner, and scope of its commercialization of VIPTERA™ to prevent the type of harm that befell plaintiffs.

## II. LEGAL STANDARDS

### A. Personal Jurisdiction under 12(b)(2)

When personal jurisdiction is challenged pursuant to Fed. R. Civ. P. 12(b)(2), plaintiffs bear the burden of establishing personal jurisdiction over defendants. *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014) (citing *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773 (7th Cir. 2003). If the issue of personal jurisdiction is raised by a motion to dismiss and decided on written material rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts. *Id.* The Court must take as true all well-pleaded facts alleged and resolve any factual disputes in favor of the plaintiff. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010).

Illinois' long-arm statute enables personal jurisdiction over a party to the extent allowed under the due process provisions of the Illinois and United States Constitutions. *See* 735 Ill. Comp. Stat. 5/2-209(c) (2016) (courts may exercise jurisdiction on any other basis now or hereafter permitted by Illinois Constitution

and Constitution of United States); *see also Kipp v. Ski Enterprise Corp. of Wisc., Inc.*, 783 F.3d 695, 697 (7th Cir. 2015) (stating governing Illinois statute permits courts to exercise personal jurisdiction up to limits of Due Process Clause of Fourteenth Amendment). The Illinois Constitution's due process and equal protection guarantee — Ill. Const. art. I, § 2 — permits the assertion of personal jurisdiction "when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Rollins v. Ellwood*, 141 Ill. 2d 244, 275 (Ill. 1990). When interpreting these principles, a court may look to the construction and application of the federal due process clause. *Id.* The Seventh Circuit Court of Appeals has suggested that there is no operative difference between Illinois and federal due process limits on the exercise of personal jurisdiction. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 715 (7th Cir. 2002). Therefore, if the contacts between the defendant and Illinois are sufficient to satisfy the requirements of federal due process, then the requirements of both the Illinois long-arm statute and the Illinois Constitution have also been met, and no other inquiry is necessary.

The Due Process Clause of the Fourteenth Amendment limits when a state may assert personal jurisdiction over nonresident individuals and corporations. *See Pennoyer v. Neff*, 95 U.S. 714, 733 (1877), *overruled on other grounds by Shaffer v. Heitner*, 433 U.S. 186 (1977). Under federal due process standards, a court can have personal jurisdiction over a defendant only if the defendant has

"certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)); *uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 425 (7th Cir. 2010) (quoting *Int'l Shoe*, 326 U.S. at 316). The defendant must have purposefully established such minimum contacts with the forum state such that it "should reasonably anticipate being haled into court there," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S 286, 297 (1980), because it has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). In deciding whether exercising jurisdiction offends traditional notions of fair play and substantial justice, the Court may also consider "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." A*sahi Metal Indus. Co., Ltd. V. Super. Ct. of Cal., Solano Cty.*, 480 U.S. 102, 113 (1987).

What personal jurisdiction means in a particular case depends on whether the plaintiff asserts "general" or "specific" jurisdiction. Specific jurisdiction refers to jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum. *Hyatt*, 302 F.3d at 716 (citing *Helecopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn. 8, 9 (1984)). General jurisdiction, on the other hand, may exist even in suits that do not rise out of or relate to the defendant's contacts so long as the defendant has "continuous and

systematic" contacts with the forum state.  *Hyatt*, 302 F.3d at 713; *Helicopteros Nacionales*, 466 U.S. at 416.

**B.  Failure to State a Claim under 12(b)(6)**

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint.  Rule 12(b)(6) permits a motion to dismiss a complaint for failure to state a claim upon which relief can be granted.  *Hallinan v. Fraternal Order of Police Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). The Supreme Court explained in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that Rule 12(b)(6) dismissal is warranted if the complaint fails to set forth "enough facts to state a claim to relief that is plausible on its face."  Notice pleading remains all that is required in a complaint, even though federal pleading standards were overhauled by *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  "A plaintiff still must provide only 'enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.' "  *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008) (citation omitted).

The Seventh Circuit offers further instruction on what a civil action must allege to endure 12(b)(6) dismissal.  In *Pugh v. Tribune Co.*, 521 F.3d 686, 699 (7th Cir. 2008), the Court reiterated the standard: "surviving a Rule 12(b)(6) motion requires more than labels and conclusions"; the complaint's allegations must "raise a right to relief above the speculative level."  A plaintiff's claim "must

be plausible on its face," that is, "the complaint must establish a non-negligible probability that the claim is valid." *Smith v. Med. Benefit Adm'rs Grp., Inc.*, 639 F.3d 277, 281 (7th Cir. 2011).

## III. ANALYSIS

### A. Choice of Law

In a diversity case, the Court applies the choice of law rules of the state in which the district court sits. *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 774 (7th Cir. 2014) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). Illinois follows the most significant relationship test found in the Restatement (Second) Conflict of Laws. *Denton v. Universal Am-Can, Ltd.*, 26 N.E.3d 448, 451 (Ill. App. Ct. 2015). Under Illinois choice of law rules, litigants can also stipulate to which substantive law applies to their case so long as the stipulation is reasonable. *City of Clinton, Ill. v. Moffitt*, 812 F.2d 341, 342 (7th Cir. 187); *see also Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1219 n.6 (7th Cir. 1995).

Importantly, a choice of law analysis is only required when a difference in the laws of the states will affect the outcome of a case. *Denton*, 26 N.E.3d at 451; *see also Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 909 (IL Sup. Ct. 2014) ("a choice-of-law determination is required only when the moving party has established an actual conflict between state laws."). The Court is cognizant that defendants state they cite "exemplar cases for principles of law that apply across the relevant jurisdictions" and that Illinois' most significant relationship applies "in the event of a conflict of laws." Doc. 137-

1 at 36.  In reviewing the motion to dismiss, it is apparent that much of the case law cited and prominently argued is out of Illinois courts or discussing Illinois law.[3]  Additionally, no actual conflicts have been highlighted by the parties between Illinois' and another states' law.  As such, the Court presumes defendants believe, and that plaintiffs agree due to their silence on the issue, that Illinois cases properly serve as "exemplars" of the possible relevant jurisdictions.  Accordingly, Illinois law is applicable and properly representative and the Court moves forward focusing on Illinois law.  As this case involves multiple plaintiffs, to the extent a conflict does arise further on in the litigation, Illinois' most significant relationship test will be utilized to determine the proper states' law.[4]

**B. Personal Jurisdiction is Established Because All of Plaintiffs' Claims Arise Out of and Relate to Syngenta's Minimum Contacts with Illinois**

Defendants do not dispute personal jurisdiction over plaintiffs besides the non-Illinois plaintiffs' group.  Syngenta's primary argument for the dismissal of the non-Illinois plaintiffs' claims is that — under the Due Process Clause — the Court lacks personal jurisdiction to adjudicate, *i.e.*, Syngenta is not subject to general personal jurisdiction, nor specific personal jurisdiction in Illinois for non-Illinois claims brought by non-Illinois plaintiffs.  Regarding specific jurisdiction

---

[3] *See e.g., In re Chicago Flood Litigation*, 680 N.E.2d 265 (Ill. 1997) (in support of application of the economic loss doctrine); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004) (same and used in discussion on proximate cause); *First Midwest Bank, N.s. v. Stewart Title Guar. Co.*, 843 N.E. 2d 327 (Ill. 2006) (using Illinois elements of negligent misrepresentation in arguing why plaintiffs cannot rely on such basis of liability).

[4] The Court notes that the same defendants in the related matter, *Poletti, et al. v. Syngenta, et al.*, 3-15-cv-01221-DRH, also raised Illinois law as exemplar cases for the relevant jurisdictions at issue.  While the Court did not go into as much nuanced detail there, it is a distinction without a difference, as the Court will review the present motion under Illinois law as well.

over the non-Illinois plaintiffs, this Court disagrees. Plaintiffs have sufficiently pled jurisdictional facts showing that the Syngenta defendants purposely availed themselves of the benefits and protections of Illinois laws. Nonresident defendants who "purposefully direct[]" their activities toward a forum create a legitimate basis to exercise personal jurisdiction, *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473-74 (1985) and *Trade Well Int'l v. United Cent. Bank*, 825 F.3d 854, 859 (7th Cir. 2016) ("a district court may exercise personal jurisdiction over any party that purposefully avails itself of the forum"), and plaintiffs have shown that this litigation arises out of and is properly related to defendants' contacts with this forum.

When determining whether personal jurisdiction exists, the Seventh Circuit uses a "quid pro quo" approach to decide whether litigation in a particular forum is reasonably foreseeable. *See uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 430 (7th Cir. 2010). What is important, is that the relationship between the defendants' contacts and the forum be "intimate enough" to keep the quid pro quo inquiry proportional. *Id*. This can be shown by demonstrating that a defendant's contacts were "temporally and substantively related" to the lawsuit at hand. *Id*. at 431. *See also Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779 (1984) (personal jurisdiction is supported when cause of action arises out of the very activity being conducted in the forum state). Here, the Syngenta defendants argue that their contacts with Illinois are not part of the causal chain leading to the

plaintiffs' alleged injuries, thus personal jurisdiction does not stand. The Court is not persuaded by this argument.

Syngenta purposefully directed and conducted substantial business activities in Illinois, which either were a step to, or part of, the commercialization of its GMO products. According to plaintiffs' Third Amended Consolidated Complaint ("CAC"), Syngenta sells seeds in Illinois, uses "Syngenta Seed Advisors" to promote Syngenta products in Illinois, maintains physical facilities in Illinois, and also field tested the genetically modified trait, MIR 162, in Illinois. CAC ¶ 746. Taking the allegations as true, Syngenta's contacts with Illinois include promoting, making, and selling Viptera seeds which led to the alleged contamination of the U.S. corn supply, and also activities which made that commercialization possible in the first place, i.e. field testing the genetically modified trait. Plaintiffs' main cause of action is that Syngenta was negligent in the way it commercialized and marketed Viptera seeds, thus the listed contacts with Illinois are sufficient to demonstrate that Syngenta's Illinois contacts are directly related to plaintiffs' cause of action.

The Court is cognizant of, and takes note of, defendants' arguments relying upon the sister litigation taking place in the United States District Court for the District of Kansas. There, the Honorable Judge Lungstrum presides over the Syngenta multi-district litigation, ("MDL"), dubbed the *In re Syngenta AG MIR 162 Corn Litigation*. In addressing defendants' personal jurisdiction arguments, Judge Lungstrum, on a motion to reconsider, held the court lacked personal

jurisdiction over the non-Kansas plaintiffs. *In re Syngenta AG MIR 162 Corn Litigation*, 14-md-2591, Doc. 2047 at 16-18. While the Syngenta defendants brought comparable defenses against the non-Kansas plaintiffs, the arguments against the non-Illinois plaintiffs are distinguishable. Here, plaintiffs have additionally pled that Syngenta conducted numerous field tests in Illinois, which aided in the eventual commercialization of VIPTERA™, which is the stated underlying basis for all plaintiffs' claims. Defendants' assert that the field tests have nothing to do with plaintiffs' current allegations and that the MDL court held similarly. Doc. 182 at 4, n. 2. However, the passage Syngenta cites to is part of the MDL court's discussion on "Trespass to Chattels" and intermeddling, a claim and issue that are not raised here. As such, the Court finds that defendants' statement overreaches and breathes new meaning into the MDL quotation. The field testing is an important step leading to the commercialization of Syngenta's GMO products, and that, combined with the other Illinois contacts, is enough to satisfy minimum contacts doctrine.

Plaintiffs do not have to prove that Syngenta did all their business activities regarding commercialization and marketing of Viptera seeds in Illinois only. In *M.M. ex rel. Meyers v. GlaxoSmithKline LLC*, plaintiffs sued over congenital birth defects allegedly caused by taking the drug, Paxil. 61 N.E.3d 1026, 1041, *appeal denied sub nom. M.M. v. GlaxoSmithKline LLC*, 65 N.E.3d 842 (Ill. 2016). Specifically, plaintiffs claimed defendants failed to use reasonable care in avoiding injuring plaintiffs. *Id.* Plaintiffs were identified in mother/child pairs, and only

two of the sixteen pairs were from Illinois. Defendants moved to dismiss the out of state plaintiffs' claims based on lack of personal jurisdiction due to claims not arising from Illinois contacts; the non-Illinois pairs did not receive or ingest Paxil in Illinois, did not suffer injury there, and did not serve as Paxil study subjects in Illinois. *Id.* at 1031. Defendants also argued, much like Syngenta's discussion regarding Illinois activities, that plaintiffs could not be correct in establishing personal jurisdiction because they focused only on a "tiny sliver" of Paxil clinical trials, when such trials took place in 44 states and abroad. *Id.* at 1033. The Paxil plaintiffs countered that while they were not domiciled, prescribed Paxil, or injured by Paxil in Illinois, their claims still arose directly out of or related to defendants' purposeful contacts with Illinois, despite similar activity occurring in other jurisdictions. *Id.*

The Appellate court held that the defendants had failed to overcome plaintiffs' *prima facie* showing that they had minimum contacts in Illinois. In addressing defendants' arguments that they did not have enough contacts with Illinois to be meaningful, the court held that plaintiff's injuries arose, in part, from acts of omission during the clinical trials. *Id.* at 1041. It did not matter that a small percentage of the clinical trial took place in Illinois, a plaintiff only has to prove a *proper* place for personal jurisdiction. *Id.* at 1040. And a proper place for personal jurisdiction is when there is a nexus between a defendant's actions and plaintiff's cause of action that does not disrupt the quid pro quo. The Paxil trial court properly highlighted this concern when it asked, "[Am I] trying to figure

out where the best location for this litigation is, or whether or not there's a significant nexus to Illinois?" *Id.* In relying on the *GlaxoSmithKline* case, this Court takes a different approach than the MDL court where that court's focus is on the amount of Viptera seed sales outside of Kansas. *In re Syngenta AG MIR 162 Corn Litigation*, 14-md-2591, Doc. 2047 at 18. This Court, instead, focuses its inquiry on whether those contacts are meaningful. *See GlaxoSmithKline LLC*, 65 N.E.3d at 1041 ("[W]hether Illinois contacts are meaningful depends entirely on their relation to the Plaintiffs' causes of action, and not at all on a percentage-based comparison between how much related conduct occurred outside of Illinois."

After minimum contacts have been established, a court must consider whether notions of fair play and substantial justice would be interrupted by litigating in the forum state. Courts typically consider factors like the burden on the defendant in litigating in the chosen state, the forum state's interest in adjudicating the dispute, and the plaintiff's interest in obtaining relief. *See e.g. Arnold v. Miller*, No. 08-234-DRH, 2009 WL 2020838, at *6 (S.D. Ill. July 9, 2009). Here, Syngenta argues that its contacts with Illinois does not make Illinois an all-purpose forum for all the claims surrounding VIPTERA™.

The Court does not find a substantial burden on the defendants to litigate in Illinois. Given today's "ease of communications and travel capabilities" it is not outrageous to believe a large corporation like Syngenta can accommodate defending itself in Illinois. *Arnold*, 2009 WL 2020838 at *6. Additionally, this

case will go forward in this Illinois forum despite defendants' arguments regarding non-Illinois plaintiffs as jurisdiction is not disputed as to the Illinois plaintiffs. The defendants have not shown how "piecemeal" litigation in different forums advances the goals of "efficient judicial resolution of the dispute." *GlaxoSmithKline LLC*, 65 N.E.3d at 1042. Such splintered litigation raises costs overall while also running the risk of inconsistent verdicts. *Id.* The Court does not believe additional burden will befall defendants when they will already be litigating in this court, thus serving judicial economy. Worth noting as well regarding the "fair play factors," is that Illinois does have an interest in resolving the litigation. This case addresses the alleged consequences felt by contamination of the U.S. corn supply due to Syngenta's claimed negligence in the commercialization of Viptera brand seeds. The creation and commercialization of Viptera seeds is the seminal event relating to the claims of all plaintiffs, Illinois and non-Illinois. The activities performed in Illinois were necessary to produce and promote trait MIR 162. Accordingly, Illinois has an interest in resolving this litigation.

Syngenta's contacts with Illinois gave rise to the claims of all plaintiffs. Therefore, specific personal jurisdiction has been established and all claims are properly before the Court.

## C. The Stranger Economic Loss Does Not Prohibit Plaintiffs' Claims

Notably, Syngenta's arguments regarding the stranger economic loss doctrine have now been made before this Court in the related *Poletti* matter,

before Judge Lungstrum in the Syngenta MDL, and before the honorable Judge Sipkins in the Fourth Judicial District of Minnesota. The Court sees no reason to stray from any of these prior rulings denying application of the doctrine as no new information has been presented by the parties. Nonetheless, the Court addresses the argument below.

The economic loss doctrine, in the most general terms, is a rule that prohibits a plaintiff from recovering solely economic damages under tort theories. *Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69 (Ill. 1982). "The doctrine stems from the theory that tort law affords a remedy for losses occasioned by personal injuries or damage to one's property, but contract law and the Uniform Commercial Code . . . offer the appropriate remedy for economic losses occasioned by diminished commercial expectations not coupled with injury to person or property." *Metro. Water Reclamation Dist. of Greater Chicago v. Terra Found. for Am. Art*, 13 N.E.3d 44, 59 (Ill. App. 1st 2014) (internal citations omitted). The doctrine is most typically applied in the context of a defective product or a contractual relationship between the parties. Syngenta argues however, that plaintiffs' allegations are barred by a discrete, extended form of the economic loss doctrine, the "stranger" economic loss doctrine ("SELD"). The SELD has often been applied in "loss of access" type cases (*see infra*) and can apply when parties have no direct or contractual relationship with one another.

The economic loss doctrine has been analyzed under the pertinent states involved here as catalogued and addressed by the MDL court in its September

2015 order.  Judge Lungstrum ruled that unless the interpretation of a particular state's law essentially *requires* application of the SELD to bar plaintiffs' claims, then the relevant states would not preclude the claims during the early stages of litigation.  *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1196 (D. Kan. 2015); *see id.* at 1196-1207, for examples of why at the motion to dismiss stage, the economic loss doctrine would not be applied with certainty across a wide number of states.  This Court agrees with the MDL court.  Taken as true, plaintiffs' allegations demonstrate that the policy rationales behind the economic loss doctrine (discussed below) would not be furthered by application here and as such, the relevant states would not apply the SELD.  Syngenta's motion to dismiss is denied on this point.

### a. Policy Concerns Underlying Application of the Economic Loss Doctrine are Not Present Here

Despite Syngenta's arguments, the economic loss doctrine is not a bright line rule applied uniformly across the jurisdictions, nor even across economic loss cases.  As case law makes clear, the economic loss doctrine is a continually evolving concept and the policy concerns underlying application of the doctrine do not apply here.  Succinctly, the main policies behind the doctrine are to close off open-ended or "boundless" tort liability that can arise when solely economic losses are sought and to ensure that liability is not far out of proportion to that of a defendant's culpability.  Here however, and as the MDL court explained, the "scope of liability is not completely open-ended, as plaintiffs represent discrete classes of growers and sellers, all in an inter-connected market."  *In re Syngenta*

*AG MIR 162 Corn Litig.*, 131 F. Supp. 3d at 1196. The Court is cognizant of Syngenta's concern that allowing economic effects can expand quickly and "turn Syngenta and other GM manufacturers into insurers with seemingly unlimited tort liability." Doc. 137 at 51 (internal quotations omitted). This unchecked liability defendants are concerned with however, most often accompanies "loss of access" cases, and does not present a threat here.

A "loss of access" case is when a public infrastructure or a public resource is damaged as a result of a tortfeasor's misconduct. Consequently, any member of the public could assert a claim for economic loss, leading to remote and indeterminate liability *disproportionate* to the tortfeasor's culpability. *See, In re Chicago Flood Litig.*, 176 Ill. 2d 179, 198 (1997). These "loss of access" cases represent prime examples for when use of the economic loss doctrine makes sense and furthers the policies behind it. The Court cannot conclude however, that the rationales behind the doctrine would be furthered by application here. "If plaintiffs' allegations are accepted as true, Syngenta is not unfairly being made an insurer for all growers; rather, plaintiffs assert claims to hold Syngenta responsible for particular actions having foreseeable and foreseen consequences." *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d at 1196. *See also, In re Syngenta Litig.*, No. 27-CV-15-3785 (4th Jud. Dist. Ct., Minn. Apr. 7, 2016) ("The scope of liability is not completely open-ended because the claims involve a discrete class of growers and sellers in an interconnected market. Syngenta had the ability to foresee the possible group of Plaintiffs by identifying the

stakeholders involved in the commercialization of its GM seed . . . In addition, because the economic losses were foreseeable, liability is not too remote or open-ended.").

Although Syngenta's potential liability for the wrongful conduct may be large, as the U.S. corn market is a billion dollar market, large damages liability does not equate with boundless liability, as defendants suggest. The Court agrees with plaintiffs and Judge Lungstrum, that the SELD should only be applied if and when the policies of the doctrine are furthered, which they are not here.

### b. Application of the Economic Loss Doctrine in Illinois Case Law

The parties cover some pages discussing Illinois case law, or courts analyzing Illinois law, in support of their economic loss arguments. The Court takes up this discussion of Illinois law as exemplar of the principles at play, and also incorporates Judge Lungstrum's analyses of all applicable states' laws, denying application of the SELD. *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d at 1196.

In *Moorman*, the Illinois Supreme Court articulated three exceptions to the doctrine's general rule that solely economic losses may not be recovered, and following that opinion, more exceptions have been carved out. *See e.g. 2314 Lincoln Park W. Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 136 Ill. 2d 302, 315 (1990) (where the Illinois Supreme Court noted other situations distinguishing *Moorman* and allowed tort actions seeking damages for economic losses to proceed). Specifically, the *2314 Lincoln Park* court noted that in

precluding application of the economic loss doctrine, "the principle common to [Illinois] decisions is that the defendant owes a duty in tort to prevent precisely the type of harm, economic or not, that occurred." *Id*. Because of this, the Court is unpersuaded that the doctrine applies in the same strict manner across the gamut of case types and claims.

In support of application of the economic loss doctrine, defendants discuss *In re Chicago Flood Litig.*, 176 Ill. 2d 179 (1997). *Chicago Flood* is a "loss of access" case and is a classic example highlighting the policy concern of unbounded liability not present here. In *Chicago Flood*, numerous businesses brought nuisance claims after flooding in an underground freight tunnel interrupted electrical service, and thus affected profits of the surrounding businesses. *In re Chicago Flood Litig.*, 176 Ill. 2d at 183-5. The freight tunnel is representative of a public infrastructure open to all the public. In barring plaintiffs' claims via the economic loss doctrine, the court reasoned that the doctrine applied to avoid the virtually limitless tort liability that could develop in such a situation where any entity affected by the flood could bring a claim, *id*. at 207, thus stressing the problem with loss of access cases. Clearly, the plaintiffs in this matter do not exemplify the same public policy concerns as those articulated in *Chicago Flood*. Here, as the MDL court expounded, plaintiffs represent discrete classes of growers and sellers, "all in an interconnected market" and any such injuries resulting to them would not be "disproportionate to Syngenta's specific wrongful conduct." *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp.

3d at 1196. Again, large liability is not the same as limitless liability, despite Syngenta's many pleas to the contrary.

The *Chicago Flood* case is also distinguishable because there, the court did not address whether plaintiffs were owed a duty by the defendant city to prevent the flooding, and whether said duty was breached resulting in the exact damages the duty was designed to prevent. Unique here, plaintiffs allege that Syngenta owed a duty to prevent the exact losses caused to plaintiffs. *See* CAC ¶¶ 829-381. The economic loss doctrine does not typically apply when a duty is owed by the defendant to prevent the precise harm that occurred. *See generally, Nixon v. United States*, 916 F. Supp. 2d 855, 862 (N.D. Ill. 2013) (the ELD is inapplicable where a duty arises outside of contract and the activity is not typically of the type subject to contract); *2314 Lincoln Park W. Condo. Ass'n,* 136 Ill. 2d at 315 ("The principle common to [whether Illinois] decisions [allow exceptions to the ELD] is that the defendant owes a duty in tort to prevent precisely the type of harm, economic or not, that occurred."). Here, it is alleged that Syngenta breached their duty to plaintiff farmers when they failed to exercise reasonable care to prevent the foreseeable contamination of the U.S. corn supply resulting from the premature sales and distribution of its GMO products and failed to provide adequate channeling and stewardship programs. CAC ¶ 830. Thus, *Chicago Flood* is distinguishable from the current facts.

Defendants also cite to *Sample v. Monsanto Co.*, 283 F. Supp. 2d 1088 (E.D. Mo. 2003), as a case directly on point to the facts at hand, yet *Sample* is

also distinguishable.  In *Sample*, for purposes of this discussion, two farmers who grew non-genetically modified soybeans and corn brought claims against defendant Monsanto, alleging negligence and public nuisance theories as a result of Monsanto's introduction of the genetically modified seeds into the market.  *Id.* at 1091.  Particularly, the complaint alleged that crops were contaminated with the genetically modified strands, including by cross pollination and commingling, which ultimately led to the products being boycotted by the European community. *Id.*

As in *Chicago Flood,* the *Sample* plaintiffs did not allege a duty on behalf of Monsanto to prevent the exact type of harm that befell plaintiffs.  Here, plaintiffs allege that Syngenta knew of and foresaw the risks of early commercialization of VIPTERA™ and thereby breached the duty owed in preventing the harm alleged from such actions.  This immediately distinguishes the two matters.  Discussed earlier, there are numerous exceptions to the economic loss doctrine and each encompasses the general understanding that the doctrine does not automatically apply if defendant owes a duty in tort and that duty is negligently breached, resulting in the type of harm the duty is meant to prevent.  *See, e.g., Ward Chrysler Ctr., Inc. v. ADP Dealer Servs., Inc.*, No. 12-CV-32-DRH-DGW, 2012 WL 3526757, at *2 (S.D. Ill. Aug. 14, 2012).  Explained in more detail below, the Court finds that Syngenta owed plaintiffs duties in tort when commercializing the genetically-modified products.  Additionally, *Sample* dealt with public nuisance claims where it was alleged that defendants owed a duty of care to the entire

public, opening up the unchecked liability policy concern. Here, plaintiffs are a finite group, allegedly foreseen by Syngenta.

Thus, the Court agrees with plaintiffs that the economic loss doctrine is not a bar to their claims. Many exceptions exist to the doctrine and the Court concurs with Judge Lungstrum and Judge Sipkins that the doctrine should only be applied when the policies and rationales underlying it would be furthered. Consequently, Syngenta's motion to dismiss is denied to the extent it relies on the economic loss doctrine.

**D. Preemption under the United States Grain Standards Act**

Like the economic loss doctrine arguments, the preemption arguments presented to the Court have largely been addressed by Judge Lungstrum presiding over the Syngenta MDL action. The Court itself has also addressed this matter already in its Order dismissing the "ABCDG" defendants. *See* Doc. 185. This Court held that the United States Grain Standards Act ("GSA") preempts any of plaintiffs' claims as they relate to:

1. Inspection and shipping requirements; and
2. Sourcing and segregating requirements.

Doc. 185 at 7.

The Court acknowledges plaintiffs' extended briefing on the history and legislative intent of the GSA compared to that drafted in the related *Poletti* matter regarding the GSA's application in relation to Syngenta's actions. Nonetheless, under the ordinary meaning of the GSA, MIR 162 counts as a characteristic of corn. Based

on the same reasoning and logic applied in *Poletti*, certain claims concerning

Viptera *corn* are preempted.

> The language of the GSA clearly states that:

> No State or subdivision thereof may require the inspection or description in accordance with any standards of kind, class, quality, condition, or other characteristics of grain as a condition of shipment, or sale, of such grain in interstate or foreign commerce, or require any license for, or impose any other restrictions upon the performance of any official inspection or weighing function under this chapter by official inspection personnel. Otherwise nothing in this chapter shall invalidate any law or other provision of any State or subdivision thereof in the absence of a conflict with this chapter.

7 U.S.C.A. § 87(g).

When determining the scope of a preemption provision, a court "begin[s] with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (internal quotations omitted). Accordingly, if an activity falls within the express language of the GSA, then it is preempted.

Syngenta argues that under the plain language of the Act, any theory under which it had a duty to ensure the "inspection, testing, description, and or segregation or channeling" of Viptera corn, or that it had a duty to force others to do so, is preempted. Doc. 137-1 at 71. Plaintiffs counter that the GSA is not applicable because they have alleged against Syngenta a general duty of reasonable care in the timing, manner, and scope of commercialization of its GMO products, not a specific duty regarding inspection or description of corn.

Plaintiffs contend that Syngenta inappropriately categorizes this general duty into multiple "discrete" duties in attempt to paint plaintiffs' allegations in a different light. Plaintiffs maintain that when their claimed general duty is looked at as a whole, Syngenta could have satisfied the duty in a multitude of ways, not just ways that involved inspection or description of corn. Consequently, under plaintiffs' theory, the GSA would not apply to plaintiffs' claims because preemption is not valid when liability would simply "induce inspection" by Syngenta – it must be the *only* way to avoid liability.

In their Third Consolidated Amended Complaint, plaintiffs claim that Syngenta owed farmers a "duty to provide assistance through either channeling or stewardship programs" and that Syngenta breached that duty by failing to provide "adequate channeling and stewardship programs which could have avoided contamination and commingling." CAC ¶¶ 829-30. To the extent these allegations rest on a duty to ensure that MIR 162 corn is kept segregated from other corn, the GSA preempts such claims. The allegations in the complaint that Syngenta failed to provide adequate channeling programs cannot be perceived to avoid liability in any other way than to inspect and segregate the GMO corn, thus imposing improper State requirements under the GSA. This holding is true whether claims are interpreted to impose a requirement to segregate corn via inspection or description by any entity for trait MIR 162, not just Syngenta. Similarly, any claim that Syngenta had a duty to control others to segregate GMO corn from the U.S. corn supply, or to aid others in facilitating a stewardship program, is

preempted to the extent the duty relates to corn. The GSA preempts any requirement of measures to channel or contain genetically-modified corn and the imposition of a duty to limit sales to those who would take such actions, necessarily imposes that inspection or description of corn take place. It makes no difference under the provisions of the GSA if this duty is placed on purchasers or other third-parties, or the manufacturer – all such claims are preempted as they relate to harvested corn.

As the MDL court recently explained, the "GSA preemption provision does not refer to state-law requirements imposed on any particular actor; thus, the statute preempts any claims based on a requirement of inspection or description by anyone, not just the seeming target of the state law." *In re Syngenta AG MIR 162 Corn Litigation*, 14-md-2591, p. 22 (Doc. 2426). *See also*, *American Trucking Ass'ns, Inc. v. City of Los Angeles, Calif.*, 133 S. Ct. 2096, 2104 (2013), and *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004). Accordingly, the GSA preempts all claims relating to segregation of corn containing the MIR 162 trait. This includes preemption of any and all allegations that Syngenta had a duty to contract with buyers of their product to ensure the inspection or channeling of corn, or any other measures to keep GMO corn isolated. A state law cannot require a seed seller, like Syngenta, to create a regime or stewardship-type program to inspect, describe, or channel genetically-modified corn via contract provisions or agreements with buyers, like grain elevators. To do so would violate the plain meaning of the GSA. Plaintiffs'

arguments that state tort law has long been available to recover financial losses from contaminated grain are misguided here as the cases cited by plaintiffs are distinguishable from the issue presented to the Court. *See* Doc. 172 at 58-60. Succinctly, the cases plaintiffs try to analogize all deal with characteristics of corn that made the product unsuitable for consumption. For example, *Adkins v. Burris Mill & Feed, Inc.*, 644 So.2d 839 (La. App. 1994) dealt with moldy corn that resulted in the death of several horses, *Dougherty v. Lee*, 168 P.2d 54 (Cal. App. 1946) examined poisoned hay that killed multiple dairy cows, and *Tillman & Deal Farm Supply, Inc.*, 246 SE.2d 138 (Ga. App. 1978) discussed corn affected by aflatoxin which killed the plaintiff's hogs. The alleged contamination in this matter is of a different kind than the above authority given that corn containing trait MIR 162 is not harmful to health. Thus, plaintiffs' arguments that defendants' and the Court's view on the GSA would result in a deprivation of a long available form of compensation is unpersuasive given the facts.

Finally, the Court acknowledges, and verifies in its reasoning and holdings above, plaintiffs' contention that the GSA only applies to transactions involving *grain*, not seeds. Again, the GSA applies to Syngenta to the extent plaintiffs' claims apply to *corn*. The MDL court also distinguished this issue and indicated that "preemption of claims based on such duties turns on whether those [segregation] measures relate to harvested corn or to the seeds sold by Syngenta prior to harvesting." *In re Syngenta AG MIR 162 Corn Litigation*, 14-md-2591, Doc. 2426 at 25. Tellingly, the MDL court provided examples of which types of

claims would be preempted. For instance, "any claim based on a duty to assist in the channeling or segregation of *corn* (through contract requirements, education, inspection, or tracing the product through the supply chain) is preempted." *Id.*

Consequently, the Court grants in part and denies in part Syngenta's motion to dismiss as it relates to preemption under the GSA. Any claims that would be preempted under the preceding analysis are dismissed.

## E. FIFRA Preemption

As the Court ruled in *Poletti*, the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") preempts any claims based on a failure to warn farmers about the risk of loss of the Chinese export market. Plaintiffs contend that they have not directly asserted a failure to warn claim, doc. 172 at 86, but in the same breath, state that "*if* Syngenta's FIFRA preemption argument applies to anything at all, it is an exceedingly narrow portion of plaintiffs' claim that . . . could at most impact allegations concerning 'failures to warn farmers concerning the risk of loss of the Chinese market.'" Thus, in addition to any claims preempted under the GSA, certain claims of plaintiffs', to the extent they implicate failure to provide warnings on product labels, are also preempted under FIFRA.[5]

Under FIFRA, labeling requirements extend to any written, printed or graphic matter on, or attached to, the product. 7 U.S.C. § 136(p). FIFRA

---

[5] The Court acknowledges that unlike the complaint filed in the MDL, plaintiffs here have not directly used the magic words, "failing to adequately warn . . ." in their negligence allegations. Nonetheless, the Court believes plaintiffs have essentially asserted that argument in the Negligence subsection by stating that Syngenta knew of the risks of commercializing VIPTERA™ and DURACADE™, including the likely contamination of the U.S. corn supply, which is the claimed reason for the loss of the Chinese export market. Accordingly, the rationale adopted by the MDL court in applying FIFRA is applicable and incorporated here.

preempts any state rule that imposes any requirement for labeling or packaging that is in addition to, or different, than those required under the Act. *See Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 444, n.17 (2005). Under 7 U.S.C. § 136(q)(1)(G), the only labeling requirements imposed on a manufacturer are those to adequately "protect health and the environment." Thus, any implied claim by plaintiffs that Syngenta should have warned about risks associated with growing its products, like the risk of loss of the Chinese market, by placing warning materials on the products' labels, are preempted. Such requirements about potential economic loss are clearly in addition to FIFRA's health and environmental protection concerns. As the MDL court held, "because such warnings [about risks of growing Viptera corn] might ordinarily be included in materials accompanying the products, plaintiffs' complaints do appear to include a claim that seeks to impose a labeling requirement not found among FIFRA's statutory requirements." *In re Syngenta AG MIR 162 Corn Litigation*, 14-md-2591, Doc. 2426 at 36, quoting *In re Syngenta AG MIR 162 Corn Litigation*, 131 F. Supp. 3d at 1208. Even though plaintiffs disclaim they've made any such allegations, the Court "dismisses any claim based on an alleged failure to warn to the extent that such claim is based on a lack of warnings in materials accompanying the products." *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d at 1208.

**F. Syngenta's Arguments That No Duties Existed in Tort are Rejected**

Regarding the enduring claims not preempted under the GSA or FIFRA, the Court agrees with plaintiffs that the remaining allegations have already been extensively reviewed by the MDL court holding that under the ordinary principles of tort law, Syngenta owed a "duty of reasonable care with respect to the timing, manner, and scope of Syngenta's commercialization of its Viptera and Duracade products." 131 F. Supp. 3d at 1188. As such, Syngenta's "no duty" arguments are rejected.

Briefly, plaintiffs charge that Syngenta owed a duty to not create unreasonable risks to others, by refraining from "selling and distributing Viptera and Duracade in a manner that would foreseeably cause harm to the Plaintiffs, [and] to use reasonable care in its commercialization of Viptera and Duracade." CAC ¶ 829. Defendants counter that they cannot be held liable in tort for selling an approved genetically-modified seed within the United States, doc. 137-1 at 94-95, and that a manufacturer has no duty to control post-sale use of its products. *Id*. at 83. When considering whether a duty exists, foreseeability is considered. Here, plaintiffs allege that Syngenta actually foresaw the risks to plaintiffs, CAC ¶¶ 778, 832, in part because the parties had a relationship with each other with defendants even calling plaintiffs "stakeholders." *Id*. at ¶ 758; *see also In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d at 1189. Policy considerations also play an important role in determining whether a duty exists, for example, the expectation of the parties, the magnitude of the burden of

guarding against injury, and whether allowing recovery would have no sensible or just stopping point. *Id.*

The Court is cognizant of Syngenta's concern that foreseeability is not the only requirement regarding duties and that plaintiffs' theory of placing a duty on a seed manufacturer as such, could impose great unchecked liability in the marketplace. As discussed *supra* however, and by Judge Lungstrum in distinguishing away *Hoffman v. Monsanto Canada, Inc. (Hoffman I)*, 2005 SKQB 225, 2005 SK.C. LEXIS 330 (Can. Sask. Q.B. May 11,2005) *aff'd*, *Hoffman v. Monsanto Canada, Inc.* (*Hoffman II*), 2007 SKCA 47, 2007 SK.C. LEXIS 194 (Can. Sask. C.A. May 2, 2007), there is a relationship between the parties here, who all share an interconnected market. *See generally, In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d at 1188-93; *id.* at 1189 ("the Court is not persuaded that recognition of a duty in this case would allow for a recovery that is too remote, or would open the door too much to fraudulent or speculative claims. Nor is the Court persuaded . . . that other policy considerations preclude the recognition of a duty here."). Thus, liability stemming from imposing a duty on Syngenta to take reasonable steps in commercializing its genetically-modified seeds does not create unrestrained liability.

Regarding Syngenta's arguments that manufacturers are routinely not held liable for injuries resulting from third parties' post sale use of non-defective products, the Court disagrees with Syngenta's logic in likening this matter to cases where third parties misused products. *See e.g., Ashley Ctyl, Ark. V. Pfizer,*

*Inc.*, 552 F.3d 659 (8th Cir. 2009), discussing whether liability exists for makers of cold medicine used to create methamphetamine; *Williams v. Cingular Wireless*, 809 N.E.2d 473 (Ind. Ct. App. 2004), rejecting liability on cell phone retailers to prevent car accidents caused by use of cell phones while driving; *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, holding no liability on gun manufacturers for misuse of their products. In those cases, the manufacturers/retailers were not held liable for sale of the products due to the purchasers' misuse or illegal conduct performed with the product. That is not the issue here. Here, there are no allegations against plaintiffs or farmers in general that they somehow misused or improperly planted Viptera or Duracade seeds. Instead, farmers simply planted the seeds in a normal, industry-derived fashion with no intervening event that could be considered "misuse." The focus is not on controlling third parties' activities, but rather on Syngenta's own affirmative conduct in failing to act reasonably in its commercialization of the GMO products. The Court is unpersuaded by defendants' appeal to Judge Lungstrum's order dismissing certain tort claims based on a finding that Syngenta lacked control because that reasoning did not apply to negligence claims, it applied to reject claims like nuisance, strict liability, and trespass. Thus, it is inapplicable here.

It is important to note once again, that any duties Syngenta has in relation to plaintiffs' claims, only apply as the claims relate to *seeds*. The allegations are preempted under the GSA as they relate to corn. Thus, the Court concludes that policy considerations do not warrant that Syngenta did not have a duty to exercise

reasonable care and judgement in its commercialization of VIPTERA™ to avoid risk of harm to plaintiffs. For reasons more fully stated by our sister court in *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d at 1188-93, (discussing factors influencing when a duty is imposed) and incorporated here, the Court denies Syngenta's motion to dismiss based on plaintiffs' negligence claims for lack of a legal duty.

## G. Proximate Causation is Proven

Defendants argue that proximate cause is too remote to prove and that foreseeability does not play a role in determining proximate causation. The injuries alleged by plaintiffs however do prove a connection to Syngenta's conduct and thus, the Court disagrees with Syngenta that plaintiffs' chain of causation is too remote to demonstrate proximate cause.

To start, the Court agrees that Illinois law has established a difference between a "condition" of an event and a "cause" of an event as defendants assert. *See Beretta*, 821 N.E. 2d at 1133. However, despite these assertions and attempts to make distinctions, foreseeability stills plays a big role in determining proximate causation even if a condition v. cause distinction exists. *See id.* at 1133-34, explaining that legal cause is "essentially a question of foreseeability" and that when a party's injuries are claimed to be the result of a subsequent third party, as Syngenta does here, the question is whether "the intervening efficient cause was of a type that a reasonable person would see as a likely result of his or her conduct." (Internal citation omitted). As stated numerous times above, plaintiffs have alleged that their injuries were not only foreseeable, but actually

foreseen by Syngenta.  *See* CAC ¶¶ 778, 756-757; 765; 776.  Thus, the chain of causation is not broken because the acts of the purchasers of the GMO products, i.e. to plant the seeds, were no different than what a reasonable manufacturer would assume as a likely result of their conduct.

Defendants continue that even if foreseeability is shown, conduct can still be too remote to prove legal causation.  Defendants argue that no proximate cause exists because plaintiffs have not shown a "direct relation" between harm and Syngenta's conduct and goes on to create their own causal chain of events they believe plaintiffs have alleged to arrive at their injuries.  Doc. 137-1 at 110.  The Court believes however, that plaintiffs have alleged enough facts to show that Syngenta directly contributed to their injuries, including creation of VIPTERA™, marketing of VIPTERA™, and directions to plant different corn varieties side-by-side, knowing the increased cross-pollination chances.  CAC ¶ 777.  On top of that, numerous of the steps defendants list to demonstrate remoteness have been rendered moot by the Court's Order dismissing the ABCDG defendants.  Doc. 185.  Even if a precise number of steps were needed to avoid a finding of proximate causation, three of Syngenta's six steps are obsolete in face of the dismissal of the various grain elevators and exporters.  Consequently, the Court is not persuaded that proximate causation is lacking.  Defendants' motion is denied on this point.

**H.    Plaintiffs Cannot Rely on a Misrepresentation Theory of Liability to Support Negligence Claims**

The arguments regarding reliance on a negligent misrepresentation theory to support general negligence claims have been brought before the MDL Court and Judge Sipkins of the Fourth Judicial District of Minnesota. Both courts have agreed with Syngenta that there is "no basis for Syngenta's liability based on false representations or omissions of fact[.]" *In re Syngenta AG MIR 162 Corn Litigation*, 14-md-2591, Doc. 2426 at 20. The Court here does the same and defendants' motion to dismiss is granted with respect to the argument that plaintiffs cannot rely on a misrepresentation theory of liability to support their negligence claims.

The elements of a negligence claim differ from what is required to prove a negligent misrepresentation claim - satisfying the former does not satisfy the latter. To properly allege a negligent misrepresentation claim, a plaintiff must show: (1) a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information. *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 843 N.E.2d 327, 332 (2006). In their complaint, plaintiffs claim that Syngenta "misrepresented and deceived industry stakeholders concerning the standing of its petition for deregulation of Viptera/MIR 162 with the Chinese government" and "Syngenta misrepresented to industry stakeholders China's significance as a

purchaser of U.S. corn and corn products." CAC ¶ 777. But, plaintiffs do not allege negligent misrepresentation as a separate cause of action, as plaintiffs agree in their Opposition. Doc. 172 at 107.

Here, the misrepresentations alleged by plaintiffs are in regards to the sale of seeds. Thus, the Court agrees with Judge Sipkins when he held that the purported misinformation was not made to or relied on by the plaintiffs because "the vast majority of Plaintiffs in this litigation did not grow Viptera or Duracade." *In re: Syngenta Litigation*, 27-CV-15-3785-TMS (Order dated 3/31/2017 at 14). Accordingly, Syngenta is correct when it argues that plaintiffs cannot rely on evidence of misrepresentations as a basis of support for their negligence claims because they have not pled facts supporting each element of the higher standard associated with the distinct tort of negligent misrepresentation.

## I. The principle of Res Ipsa Loquitur is not properly applicable in this case

In their complaint, plaintiffs allege claims against Syngenta for negligence, as discussed thoroughly above, and also for *res ipsa loquitur.* Syngenta seeks to dismiss the *res ipsa loquitur* claim, stating it fails as a matter of law because it is merely a theory for proving negligence, allowing the fact finder to infer negligence by circumstantial evidence. Plaintiffs agree implicitly that *res ipsa loquitur* does not provide a basis for an independent cause of action, arguing that the claim is "part and parcel of Plaintiffs' negligence claim – it is one way Plaintiffs' might *prove* Syngenta's negligence." Doc. 172 at 108-9. Accordingly, the separate claim based on *res ipsa loquitur* is dismissed.

Syngenta also argues that because plaintiffs have alleged multiple specific negligent acts, *res ipsa loquitur* is not appropriately applied here. Because concrete, precise negligent acts have been alleged, "the principle of *res ipsa loquitur* is not appropriately applied here, as that principle is intended to apply when a specific act of negligence cannot be shown." *In re Syngenta AG MIR 162 Corn Litigation*, 14-md-2591, Doc. 2426 at 27. The Court agrees with defendants that this is not the type of case in which there is a need to resort to the inference provided by *res ipsa loquitur,* and thus dismisses any theory of negligence based on the doctrine.

A negligent act may be inferred to the defendant under the principle of *res ipsa loquitur*, when:

(a) the event is of a kind which ordinarily does not occur in the absence of negligence;
(b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated; and
(c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

*See* Restatement (Second) of Torts § 328D(1).

In addition to the above, the Court also concludes that the cause/event of plaintiffs' harm "is not of a kind which ordinarily does not occur in the absence of negligence." As the MDL court explained, the textbook example cited for the principle of *res ipsa loquitur* is that of a pedestrian walking on a sidewalk hit by a barrel of flour which fell from an above window. In that case, "it was not known how the barrel escaped from the window, but the event was of a kind that would

not have occurred absent some negligence by someone." *In re Syngenta AG MIR 162 Corn Litigation*, 14-md-2591, Doc. 2426 at 28.

Here, plaintiffs' alleged harm is a decrease in market price for corn due to cross-pollination of non-GMO corn with defendants' GMO products. As Syngenta correctly states, cross-pollination can and does occur without any negligent behavior. Consequently, the injuries plaintiffs complain of are "not of a type that ordinarily does not occur in the absence of negligence, as changes in prices in a commodity market are routinely caused by any number of factors not involving negligence." *Id.* Accordingly, Syngenta's motion is granted with respect to the application of *res ipsa loquitor* in this matter.

## IV. CONCLUSION

IT IS THEREFORE ORDERED BY THE COURT THAT Syngenta's motion to dismiss, Doc. 137, is hereby **granted in part and denied in part**, as set forth herein. The motion is granted with respect to any and all claims preempted by the GSA and by FIFRA. The motion is also granted with respect to the *res ipsa loquitur* claim and any claims based on negligent misrepresentation. The motion is otherwise denied. The request for oral argument is denied as moot.

**IT IS SO ORDERED.**

**DATED:** May 15, 2017

Digitally signed by
Judge David R. Herndon
Date: 2017.05.15
12:11:14 -05'00'

UNITED STATES DISTRICT JUDGE